UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                               :

KIRSCHENBAUM, et al.,            :             09-cv-165 (KBF)
                               :             09-cv-166 (KBF)
                               :             09-cv-553 (KBF)
                       Plaintiffs,       :             09-cv-564 (KBF)
                               :             10-cv-1627 (KBF)
                               :             11-cv-3761 (KBF)
                               :             12-mc-19 (KBF)
                   -v-                :             12-mc-20 (KBF)
                               :             12-mc-21 (KBF)
                               :             12-mc-22 (KBF)
650 FIFTH AVENUE and RELATED    :             13-mc-71 (KBF)
PROPERTIES,                         :             13-cv-1825 (KBF)
                               :             13-cv-1848 (KBF)
                               :
                     Defendants.       :           OPINION & ORDER
                               :
------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

       Before the Court are a number of separate actions (the "Judgment Creditor actions" or "turnover actions") brought by judgment creditors ("Judgment Creditors") of the Government of the Islamic Republic of Iran (the "Government of Iran"). The Judgment Creditors seek to enforce their judgments against property owned by defendants the Alavi Foundation ("Alavi" or the "New York Foundation")[1] and the entity of which it is the managing partner, 650 Fifth Avenue Company (the "650 Fifth Ave. Co." or the "Partnership"). Plaintiffs assert that both entities are

---

[1] "Alavi" is the most recent name of a charitable foundation that has held various names over time, including the Pahlavi Foundation and the Mostazafan Foundation, (GX 75 ¶¶ 1, 3); from time to time, it also was referred to as the "New York branch" of an Iranian Foundation. To minimize confusion, the Court largely to this entity as the "New York Foundation."

the agencies, instrumentalities, or alter egos of Iran.[2]  Each Judgment Creditor

action asserts claims under one or both of § 201(a) of the Terrorism Risk Insurance

Act ("TRIA"), 28 U.S.C. § 1610 note, or § 1610(b)(3) of the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. § 1610(b)(3).  The actions were coordinated for

pre-trial and trial purposes.  After lengthy and highly contentious discovery, a trip

to the Second Circuit and back, and most recently a bench trial, the matter is now

ready for final disposition.  For the reasons set forth below, the Court concludes that

the Judgment Creditors are entitled to a determination in their favor on both

claims.[3]

I.    JURISDICTION

There are two separate bases for this Court's subject matter jurisdiction.  All

Judgment Creditors assert claims pursuant to TRIA.  As the Second Circuit noted

in Kirschenbaum v. 650 Fifth Avenue & Related Properties, § 201(a) of TRIA

provides "an independent basis for subject matter jurisdiction over post-judgment

execution and attachment proceedings against property held in the hands of an

agency or instrumentality of the terrorist party, even if the agency or

instrumentality is not itself named in the judgment."  830 F.3d 107, 132 (2d Cir.

2016).  TRIA § 201(a) "clearly differentiates between the party that is the subject of

---

[2] While these actions seek attachment and execution upon specific property (the "Subject
Properties"), the New York Foundation and the Partnership are herein referred to as "defendants"
for convenience.

[3] As the relief is the same for both claims, there is ultimately no outcome-determinative distinction
between whether a Judgment Creditor asserts a claim under the TRIA, FSIA, or both.  As part of its
determination, the Court also grants the Hegna plaintiffs' order to show cause.  (Show Cause Order
("SCO"), ECF No. 431-32; Am. SCO, ECF No. 21.)  The Hegnas' particular claim is discussed in more
detail herein.

the underlying judgment itself, which can be any terrorist party (here, Iran), and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also 'any agency or instrumentality of that terrorist party.'" Id. at 132 (quoting Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 49 (2d Cir. 2010)).

FSIA § 1610(b) provides a separate basis for jurisdiction for all Judgment Creditor actions (except those brought by the Greenbaum and Peterson plaintiffs, who did not assert such a claim). In September 2014, this Court granted summary judgment on, inter alia, plaintiffs' FSIA claims under § 1610(a)(7) and § 1610(g). (ECF No. 1125.)[4] In 2016, the Second Circuit vacated that decision. Kirschenbaum, 830 F.3d at 122-30. That vacatur left untouched plaintiffs' FSIA claims pursuant to § 1610(b)(3)—a section under which they had asserted claims but had not moved for summary judgment, and to which the appeal did not relate. This Court's May 4, 2017 decision addresses this procedural issue in some detail. (ECF No. 1649.) Indeed, while each Judgment Creditor asserting FSIA claims in a complaint had alleged one pursuant to § 1610(b)(3),[5] plaintiffs' 2013 memorandum in support of summary judgment explicitly stated that the motion was not brought with respect to that provision. (ECF No. 871 at 13 n.13; see also ECF No. 1125 at 44 n.20.)

---

[4] Unless otherwise noted, all ECF citations are to Case No. 08-cv-10934.

[5] The Court addresses defendants' argument that the Heiser Judgment Creditors have not brought a claim pursuant to FSIA § 1610(b) in more detail below.

Accordingly, as discussed more fully in this Court's May 4, 2017 decision, the §

1610(b) claims remain live and are resolved herein.

## II.    PROPERTY AT ISSUE

The property at issue includes:[6]

1. The real property at 650 Fifth Avenue in New York, New York in 650 Fifth Ave. Co.'s name, which was built in the late 1970s;

2. The New York Foundation's interest in the 650 Fifth Ave. Co.;

3. The real property at 2313 South Voss Road in Houston, Texas in the New York Foundation's name, which was acquired in 1988;

4. The real property at 55-11 Queens Boulevard in Queens, New York in the New York Foundation's name, which was acquired in 1991 and 1997;

5. The real property at 4836 Marconi Avenue in Carmichael, California in the New York Foundation's name, which was acquired in 1989;

6. The currently undeveloped real property at 4204 and 4300 Aldie Road in Catharpin, Virginia in the New York Foundation's name, which was acquired in 1990; and

7. The real property at 7917 Montrose Road and 8100 Jeb Stuart Road in Rockville, Maryland in the New York Foundation's name, which was acquired in 1981 and 1984.

In addition, plaintiffs seek to attach and execute on three bank accounts at Sterling

National Bank held in the New York Foundation's name.[7]

Together, the property and bank accounts at issue in this action are referred

to as the "Subject Properties."

---

[6] (See GX 79; PX 50; GX 77.)

[7] (See Trial Tr. 2475:19-2477:1 (Van Driessche).)

III.   PLAINTIFFS' CLAIMS

A chart setting forth the relevant Judgment Creditors' claims is attached as Appendix A to this Opinion.  Following submission of this chart to the Court by the Judgment Creditors, (ECF No. 1811-1), defendants lodged three objections to the information included: (1) that the <u>Hegna</u> Judgment Creditors, who filed a show-cause order rather than a complaint, have not initiated a civil action against defendants in accordance with the Federal Rules of Civil Procedure;[8] (2) that the <u>Heiser</u> Judgment Creditors have not brought an FSIA § 1610(b) claim; and (3) that because the two <u>Greenbaum</u> Judgment Creditor actions stem from the same underlying complaint, Case No. 09-cv-564 (which Assa Corporation ("Assa Corp.") removed from state court on January 21, 2009) should be dismissed.  (<u>See</u> ECF No. 1831.)

The third objection has been resolved.  The <u>Greenbaum</u> plaintiffs filed a consent motion to consolidate the two <u>Greenbaum</u> cases on June 21, 2017, thus mooting defendants' objection.  (<u>See</u> ECF No. 1873.)  The Court granted the motion on June 22, 2017.  (ECF No. 1876.)  Regarding the second objection, the <u>Heiser</u> Judgment Creditors responded to defendants' letter on June 16, 2017, arguing that their complaint refers to FSIA § 1610 generally in several paragraphs, that they have repeatedly asserted FSIA § 1610(b) claims since their action was filed four years ago, and that defendants have repeatedly acknowledged those claims.  (ECF

[8] Defendants, however, did not otherwise object to the content of the chart as it relates to the <u>Hegna</u> plaintiffs.  And in summations, defendants did not address the Hegnas' claims separate from those of the other Judgment Creditors.

5

No. 1851.)  The Court agrees that the <u>Heiser</u> Judgment Creditors have asserted a § 1610(b) claim.

The issue regarding the <u>Hegna</u> Judgment Creditors' action is unique.[9]  The <u>Hegna</u> plaintiffs commenced a proceeding by way of an order to show cause on March 27, 2009.  That show-cause proceeding—resolved as part of this Opinion & Order—seeks overlapping relief with the other Judgment Creditors and on the same bases.  In 2009, there was some initial back and forth before the then-presiding judge, the Honorable Richard J. Holwell, as to whether the Hegnas should be required to file a formal complaint.  By order dated April 16, 2009, Judge Holwell concluded a complaint was unnecessary.  (ECF No. 15 ("After further review of the <u>Hegna</u> plaintiffs' submissions, the Court sees no need for a complaint to be filed . . . .").)  Notably, the nature of the relief sought in <u>Hegna</u> plaintiffs' initial and amended orders to show cause parallels that sought by the other Judgment Creditors.  (<u>See</u> SCO; SCO Mem., ECF No. 431-18; SCO Aff., ECF No. 431-19; Am. SCO.)[10]

The record shows no further discussion or motion practice regarding this issue, and the Hegnas' order to show cause has remained on the docket unresolved.

---

[9] The <u>Hegna</u> Judgment Creditors responded to defendants' letter on June 19 and 25, 2017.  (ECF Nos. 1861, 1887.)

[10] The other Judgment Creditors have argued that the <u>Hegna</u> plaintiffs have asserted a claim with respect to Assa Corp. but not with respect to the New York Foundation and 650 Fifth Ave. Co.  (Trial Tr. 2906:5-12; <u>see also</u> ECF No. 964.)  In fact, the Hegnas' memorandum in support of their order to show cause, which is brought against the Islamic Republic of Iran and the Iranian Ministry of Information and Security, states that they have a "priority judgment lien on all real property and the earnings attributable thereto owned by the Islamic Republic of Iran and/or its agencies or instrumentalities . . . ." (SCO Mem. 3.)

At all times—and for years—the Hegnas participated actively in the litigation alongside the other Judgment Creditors: They were active in discovery, spoke at many conferences (often raising individual points), appealed various rulings, and participated in the bench trial.  In short, while the Federal Rules of Civil Procedure require actions to be commenced with a summons and complaint, it would be manifestly unjust to deny that the Hegnas have a viable claim entitling them to the same relief as the other Judgment Creditors (no more, no less).  And there is no doubt that the other Judgment Creditors as well as defendants have long been on notice of the Hegnas' claims.

As the relief is ultimately the same for both the TRIA and FSIA § 1610(b) claims, there is no distinction between the relief to which any Judgment Creditor is entitled based on whether such plaintiff alleged one or both claims.

IV.    PROCEDURAL HISTORY

In 2014, the Court granted summary judgment to the Judgment Creditors and ordered the turnover of defendants' assets.  (ECF No. 1125.)  Defendants appealed, and, on July 20, 2016, the Second Circuit Court of Appeals reversed and remanded.[11]  <u>Kirschenbaum</u>, 830 F.3d at 117, 141-42.

---

[11] As part of its 2014 decision, this Court granted the Judgment Creditors' motion for summary judgment with regard to the 40% stake of Assa Corp. and Assa Co. Ltd. (collectively "Assa") in the Partnership; Assa did not appeal that decision.  <u>See</u> <u>Kirschenbaum</u>, 830 F.3d at 117 n.1.  Throughout the trial, all parties have repeatedly referenced that this 40% share already has been forfeited (or is otherwise subject to attachment).

Following the Second Circuit's decision, the issues that remain to be decided are whether the Judgment Creditors are entitled to enforce their unsatisfied judgments against the Subject Properties pursuant to TRIA § 201(a) and FSIA § 1610(b)(3).[12]

A. The Trial

The Judgment Creditors' claims were tried to the bench simultaneously with a jury trial in the Government's civil-forfeiture action that began on May 30, 2017. The evidentiary record closed on June 22, 2017, and closing arguments in these turnover actions were held on June 28, 2017. Pursuant to a number of pre-trial orders, the evidentiary record developed during the jury trial was applicable in toto to the bench proceeding. In addition, both plaintiffs and defendants were provided an allotment of time for examination of witnesses they believed necessary for issues specific to the bench trial and were entitled to offer additional evidence. Additional examination of witnesses occurred after a witness's direct and cross examination had been completed in the forfeiture trial, and at the conclusion of the jury trial day. (See ECF No. 1754.)

Both parties conducted additional examination of witnesses, including: Lisa Palluconi, U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"); George Ennis, Special Agent for the Federal Bureau of Investigations ("FBI"); Gholamreza Rahi, former official of Bank Melli Iran ("Bank Melli"); Dan McWilliams, Supervisor Special Agent with the Internal Revenue Service ("IRS");

_____

[12] The parties have stipulated that the unsatisfied portions of plaintiffs' judgments exceed the value of the Subject Properties. (DX 5003.)

Hanieh Safakamal, former employee of the New York Foundation; and Marc Van Driessche, IRS Special Agent. The Judgment Creditors also introduced a number of documents—including stipulations, deposition designations, and other exhibits—in addition to those received during the forfeiture trial.[13]

The parties in the turnover actions submitted pre-trial briefs on the relevant legal issues and made additional evidentiary and legal submissions throughout trial. (See Defendants ("Defs.") Pretrial Statement, ECF No. 1748; Judgment Creditor ("JC") Pretrial Statement, ECF No. 1749.) The Court informed the parties early that post-trial submissions would likely be unnecessary and the Court intended to rule promptly, as is often its practice in bench trials. At various points during trial, the Court encouraged the parties to make any additional submissions on legal or factual issues they believed necessary before closing arguments to ensure the Court was aware of their positions. During the course of the trial, the Court sua sponte raised that, while defendants had asserted a number of affirmative defenses in their answers in these actions, such defenses largely had not been addressed in their pretrial statement; the Court invited further submission on any defenses. (Trial Tr. 1986:9-23; ECF No. 1850.)[14] On June 18, 2017, defendants filed a letter stating that they intended to pursue two affirmative defenses to the TRIA actions: an innocent-owner defense, and a statute-of-limitations defense

---

[13] The parties to the turnover actions were able to fully participate in all motion practice on relevant evidentiary issues—both those that were raised pre-trial and the numerous motions made during the course of trial.

[14] "Trial Tr." citations refer to the jury trial transcript. When referencing the separate bench trial proceedings, the Court will use "Bench Tr." for the citation.

against the claims of the <u>Rubin</u>, <u>Miller</u>, <u>Hegna</u>, <u>Peterson</u>, <u>Acosta</u>, <u>Heiser</u>, <u>Kirschenbaum</u>, and <u>Havlish</u> plaintiffs. (ECF No. 1855.) The Judgment Creditors responded to each of these submissions, (ECF Nos. 1868, 1875), and the <u>Hegna</u> plaintiffs filed their own letter, (ECF No. 1889). Defendants filed an additional submission on June 25, 2017. (ECF No. 1886.)

B. <u>The Jury Trial</u>

As stated above, the Government's civil-forfeiture jury trial proceeded simultaneously with this bench trial. While the evidence overlapped significantly between the trials, the claims at issue were different and the evidence was not identical. The forfeiture trial involved claims that the New York Foundation and the Partnership had violated the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 <u>et seq.</u>, and that they had engaged in various forms of money laundering. In this bench trial, the turnover claims are asserted under entirely separate statutory schemes: FSIA § 1610(b) and TRIA § 201(a). Plaintiffs also seek different relief: attachment and turnover, rather than forfeiture. Defendants have argued that this Court should await the jury verdict—and give it deference—before rendering its own decision in this case. (ECF No. 1824.) Given the particular circumstances here, there is no legal or prudential reason why deference is required or would even be appropriate. That is so irrespective of the jury verdict.[15]

---

[15] This Court has given a great deal of thought to the timing of this decision's issuance. The Court's concern with timing is not based on a need for deference, but rather on the publicity the decision may draw. To avoid media coverage that might come to the attention of a juror in the forfeiture

As an initial matter, there is no legal reason why deference is required. In Matthews v. CTI Container Transportation International Inc., plaintiffs' claims against all defendants except Compania Trasatlantica Espanola, S.A. ("Spanish Lines") were resolved after trial by a jury, whereas its FSIA claims against Spanish Lines were tried to the bench. 871 F.2d 270, 274-75 (2d Cir. 1989). The resolution of plaintiffs' claims tried to the jury "differed in significant respects" from the district court's bench decision. Id. at 274. On appeal, the lack of deference was raised to the jury verdict as a basis for reversal. The Second Circuit disagreed. It held that the district court "was entitled to disregard the jury's fact-finding in reaching [its] conclusions." Id. at 280 (favorably citing Moloney v. United States, 354 F. Supp. 480 (S.D.N.Y. 1972)).

Here, too, the Court reaches its own determinations regarding findings of fact and conclusions of law. The Government brought its forfeiture action, the Judgment Creditors brought their own separate turnover actions, and the elements of the claims differ. As the Court has explained, in the separate civil-forfeiture action, the Government was required to show that defendants committed a forfeitable offense under IEEPA or the federal money-laundering statutes. See

---

action, the Court will issue this decision only once a verdict has been reached or the jury has hung—but will then issue the decision promptly. In short, these cases were tried simultaneously and shall be decided that way.

In this regard, it is worth discussing how the Court has been able to draft a decision of more than 100 pages and issue it immediately, and not have pre-determined the issues before trial. As the parties are aware (the Court announced this a week into trial), the Court took notes on the computer at the bench as the evidence began to come in. These were later converted into findings. The Court also drafted portions of this Opinion at night, early in the morning, and on all intervening weekends during this five-week trial.

Kirschenbaum, 830 F.3d at 121. This involved questions of knowledge, as well as questions of whether—and what—"proceeds" were traceable to either an IEEPA violation or a money-laundering transaction. The Court's jury instructions in that action laid out the necessary findings. By contrast, plaintiffs here were required to show that, inter alia, defendants are an agency or instrumentality of the Government of Iran, or its alter ego. In addition, the evidence in each case, although overlapping, was different.[16] As stated above, the Court heard additional testimony and admitted additional evidence in the Judgment Creditor action.

In addition, the fact that this case featured extensive evidence and was, in certain respects, unusually difficult to follow is another reason that jury deference is not warranted. Each fact-finder may separately weigh the evidence. Challenges included the breadth of the evidence, the number of people and places with multiple names, and the sometimes difficult-to-understand witnesses.[17] In particular, this case had an unusually large number of relevant players whose identities and positions with various organizations were important to understanding the evidence. There were dozens of individuals who had different roles in key events, and there were a number of different entities with names that changed over time; the events in this case spanned more than thirty years. In an attempt to enable the jury to follow the evidence, the Court asked the parties to use a board to display the names

---

[16] At one point, Claimants in the forfeiture action dropped a footnote in a filing about possibly having the jury in that case answer special interrogatories. They never pursued this possibility further and never proposed any particular interrogatories.

[17] On two separate occasions, a juror wrote notes to the Court (which were read to the parties) requesting that witnesses keep their answers short and speak slowly in an effort to better understand them. (Court Exs. 1, 3.)

of the individuals being discussed.  While the parties agreed to this suggestion, it was not immediately taken up.  Only after further prodding by the Court was a board used—but even then, all that was included on the board was a name with no organizational affiliation.  The Court also repeatedly requested that the parties confer on a "players list" to give the jury—similar to that which had been submitted by the Judgment Creditors in the bench trial—with names of relevant individuals, their affiliations, and the dates of those affiliations, along with supporting evidence for those facts.  (See, e.g., Trial Tr. 2058:17-2059:10 (Hesami-Kiche).)  Such a list was only finally available to the jurors during deliberations.  This Court's ability to review the transcript both in real time (with LiveNote at the bench), as well as at the end of each day, enabled it to focus on the factual issues at hand in the Judgment Creditor actions and to render this decision expeditiously.

In short, the facts and circumstances here do not present a situation in which deference to the jury verdict is required.  Issuance of this decision, therefore, proceeds independently.

## V.    FINDINGS OF FACT

The Court's findings of fact are based on its assessment of the preponderance of the credible evidence.[18]

---

[18] There were a large number of individuals who played roles in the relevant issues.  The parties stipulated to the names of the New York Foundation's board of directors (the "Board"), their positions, and the dates they held those positions.  (DX 5004 ¶ 20.)  In addition, attached as Appendix B is a summary chart submitted by the Judgment Creditors that indicates the names and affiliations (with dates) of the most relevant players.  (ECF No. 1883-1.)  The chart incorporated defendants' edits, with the exception of two outstanding objections.  (See ECF No. 1883.)  First, defendants object to IRS Special Agent McWilliams's testimony about Mehdi Faridzadeh (cultural ambassador for the Iran Mission to the United Nations ("U.N.")) on the ground that he lacks

In sum, based on a massive amount of evidence, this Court is firmly convinced—and finds by far more than a preponderance of the evidence—that at all relevant times, the Government of Iran exercised extensive control over the New York Foundation, the 650 Fifth Ave. Co. (of which the New York Foundation is the managing partner), and their Subject Properties. The Government of Iran also has regularly used an Iranian charitable organization operating at different times under different names (referred to herein as the "Iranian Foundation" but also known at times as the "Bonyad Mostazafan" or the "Janbazan" Foundation), as well as a government-owned bank (Bank Melli) as intermediaries through which it exercised control over the New York Foundation, the Partnership, and Assa (the other participant in the Partnership). The New York Foundation has been well aware of its true role and worked to fulfill its true purpose.

Since its establishment, the most significant decisions for the New York Foundation have been made by the Government of Iran, Bank Melli, and the Iranian Foundation. The New York Foundation was able to further the Government of Iran's national purposes by concealing Iranian ownership of property within the United States during a period in which such ownership was perceived as decreasing the rental value of certain property or, later, was prohibited by law. In addition, the New York Foundation was established to further, and has in various ways furthered, the national purposes of the Government of Iran by

_____

personal knowledge regarding Faridzadeh's identity and role. (Id. at 2.) The Court agrees with the Judgment Creditors that McWilliams had sufficient personal knowledge based on his involvement in the investigation as established during his testimony. Second, defendants object to the inclusion of several individuals that the Court does not reference in this Opinion, mooting that objection.

promoting Iranian culture, heritage, language, and religious values in the United States.  In effect, the New York Foundation not only has carried out a charitable mission that has served Iranian interests, but it also has functioned as a real estate holding company, the properties of which grew over time, for the ultimate benefit of the Government of Iran.  The fact that the New York Foundation is registered as a not-for-profit corporation does not prevent such findings or erase such purposes. The corporate form of the New York Foundation has itself been used as part of the concealment apparatus.  Despite nominal adherence to corporate formalities, its independence has—in fact—been a fiction.  These findings are not what this Court considers to be "close calls."  As set forth in the voluminous trial record and only summarized below, they are based on overwhelming evidence.

During the trial, defendants pointed to evidence that, they assert, supports contrary findings: that the New York Foundation's formal incorporation proves its independence; that witnesses testified to its functioning independently from foreign influence; and that the New York Foundation lacked knowledge that it was managing the Partnership for an Iranian entity, Bank Melli, after 1995—and, therefore, could never itself have been an agency or instrumentality.  As discussed at length below, this evidence is not persuasive.  To preview this discussion, there is more than sufficient evidence to demonstrate that the fact of incorporation did not alter the exercise of control by the Government of Iran but, indeed, assisted in preventing discovery of such control; that, when necessary, the New York Foundation created separate minutes of Board meetings, with cleansed versions

used to maintain the fiction of independence; that the New York Foundation has been was willing to lie to regulators and courts about its connections to the Government of Iran, (see, e.g., GX 618 at 8; GX 1403; GX 1409; PX 318); and that there were several significant examples of charitable funds of the New York and Iranian Foundations being deemed interchangeable and used interchangeably, (see, e.g., GX 641-T; GX 643-T; GX 643C-T.)  In addition, because the Government of Iran has selected the Presidents of the New York Foundation and controlled the composition of its Board, even more minor decision-making ultimately has been informed by those loyal, and beholden, to the Government of Iran and its agencies. Put simply, when representatives of the Government of Iran controlled the New York Foundation as Board members, they ran the New York Foundation on its behalf.  That the Board members understood to whom they owed ultimate allegiance was demonstrated by both words and actions.

As the Court discusses in more detail below, over time, the Government of Iran, Bank Melli, the Iranian Foundation, and the New York Foundation became concerned that the Government of Iran's control of the New York Foundation—even through intermediary companies—could have severe consequences vis-à-vis its assets, including forfeiture or loss.  Lawsuits, such as those before this Court, were of particular concern.  A number of documents reference these issues, and reference efforts to find a way to retain the significant assets held by the New York Foundation for the benefit of the Government of Iran through increasing layers of concealment and elaborate denials; resolving these concerns in order to protect

property ultimately held for the benefit of the Iranian people is mentioned. Concerns that the Government of Iran's involvement in the properties would be discovered led directly to an elaborate and multi-layered coverup. For a variety of reasons that changed over time, starting in the late 1980s and continuing for decades thereafter, the Government of Iran—through Bank Melli, the Iranian Foundation, and the New York Foundation—made concerted efforts to conceal the truth of its essential control. As can be reasonably expected of a sophisticated sovereign power concerned about the loss of valuable assets, these efforts were many, varied, and prolonged. And, of course, not every person who played a helpful role in the coverup understood the use (or the full use) to which he/she was being put.[19] Those efforts have included operating through layers of front companies; having straw owners; minimizing an English-language paper trail that could tie control of the entities together; delivering instructions directly when it was perceived to be safe and circuitously when it was perceived not to be; creating a diversionary paper trail designed to give the false impression that the New York Foundation did not know that Assa (its partner in 650 Fifth Ave. Co.) was owned and controlled by Bank Melli (and, therefore, the Government of Iran); creating a diversionary paper trail to give the false impression that the New York Foundation believed the two post-1995 straw owners of Assa (Davood Shakeri and Fatemeh

---

[19] The deposition testimony of Abbas Mirakhor (a former Board member and former employee of the International Monetary Fund ("IMF")), the transcript of which is appended to the jury trial transcript from June 19, 2017, provides an example of this. However, even during the period after 1995 when providing services to the Government of Iran became illegal, Mirakhor understood that the New York Foundation's partner (for whom it was providing services, such as managing the partnership, and to whom it was sending distributions) was Bank Melli Iran, a known agency of the Government of Iran.

17

Aghamiri) were Assa's <u>actual</u> owners; perjuriously denying past and present association with the Government of Iran in a variety of forums, including in court filings and submissions to regulatory agencies; keeping certain members of the New York Foundation's Board or in its employ in the dark; and spending years in a scorched-earth legal strategy that denied the truth and sought to prevent disclosure and loss. All of this has been done by numerous people via numerous channels over many years.

It was only through a prolonged investigation by the FBI and the IRS, with the assistance of the U.S. Attorney's Office, that the truth was pieced together. The amassed evidence has now shown that, in truth and fact and at all relevant times, the Government of Iran has extensively controlled the New York Foundation, the Partnership, and the Subject Properties. The Government of Iran's control will not manifest as an Iranian flag flying over the 650 Fifth Avenue Building or any other Subject Property. But the evidence is there, it is clear, and it is dispositive. The New York Foundation has known who and what it is throughout this time.

A. <u>The Early Years</u>

From the very outset of the New York Foundation, there have been strong connections among all of the relevant entities involved in this drama that have never been severed: between the Government of Iran and the New York Foundation, the Iranian Foundation and the Government of Iran, the Iranian Foundation and the New York Foundation, and Bank Melli and the New York Foundation. These connections have persisted over time.

The Alavi Foundation is the most recent name of a charitable organization that dates back to pre-revolutionary Iran. The last Shah of Iran, Mohammad Reza Pahlavi, started a charitable foundation in Iran called the Pahlavi Foundation of Iran. (GX 75 ¶ 1; Trial Tr. 767:13-768:23 (Shafie).) In the early 1970s, the Shah created an American branch of the Pahlavi Foundation; this became the Pahlavi Foundation of New York, the name of which was later changed to the Mostazafan Foundation of New York and, eventually, the Alavi Foundation. (GX 75 ¶¶ 1, 3.) The Pahlavi Foundation of New York was established as a not-for-profit corporation under the laws of the State of New York and was granted § 501(c)(3) status by the IRS. (Id. ¶ 1; GX 213-T.) The New York Foundation continues to exist as a § 501(c)(3) charitable entity.[20] (GX 75 ¶ 1.)

Since its inception, the New York Foundation has, like its Iranian parent organization,[21] engaged in a variety of charitable works. These include promoting Persian culture and heritage, teaching Farsi, and supporting Muslim educational and religious missions.[22] (Id. ¶ 5.) It also has functioned as a real estate holding company with a growing portfolio of American properties acquired between 1974 and 1997. (See GX 79.)

---

[20] Two adjoining parcels of land in Virginia are, at present, undeveloped. (See Bench Tr. 198:5-15.)

[21] The Court uses the term "parent" not in the sense of a legal corporate parent, but as a relational analogy. As will be discussed extensively in this decision, the Pahlavi Foundation of Iran started as the parent organization of the Pahlavi Foundation in New York, and the parent/child relationship has continued throughout the history of the two organizations.

[22] The Court notes that the charitable works performed by the New York Foundation are real and undoubtedly valuable to many recipients. That fact, however, does not alter the evidence that demonstrates plaintiffs' entitlement to attachment.

In 1974, the New York Foundation purchased property located at 650 Fifth Avenue, New York, New York, upon which it constructed the 36-story office tower (the "Building") that has long been at the heart of this case. (GX 77 ¶ 1.) This acquisition was financed by a $42-million, interest-free mortgage from the New York branch of Bank Melli, a bank owned and controlled by the Government of Iran. (Id.; GX 143; Trial Tr. 769:11-13 (Shafie); id. 1113:8-10 (Rahi).) The loan from Bank Melli paid off an existing mortgage on the property and was used to construct the Building.[23] (GX 77 ¶ 1; Trial Tr. 769:1-10 (Shafie).)

Since the Building's construction, the New York Foundation's primary source of income has been commercial rents.[24] (A very small percent of its income is from other sources.) Until the mortgage was eliminated in 1989, the New York Foundation also made mortgage payments to Bank Melli. As discussed herein, the structure of the New York Foundation's sources and uses of funds raised tax and other concerns with numerous of individuals associated with the Government of

---

[23] The evidence at trial demonstrated that when the mortgage fell into arrears, Bank Melli charged interest on the arrears. (Trial Tr. 1159:10-12 (Karjooravary).) While defendants elicited testimony from individuals who had worked at Bank Melli that the loan was similar to other commercial loans, the preponderance of the evidence demonstrates that it was not. As the Court discusses below, at the very least, the loan was made by one branch of the Government of Iran—Bank Melli—to another—the New York Foundation—to serve the national purpose of acquiring a significant piece of commercial real estate that could generate significant American currency and increase in value as a hard asset. The New York Foundation distributed millions of dollars in proceeds from the Building in U.S. dollars to an entity—Assa—it knew was a front for the Government of Iran's bank; but it also used a portion of the proceeds from the Building to promote Iranian culture and support Iranian students. Thus, collection of the loan in a traditional sense was never required, though undoubtedly desired. Instead, this Court finds that the most reasonable inference is that the primary goal was to obtain U.S. currency, whether through what was referred to as loan payments, or eventually, partnership distributions. The evidence strongly supports the fact that financial decisions regarding how the loan would be treated were made at a political level.

[24] As the Court will discuss, after 1989, the New York Foundation's income was received through distributions from a partnership it established with Bank Melli. (See e.g., GXs 15I-15L.)

20

Iran's political arms, Bank Melli, the Iranian Foundation, and the New York Foundation. These individuals were concerned that the New York Foundation had to pay significant taxes and was deducting taxes payable to the IRS from amounts that would otherwise be paid to Bank Melli. (See, e.g., GX 242-T.) Ultimately, these concerns led to the financial relationship between the New York Foundation and Bank Melli being restructured into a long-term partnership.

But first, the intervening Iranian Revolution created significant changes for the New York Foundation. In 1979, Shah Pahlavi was overthrown in a revolution. (GX 76 ¶ 1.) A new, theocratic government assumed power, and the country was renamed the Islamic Republic of Iran.[25] The Supreme Leader of this government a religious figure, Ayatollah Ruhollah Khomeini. (Id.) The new government confiscated the property of the Shah and the royal family. This included the Pahlavi Foundation of Iran and the Pahlavi Foundation in New York, which subsequently came under the ownership and control of the revolutionary Government of Iran. (Trial Tr. 1719:19-1720:21 (Hesami-Kiche).) Following that confiscation, the Pahlavi Foundation in Iran was renamed the Mostazafan Foundation in Iran—or the Bonyad Mostazafan—by the Ayatollah Khomeini. (Id. 772:2-6, 774:2-17 (Shafie); id. 1707:11-16, 1709:1-5 (Hesami-Kiche).) The Iranian Foundation's New York branch was similarly renamed the Mostazafan Foundation of New York. (GX 75 ¶ 3; Trial Tr. 1720:17-21 (Hesami-Kiche).)

---

[25] The Court refers to the national government of Iran both before and after the Iranian Revolution as the "Government of Iran."

After the Iranian Revolution, the new government's Revolutionary Council passed a "Legal Bill of the Charter of the Oppressed Foundation," dated July 13, 1980, which is similar to articles of incorporation for the Iranian Foundation. (PX 559 at 3, 11-24.) Article Two of the document identified the subject and purpose of the Iranian Foundation as, inter alia, to "centralize all the case, stocks, negotiable instruments, and movable and immovable properties of the Pahlavi family." (Id. at 11.) Article Five provided that the Iranian Foundation "may open a branch or office in any place inside and outside the country as it deems appropriate." (Id. at 13.) The Court finds that the New York Foundation was a branch of the Iranian Foundation.

The Iranian Revolution did not alter the fact that the Government of Iran had ultimate control of the Iranian and New York Foundations. The Government of Iran controlled the Mostazafan Foundation in Iran, which in turn controlled the New York Foundation. The New York Foundation readily took direction from the Iranian Foundation on the most significant matters affecting its operations. In some instances, it took instructions directly from high-ranking political officials of the Government of Iran, including, at times, the Ayatollah himself. Moreover, the history of appointments of Board members to the New York Foundation shows placement of individuals on the Board who also occupied influential positions with the Iranian Foundation and/or the Government of Iran. Other Board members without such official positions were nonetheless beholden to the Iranian Foundation and/or the Government of Iran for their appointments.

The evidence at trial does not support a point in time when the Iranian Foundation and New York Foundations severed relations.  At most, as concerns about discovery of Iranian involvement in the New York Foundation (and, therefore, asset forfeiture or seizure) increased, concealment efforts increased.  Extensive efforts were made—and continue to be made—to conceal and vigorously deny the continuing, close relationship between the Foundations.

Seyed Mojtaba Hesami-Kiche, who gave a first-hand account of the close parent/child relationship between the Iranian and New York Foundations, testified for over two days.  Hesami-Kiche served as the Secretary of the New York Foundation and as a member of its Board from 1983 to 1991.  (GX 607; GX 602-T.)  His affiliation with the Foundations began soon after the Iranian Revolution, when he started working for the Iranian Foundation.  (Trial Tr. 1707:19-20 (Hesami-Kiche).)  The Court found Hesami-Kiche highly credible and extremely knowledgeable as to the New York Foundation's early history and the connections between the Iranian and New York Foundations.[26]  He provided important insight into the background of the New York Foundation as a branch of the Iranian Foundation and its connection to the Government of Iran.

When he started working for the Iranian Foundation, and for some years thereafter, Hesami-Kiche reported directly to its head, Mehedi Tabatabaei.  (Trial

---

[26] Defendants spent significant time attempting to impeach Hesami-Kiche based on the payments and other benefits he received in exchange for assisting the Government's investigation and case.  Ultimately, this evidence does not negatively impact this Court's assessment of his credibility on the material issues as to which he testified.  The majority of his testimony was based on documents, the authenticity of which was not seriously contested.  While defendants lodged a number of foundational objections to these documents, the Court ultimately overruled them because Hesami-Kiche's testimony provided a sufficient foundation.

Tr. 1713:7-13, 1716:13-21 (Hesami-Kiche).) Early in his employment with the Iranian Foundation, Hesami-Kiche was given the responsibility of overseeing the New York Foundation. (Id. 1717:4-12 (Hesami-Kiche).) As part of his oversight responsibilities of the New York Foundation while he was in Iran, Hesami-Kiche interacted with various members of the Board of the New York Foundation, including Mohsen Davachi, Manoucher Shafie, and Sirousse Tabriztchi. (Id. 1725:20-1726:1 (Hesami-Kiche).) At that time, Shafie was President and Davachi was Treasurer of the New York Foundation. (Id. 1727:19-20 (Hesami-Kiche).)

Numerous documents evidence the Iranian Foundation's early, direct control and management of the officers and members of the Board of the New York Foundation. For instance, while he was working in Iran for the Iranian Foundation in the early 1980s, Hesami-Kiche was directed by Tabatabaei (the head of the Iranian Foundation) to replace New York Foundation Board members who had served under the Shah, and to increase the number of Board members of the New York Foundation. (Id. 795:16-18 (Shafie); id. 1729:14-1731:6 (Hesami-Kiche).) Tabatabaei personally identified the individuals who should be added to the Board. (Id. 1729:19-21 (Hesami-Kiche).) He instructed that those to be added include four individuals from the Iranian Foundation: his brother, Mohsen Tabatabaeipour (head of the cultural section of the Iranian Foundation), Hesami-Kiche himself, Abdollah Poosti (deputy of judicial or legal affairs for the Iranian Foundation), and Mohammad Piryandeh (who worked in the cultural section of Iranian Foundation). (Id. 1729:22-1730:12, 1732:222-1734:12 (Hesami-Kiche).) At Tabatabaei's

instruction, Hesami-Kiche called these individuals to inform them of their nomination to the Board of the New York Foundation. (Id. 1730:17-21 (Hesami-Kiche).) There is no indication in the record that these appointments would (or did) require relinquishment of the positions these individuals had with the Iranian Foundation.

The minutes from the May 2, 1983 annual meeting of the New York Foundation's Board corroborate Hesami-Kiche's testimony regarding the Iranian Foundation's direct control over the Board of the New York Foundation. (GX 607.) The minutes indicate that the individuals referred by Tabatabaeipour were in fact put on the Board of the New York Foundation.[27] (Id. at 1, 2.)

Control of the New York Foundation Board occurred not only by arranging its composition, but by active participating in Board meetings. At a subsequent meeting of (nominally) the Board of the New York Foundation that occurred in July 1983, Tabatabaei instructed that Hossein Mahalati[28] would become the new President and Mohammad Badr-Taleh the new Treasurer of the New York Foundation. (GX 608; Trial Tr. 904:13-14 (Shafie), id. 1738:7-8, 1738:19-1739:5 (Hesami-Kiche).) The same minutes also reflect Davachi's and Shafie's resignations

---

[27] Houshang Ahmadi also was added to the Board. At various points in the testimony and documents, this individual was referred to as Houshang Ahmadi and Houshang Ahmadi Javadi. (E.g., GX 601-T.) For convenience, the Court will refer to him as Ahmadi.

[28] At various points, this individual's last name has been spelled Mahallati and Mahalati. For convenience, the Court refers to him as "Mahalati." As will be seen, Mahalati played an important role in covering up the Government of Iran's involvement in the New York Foundation. He eventually sued the New York Foundation, and during that litigation he threatened to reveal its ties to the Government of Iran. He was paid $4 million by the New York Foundation and Assa; a portion of these payments was given to officials in various Iranian embassies worldwide. These events are later described in connection with the Hanif Partnership ("Hanif") litigation.

from the Board of the New York Foundation.  (GX 608 at 4-5; Trial Tr. 1737:11-24 (Hesami-Kiche).)  Shafie testified live at trial and stated that he viewed the composition of the Board of the New York Foundation as lacking independence from the Iranian Foundation.  (Trial Tr. 849:12-20 (Shafie).)

Control of the New York Foundation by the Iranian Foundation was—in effect—control by the Government of Iran.  Ample evidence supports that the Government of Iran itself directed who would become the head of the Iranian Foundation and that the heads of the Iranian Foundation were or had been high-level officials of the Government of Iran.  For instance, in the 1980s, the Government of Iran replaced Tabatabaei with Tahmaseb Mazaheri as the director of the Iranian Foundation.  (Id. 1744:13-21, 1747:6-8 (Hesami-Kiche).)  Later, Mazaheri, yet another high-ranking official in the Government of Iran, assumed a leadership position at the Iranian Foundation.  Mazaheri was placed in this position by the then Iranian Prime Minister, Mir-Hossein Mousavi.  (Id. 1744:19-21, 1747:24-1748:2 (Hesami-Kiche).)  Mazaheri had been the budget planning commissioner for the Government of Iran, (id. 1748:3-10, 1749:8-16 (Hesami-Kiche)), and later became the Minister of Finance and head of the Central Bank of Iran, (id. 1749:23-1750:2 (Hesami-Kiche)).

Hesami-Kiche was still working with the Iranian Foundation at the time Mazaheri assumed its leadership.  Hesami-Kiche informed Mazaheri about the role and activities of the New York Foundation.  (Id. 1750:3-9 (Hesami-Kiche).)  As part of his duties and responsibilities, Hesami-Kiche provided Mazaheri with reports he

received from the New York Foundation. (Id. 1742:6-1744:10, 1750:3-15, 1880:17-1883:5 (Hesami-Kiche).) The Office of the Prime Minister of Iran also received information regarding the New York Foundation, and had an official interest in such information during this time.[29]

While the composition of the New York Foundation's Board continued to shift during the 1980s, it remained firmly under the control of the Iranian Foundation and the Government of Iran. At a meeting of the New York Foundation's Board in December 1983, Poosti (also deputy of the Iranian Foundation's legal or judicial affairs) resigned his position as Secretary of the New York Foundation, and Hesami-Kiche was elected to replace him. (GX 609 at 2-3.) At a Board meeting of the New York Foundation in July 1984, which Hesami-Kiche attended, Mohsen Tabatabaeipour resigned from his position with the New York Foundation and Habib Zobeidi (Deputy of Financial Affairs for the Iranian Foundation) was nominated to serve on its Board. (GX 610 at 3-4; Trial Tr. 1742:3-5 (Hesami-Kiche).)

An important addition to the New York Foundation personnel also occurred at the July 1984 board meeting. At that meeting, Firooznia and Mekul, Certified Public Accountants, P.C., was appointed to be the accountant for the New York Foundation. (GX 610 at 6.) Hamid Firooznia of that firm then became the

---

[29] This finding is based on the involvement of governmental officials in the Iranian Foundation and its oversight of the New York Foundation, as well as Hesami-Kiche's testimony that an individual from the Prime Minister's Office asked him questions about the New York Foundation that were similar to issues addressed in a report Hesami-Kiche had recently received from the New York Foundation. (Id. 1743:22-1744:10 (Hesami-Kiche).)

accountant for the New York Foundation; it appears that, at times, he also acted as the account for Assa. (Trial Tr. 1049:6-7 (Rahi); id. 1255:5-9, 1291:5-7 (Karjooravary); see also DXs 201-226.) Firooznia remained in this position until 2004. (DX 5001.) The evidence demonstrates that, in that position, he had acted as an agent for both entities; he had substantial interactions with the Iranian Foundation, the New York Foundation, Bank Melli, and, eventually, the Assa entities set up as part of a partnership between Bank Melli and the New York Foundation. His actions on behalf of the New York Foundation repeatedly demonstrated that the New York Foundation ultimately was ultimately controlled by the Iranian Foundation and the Government of Iran. (However, as discussed below, the evidence also supports Firooznia continuing to act as an agent for the New York Foundation even after he was its accountant.)

In the 1980s, the New York Foundation continued to build its real estate portfolio, acquiring several pieces of real property. In 1981 and 1984, it purchased property in Rockville, Maryland. (See GX 79; PX 50.) In 1989, it acquired property in Houston Texas. (See GX 79.) And in 1989, it purchased property in Carmichael, California. (Id.)

During this same time period, the Government of Iran was involved in the New York Foundation's decisions regarding its charitable activities. For instance, in an October 1985 letter to Iranian Prime Minister Mousavi, Ali Sabzalian (head of the Interest Section of the Islamic Republic of Iran in Washington ("ISEC")) proposed using the New York Foundation to support activities promoting the

Iranian Revolution in the United States.  (GX 650-T.)  He wrote that the proposal was the result of "lengthy discussions" with, inter alia, the agencies of the Islamic Republic in New York and "persons in charge of [the] New York Foundation."  (Id. at 2 (emphasis added).)  He concluded that, if the Prime Minister agreed to "allocat[e] a budget for the above mentioned issues, and sending to the above mentioned organizations, a detail[ed] and comprehensive plan will be submitted." (Id.)  The trial record also contains several documents related to the involvement of the Iranian Prime Minister's Office—including the direct involvement of Prime Minister Mousavi himself—in donations to Canadian institutions that would be paid by the Foundation.  (GX 641-T; GX 643-T; GX 643C-T; GX 640-T; see also GXs 642-T; GX 633B-T.)  In 1988, Badr-Taleh (the President of the New York Foundation) wrote to Hesami-Kiche (the Secretary of the New York Foundation and still living in Iran), copying Zobeidi (who also held simultaneous positions in both the Iranian and New York Foundations).  (GX 639-T.)  This letter reveals a clear overlap in charitable activities between the New York and Iranian Foundations:

> In order to protect the interests of the Foundation . . . it is not advisable that the management expenses in Canada be paid by [the New York Foundation]. . . .  God forbid if any American Officials get in contact with the afore-mentioned university this issue and anything related to it will be opened and could be used as a weapon against the New York Foundation.  My recommendation is that the Foundation of New York should not accept this plan.  Instead the Mostazafan Foundation in Iran would undertake the project and the expenses be paid from Germany.

(Id. (emphasis added).)

A December 1990 letter from the Office of the President of Iran to Mohsen Rafighdoost (then head of the Iranian Foundation) indicated that the donations

continued.  (GX 633-T.)  That letter referenced donations to McGill University in Montreal and requested that Rafighdoost "confirm the proposal of the institute [at McGill] and instruct to Most[a]zafan foundation of NY to cooperate in amending the contract as per the same rules and conditions but on 5 year[] periods."  (Id. (emphases added).)

B.  Creation of the Partnership

Substantial evidence demonstrates the direct involvement of the Government of Iran and the Iranian Foundation in the creation of the Partnership between Bank Melli and the New York Foundation.  The Government of Iran was on both sides of the transaction and directed both of the entities—the New York Foundation and Bank Melli—to enter into it.  The evidence demonstrates that the New York Foundation knew that the Government of Iran was the primary decisionmaker in this regard; the New York Foundation's representatives received (rather than originated) information regarding the plan, its implementation, and the authorization for its implementation—all from Iranian governmental officials, and primarily through the Iranian Foundation or Bank Melli.  This same evidence also demonstrates that members of the Board of the New York Foundation understood from the formation of the Partnership that its real partner was the Government of Iran.  And, as discussed below, the Partnership was protecting the Government of Iran's financial interests.

For instance, in the late 1980s, a letter addressed to the then Iranian Prime Minister Mousavi—drafted by Zobeidi (who held simultaneous positions with the

30

New York and Iranian Foundations) but signed by Mazaheri (Deputy Prime Minister of Iran and the head of the Iranian Foundation)—set forth an early version of a plan to address concerns regarding U.S. taxes paid by the New York Foundation. (GX 626-T; Trial Tr. 1752:22-1755:15, 1796:3-9, 1797:17-20 (Hesami-Kiche).) The draft letter began: "This is to respectfully inform you that [] one of the major problems of the New York Mostazafan Foundation stems from the debt it owes to the New York branch of [Bank Melli]." (GX 626-T at 1.) Notably, this statement evinces a concern <u>for</u> the New York Foundation, not "because of" it. This distinction is meaningful, as it indicates a concern regarding the stability of the New York Foundation itself; at this time the debt to Bank Melli, while periodically in arrears, was being paid down. One option proposed in this letter was to create a company, the shares of which would be owned by the New York Foundation, with the ownership of the 650 Fifth Avenue Building transferred to that company. (<u>Id.</u> at 2.) Put otherwise, this plan contemplated cancelling the New York Foundation's mortgage by giving it total ownership of the Building through shares in a separate corporate entity. This plan certainly appears to have been driven by concerns about the New York Foundation's well-being more than repayment to Bank Melli. Needless to say, this does not demonstrate an intention to have an arms-length transaction with Bank Melli. This draft refers to a plan having been discussed with Majid Ghasemi (head of the Central Bank of Iran). (<u>Id.</u> at 4; Trial Tr. 1802:22-24 (Hesami-Kiche).)

While this particular plan was not implemented, a version of it was. (Trial Tr. 1813:2-12 (Hesami-Kiche).) Ultimately, more distance than contemplated in the original plan was created between the New York Foundation and the structure that would shield it from taxes through the creation of the Assa companies and a partnership to which the Building was then transferred. That is, layers of companies along with straw owners were eventually used.

The plan to resolve the Bank Melli mortgage continued to evolve. A 1987 English-language document titled "Consent of Directors In Lieu of Meeting" proposed a partnership format to eliminate the tax liability. (GX 611.) In particular, it stated that "a partnership format, with the [New York Foundation] contributing the Building [located at 650 Fifth Avenue] and an investor contributing the necessary capital to discharge the outstanding mortgage debt on the Building, would enable the [New York Foundation] to achieve this desired elimination of tax liability." (Id. at 1.) Early awareness of a desire to conceal Bank Melli's actual participation in the Partnership is demonstrated by this reference in the English-language Board document to "finding" an investor—when it was already known that the investor was Bank Melli, through Assa. Another English-language "Consent of Directors in Lieu of Meeting," dated February 26, 1987, approved the transfer of the Building to a partnership subject to, inter alia, Bank Melli's consent as mortgagor. (GX 612 at 1-2.) An English-language resolution by the New York Foundation's Board from April 1987 reflected that Bank Melli approved the transfer of the Building to the Partnership. (GX 613 at 1-2.) This

document avoids the actual circumstances of the transaction, in which Bank Melli and the Iranian Foundation together, with other Iranian officials, had come up with the plan in the first instance. "Bank Melli" alone, therefore, was not the sole approving party—several Iranian officials and entities were closely involved as well. All of these English-language resolutions contrast with the Farsi-language documents that evidenced how and why the Partnership actually came into existence. This contrast between the behind-the-scenes Farsi documents and the English-language Board documents reveal the misuse of the New York Foundation's corporate form to conceal actual circumstances.

For instance, in November 1987, Hesami-Kiche received a copy of a "confidential" letter that Mazaheri (Deputy Prime Minister of Iran and "Superintendent" of the Iranian Foundation) wrote to Prime Minister Mousavi. (GX 623-T at 1; Trial Tr. 1806:20-1807:9 (Hesami-Kiche).) In this letter, Mazaheri requested that the Prime Minister "make a decision" regarding the plan "to improve the financial problems of the New York Foundation." (GX 623-T at 1 (emphasis added).) The letter indicated that the Iranian Prime Minister's approval was needed in two respects: first, for "[g]eneral agreement with the presented plan, and your permission for its implementation"; and, second, to "[a]llocat[e] forty million dollars in foreign currency for the [New York] Foundation." (Id.; Trial Tr. 1809:10-16 (Hesami-Kiche).) An attached "confidential" response from Hadi Mohajeri (in the Office of the Prime Minister) stated that Prime Minister Mousavi is "agreeable to both suggestions." (GX 623-T at 2.) With the Prime Minister's permission in hand,

Mazaheri then wrote to Ghasemi (head of the Iranian central bank) to let him know that the Prime Minister had approved the plan. (Id.; GX 621-T; Trial Tr. 1801:22-1802:5 (Hesami-Kiche).) In that letter, Mazaheri acknowledged a need for secrecy regarding the Government of Iran's involvement, stating that "in all stages of allocation, executive, payment, as well as in all corresponden[ce] and discussions, confidentiality is of the utmost importance." (GX 621-T.)

Farsi-language minutes of a May 24, 1989 meeting of the Board of the New York Foundation were drafted on the letterhead of the Iranian Foundation. (GX 603-T; Trial Tr. 1826:11-17 (Hesami-Kiche).) Those minutes reflected attendance by Mohammad Hossein Behdadfar, who held a high-level position with Bank Melli and was a straw owner of the shares of Assa, which was created to be the New York Foundation's partner in the 650 Fifth Ave. Co. (GX 603-T; GX 210-T; GX 425 at 4; GX 78 ¶¶ 1-2; Trial Tr. 1829:1-15 (Hesami-Kiche).) Behdadfar is not indicated as an invited guest but is instead mentioned along with all the other Board members. The minutes further reflect attendance by Eisa Sbabsavar Khojasteh[30] (the Deputy Director of Commerce and International Affairs for the Iranian Foundation), Badr-Taleh (President of the New York Foundation), and Mohammad Reza Moghaddasi (it is unclear who he is, but he was not on the Board of the New York Foundation). (GX 603-T; GX 632-T; Trial Tr. 1814:16-17, 1828:23-1824:19 (Hesami-Kiche).) The meeting was held in Khojasteh's offices. (GX 603-T.) These high-level representatives of Bank Melli, the Iranian Foundation, and the New York

---

[30] Khojasteh's name is translated elsewhere as Issa Shahsavar Khojasteh. (GX 632-T.)

Foundation together reached various decisions at that meeting, including that: "Only one company from the Central Bank Melli Iran will partner with the New York Foundation;" "As part of the mutual agreement between the New York Foundation and Bank Melli Iran, the New York Foundation agrees to pay taxes, if the building is sold or transferred;" and "Bank Melli Iran created two partnerships in Jersey Island (illegible) and will cooperate with the New York Foundation or through other partners." (GX 603-T.)

A month after this meeting, Badr-Taleh (President of the New York Foundation) wrote in Farsi to Bank Melli to advise them of increased urgency in reaching a resolution because the New York Foundation's tax-exempt status might well change—requiring a payment of $4 million from Bank Melli in U.S. taxes. (GX 242-T at 2.)

An English-language July 31, 1989 "Consent of Directors in Lieu of Meeting" authorized the New York Foundation to form a partnership subject to the prior consent of, inter alia, Bank Melli. (GX 616 at 1.) Also, on July 31, 1989, the New York Foundation and Bank Melli's newly-incorporated New York company, Assa Corp., entered into the partnership agreement ("Partnership Agreement") that formed the 650 Fifth Ave. Co. under New York State law, and designated the New York Foundation as its managing partner. (GX 125; DX 109; GX 77 ¶ 3.) Assa Corp. is wholly owned by Assa Co. Ltd., a Channel Islands corporation. It is

undisputed that Assa Co. Ltd. is ultimately owned and controlled by Bank Melli.[31]
(GX 78 ¶¶ 1, 6.)  At its annual meeting on August 3, 1989 in Tehran, the Board of
the New York Foundation approved the transfer of the 650 Fifth Avenue Building to
the Partnership.  (GX 617 at 21-22.)  These consents and resolutions concealed that
all pertinent authorizations had already been given by the Prime Minister's Office,
Bank Melli, and the Iranian Foundation.

Pursuant to the Partnership Agreement, the New York Foundation
contributed the Building at 650 Fifth Avenue (then valued at $83.2 million) subject
to the existing mortgage to the 650 Fifth Ave. Co. Partnership.  Assa contributed
$44.8 million, which the 650 Fifth Ave. Co. used to satisfy the Bank Melli mortgage.
(GX 77 ¶ 4.)  In exchange for their respective contributions, the New York
Foundation received a 65% interest in the 650 Fifth Ave. Co., and Assa received a
35% interest in the 650 Fifth Ave. Co.  (Id.)  The 650 Fifth Ave. Co. Partnership
became the 100% title-owner of the Building.  (Id.)  In 1994, the New York
Foundation sold 5% of its interest in the Partnership to Assa.  As a result, the New
York Foundation now holds a 60% interest, and Assa holds a 40% interest.  (Id. ¶ 8;
DX 123.)  Under the Partnership Agreement, the New York Foundation is the
managing partner; 650 Fifth Ave. Co. has no employees of its own.  (GX 77 ¶ 9.)

---

[31] Between 1989 and 1999, Assa Co. Ltd. was itself owned by Harter Holdings Ltd. ("Harter
Holdings") through a front company.  (GX 78 ¶ 2.)  Until 1992, Harter Holdings was held primarily
by two individuals, Behdadfar and Mohsen Kakavand.  (Id.)  Both were prominent officials at Bank
Melli.  (Trial Tr. 1125:20-1126:23 (Rahi).)  In 1993, Behdadfar's and Kakavand's interests in Harter
Holdings were together transferred without material consideration to Bank Melli, where they
remained until 1995.  (Id. ¶ 3.)  In 1995, Bank Melli transferred the shares of Harter Holdings to two
other straw owners, Shakeri and Aghamiri.  (Id. ¶ 4.)  Shakeri and Aghamiri have been the sole
owners of Assa Co. Ltd. since that time.  (Id. ¶ 5.)

Based on the evidence, individuals from Bank Melli, the Iranian Foundation, and the New York Foundation clearly believed that eliminating the Bank Melli mortgage freed the New York Foundation of tax obligations on rental income from the 650 Fifth Avenue Building's commercial tenants, and eliminated the risk that Bank Melli would be subject to a significant tax payment. (Id. ¶ 7.) The Partnership enabled Bank Melli—and the Government of Iran through Bank Melli, as well as the New York Foundation—to conceal ownership in the valuable real estate asset located at 650 Fifth Avenue. As Mohammad Karjooravary (a former Bank Melli official also known as "Karjoo") testified, Bank Melli understood that, as a bank, it was not allowed under U.S. law to hold real estate for more than five years. (Trial Tr. 1266:9-14 (Karjooravary).)

On August 18, 1989, Mohammad Bagherian (then Director of the Iranian Foundation, which at that time had changed its name to the "Islamic Revolution Janbazan ["battle wounded" or "wounded warriors"] Foundation")[32] received a "confidential" letter from Khojasteh (Deputy Director of Commerce and International Affairs for the Iranian Foundation). (GX 632-T at 1; GX 604-T at 1; Trial Tr. 1830:9-17 (Hesami-Kiche).) The letter followed a meeting they attended, along with Kamal Kharazi[33] (who soon would be Iran's Permanent Representative

[32] "Janbazan Enghelab" was the newest name of the Iranian Foundation, but it was still the same organization. (Trial Tr. 1830:5-23 (Hesami-Kiche).) "Janbazan" means "battle wounded" or "wounded warriors" in Farsi. There is no evidence that the New York Foundation ever used that name.

[33] At various points, this individual's last name is spelled Kharazi or Kharrazi. For consistency, the Court uses Kharazi.

(the "Ambassador") to the U.N.) and Badr-Taleh (President of the New York

Foundation) in the office of the Islamic Republic of Iran News Agency. (GX 632-T at

1; DX 5004 ¶ 12.) In the letter, Khojasteh stated that the meeting participants had

agreed to establish:

> [A] Company in the USA that the owner of all its shares to be Vena
> Holding Co., belonging to [the Iranian Foundation].[34] This Company
> from the indirect help[] of Mostazafan Foundation of New York, also
> taking loan from the banks inside of the USA, will purchase some
> residential building for renting to the employees of Islamic Republic
> of Iran Agency Office in the UN, or the individuals that will be
> introduced by [the Iranian] Foundation. Mr. Mahalati, the executive
> director of Elmi Company (which belongs to the [Iranian] Foundation)
> also will act as the executive director of the new Company.

(GX 632-T at 1 (emphases added).) In a handwritten note at the bottom, Bagherian

responded: "I agree. Take the appropriate measures." (Id. at 2.) This plan appears

eventually to have been implemented. M.I.R.I. Holdings ("MIRI") purchased a

building and rented units to employees of Iran's mission to the U.N. through

another entity, Mellon Properties. (Modarres Tr. 72:10-13.)[35] As the Court will

discuss in more detail below, the New York Foundation's Board members interacted

with Mahalati (referred to above) and MIRI in connection with the settlement of the

Hanif litigation.

The next day, Khojasteh (Deputy Director of Commerce and International

Affairs for the Iranian Foundation) sent another letter to Bagherian (Director of the

---

[34] As discussed elsewhere in this Opinion, Vena Holding Co. ("Vena") operated as a front company for
the Iranian Foundation out of Germany. (Trial Tr. 1706:23-24 (Hesami-Kiche) (Vena was "an agent"
of the Iranian Foundation in Germany).) Hesami-Kiche worked for Vena from approximately 1985 to
1995. (Id. 1706:21 (Hesami-Kiche).)

[35] The Modarres deposition transcript is appended to the jury trial transcript from June 20, 2017.

Iranian Foundation) labeled "SECRET." (GX 604-T.) The primary purpose of secrecy in these circumstances was to conceal Bank Melli's ownership of Assa and participation in the Partnership. The letter stated that, "[a]s you know, the partnership agreement between the [New York Foundation] and Bank Melli of Iran has been finalized . . . . The board of trustees of the [New York] Foundation supports the partnership agreement, but to avoid any problems in the future, we would like to ask you to endorse the partnership and notify the trustees so they can take action accordingly." (Id. at 1 (emphasis added).) The Court finds the use of the term "we" indicated Khojasteh's identification of the Iranian Foundation and the New York Foundation, and the phrase "notify the trustees to they can take action accordingly" referenced a need for an instruction to the Board members of the New York Foundation to take all appropriate actions. The letter continued: "Please note that the partnership seems to be based on prior agreements between the Ministry of Finance [of Iran] and Bank Melli Iran, on one side, and the Islamic Republic of Iran Janbazan [battle wounded] Foundation, on the other . . . ." (Id. (emphasis added).)

This same letter supports a finding that the financial aspects of the transaction between Bank Melli and the New York Foundation were based on Bank Melli's available funds—not on an arms-length valuation. (Id.) Attached to the letter is a handwritten note from Bagherian to Khojasteh stating that he agreed to proceed with the Partnership and that it will "be very beneficial." (Id.; Trial Tr. 1833:20-1834:16 (Hesami-Kiche).) He stated that the benefits of not paying taxes means it will "be possible to provide more services to the wounded warriors, as well

as the cultural and educational system." (GX 604-T at 2 (emphasis added); Trial Tr. 1834:12-16 (Hesami-Kiche).) Khojasteh was plainly expressing that the stabilization of the New York Foundation would inure to the benefit of the "wounded warriors" of the Government of Iran and support Iranian national charitable purposes. Another handwritten note from Khojasteh to Badr-Taleh (President of the New York Foundation) stated, "Congratulations." (GX 604-T at 2; Trial Tr. 1834:17-25 (Hesami-Kiche).) The use of the word "congratulations" indicated that Badr-Taleh was a recipient of the authorizations agreed to by others.

Because the transfer of the Building involved the transfer of all or substantially all of the assets of a New York registered charity, the New York Foundation had to obtain court approval. (See GX 618.) In its submissions to the court for such approval, the New York Foundation deliberately concealed Bank Melli's role in the transaction and the Partnership. For instance, paragraph nine of the petition to the Supreme Court of the County of New York stated that the transfer between Assa and the New York Foundation was an "arms-length transaction." (Id. at 8.) This was false: The transfer was in fact designed by the Government of Iran, and all pricing terms had been determined by the Government of Iran and its instrument, Bank Melli.

In response to their submissions, the Attorney General for the State of New York requested further information from the New York Foundation's attorney regarding the identity of the officers, directors, and principals of Assa, and any statement of personal or business relationships between those persons and the New

York Foundation. (Id. at 80.) On September 25, 1989, the New York Foundation's attorney responded by stating that, "[t]o the best of [her] knowledge, there were no pre-existing agreements or understandings between any director, officer or principal of ASSA Corp. and the Foundation." (Id. at 83.) This statement was plainly untrue as there was an understanding that Assa would act for Bank Melli, and that the Government of Iran would ultimately call the shots. Around this time, the President of the New York Foundation (Badr-Taleh) had told the Secretary of the New York Foundation (Hesami-Kiche) that he understood that Bank Melli was the 100% owner of Assa. (Trial Tr. 1840:18-1841:8, 1846:1-5 (Hesami-Kiche).)

In November 1989, after the Partnership Agreement had been signed, Badr-Taleh (President of the New York Foundation) wrote to Kazem Najafi-Elmi (Director General of Bank Melli Iran) to report that he was "happy to inform [him] that the matter of partnership of ASSA Company and [the] Foundation of New York in the ownership of the building number 650, Fifth Avenue, New York, has been completed and effective the beginning of the month of November 1989. ASSA Company shares 35 percent of the ownership of the building and naturally the same amount of the building's income and costs." (GX 210-T at 1.) The letter further stated:

> Undoubtedly, the course of action for partnership, which took close to 4 months, would not have been feasible at all without the cooperation and assistance, both in ideas and actions, of the brothers, specially dear brother Mohammad Hossain Behdadfar, the international vice president of the bank, and the unceasing cooperation of dear brother Mohammad Karjoo, the director of the New York branch. In all fairness, these two brothers did not refrain from anything in protecting the rights and interests of the Islamic Republic. . . . [They]

<u>also help[ed] the Islamic Republic</u> with their commitment, sense of responsibility, creativity and devotion.

(<u>Id.</u> (emphasis added).)  The Court finds that the reference to "creativity" in this letter is a reference to the use of Behdadfar as a straw owner of an off-shore entity (Assa) that would hold the Bank Melli shares in the Partnership, and would obscure the Bank's or the Government of Iran's direct involvement.  This letter also reflected the Partnership was expected to benefit the Government of Iran itself.

Karjooravary, who was Director (and, briefly, Deputy Director) of Bank Melli New York during the period from 1986 to 1994, testified live at trial.[36]  (Trial Tr. 1150:9-11, 1154:5-1155:5 (Karjooravary).)  In February 1990, Karjooravary wrote to Gholamreza Rahi (Director of Bank Melli's Overseas Network Supervisory Department ("ONSD" or "Melliabroad")), which monitored the activities of overseas branches of Bank Melli).  In this letter Karjooravary explained:

> In fact the settlement of the $42,000,000 loan was done for two important reasons.  The first reason was the delay in payment of the loan installments and inability of the [New York] Foundation to repay the loan.  The second reason was the [New York] Foundation's tax problem, specifically—because the Foundation's principal was mortgaged, and from the IRS point of view was not exempt from paying taxes like other non-profit organizations—the [New York] Foundation had to pay $3,000,000 annually in property taxes out of the rental income of the building, which is the collateral for the above-mentioned loan.  As a result, instead of this amount being paid to the bank, the Foundation had to pay the same exact amount to the IRS.

---

[36] The Court found that when Karjooravary testified he showed concern that he not appear to assist the Government's case.  He provided credible testimony when documents already reflected points the Government (which was conducting the direct examination) sought to make, but he would have odd lapses of memory when asked pointed questions on certain topics damaging to the Government of Iran's interests.  He was demonstrably more at ease on cross examination and readily agreed to any leading question (and virtually all were leading) put to him.  The Court is skeptical that the testimony elicited on cross examination reflected Karjooravary's considered recollections.

> Therefore, to solve the problem of this loss for the bank and the [New York] Foundation, many plans were considered. . . . In this context, after ample study at the New York Foundation, the Central Office of the Foundation, and Bank Melli in Tehran, it was decided to form a company called Assa Channel Islands which would be financed by the bank and under direction of Mr. Behdadfar and Mr. Kakavand.

> The establishment of this company <u>was announced to</u> the Foundation in New York . . . .

(GX 161-T at 1 (emphasis added).) This letter is further evidence that the decision-making for the Partnership occurred among individuals and entities other than the Board of the New York Foundation.

Rahi also testified live at trial.[37] He testified that "the bank" referred to Bank Melli Iran, and that the "Central Office of the Foundation" meant the Iranian Foundation. (Trial Tr. 1057:3-6, 1057:23 (Rahi).) The Court finds that this testimony further supports a determination that the Iranian Foundation was the parent of the New York Foundation. In the same letter to Rahi, Karjooravary recommended the appointment of an accountant to act on behalf of Assa but said that, in the meantime, "it can be managed under the supervision and authorization of the Central Office [of Bank Melli] to avoid paying extensive fees until we find a better solution for managing the company." (GX 161-T at 2.)

On August 9, 1990, Karjooravary sent a telex to the ONSD, (Trial Tr. 1253:8-19 (Karjooravary)), the organization of which Rahi was then Director (he later became Director of Bank Melli's New York branch). The telex further confirmed the

---

[37] Rahi also demonstrated nervousness on direct and an anxiousness on cross to please and respond readily to virtually any question.

intentional concealment of Bank Melli's interest in the Partnership. The telex stated:

> Since the current attorney of ASSA Company knows the current bank official, it was deemed appropriate that another person would be appointed on the surface. Due to conflict of interest, Mr. Badr and Mr. Firooznia too cannot be appointed as the representative. Since appointing anyone else in New York required us to fully inform him of the nature and the status of the ASSA Company, it was decided that someone from the central office should be determined for this role . . . .

(GX 714-T.) Karjooravary testified that "central office" here meant the central office for Bank Melli. (Trial Tr. 1257:9 (Karjooravary).) Badr-Taleh and Firoonia were perceived as having conflicts of interest because of their work for the New York Foundation. Karjooravary testified that, because Firnooznia already was the independent auditor of the New York Foundation, he had a conflict of interest. (Id. 1256:19-22 (Karjooravary).) The conflict of interest was not of concern to Bank Melli—which was effectively already on all sides of the transaction—but would be from the anticipated perspective of U.S. officials or regulators.

A representative of the supervisory department of Bank Melli wrote a telex to Karjooravary on August 27, 1990. (GX 154D-T; Trial Tr. 1259:12-14 (Karjooravary)). This telex further supports Badr-Taleh's firsthand knowledge that Assa was owned by Bank Melli. The telex stated that it was to inform Karjooravary:

> [A]ctions are being taken regarding the official transfer of the Harter Holding Co. shares [the shares of Assa, owned by Harter Holdings] as well as a change in its management and that of Assa Channel Islands. Therefore, in conjunction with Mr. Badr's views and his preference for announcing the change of management in the company by Mr. Behdadfar via an attorney, I would like to ask you to please

immediately obtain the opinion of related consultants, prepare an applicable text in this matter, have it signed by Mr. Behdadfar with the approval of the associated attorney, and then telex it."

(GX 154D-T (emphasis added).)  This statement also indicates that Badr-Taleh understood the nature of Bank Melli's involvement: Behdadfar was a high-level official of Bank Melli.  Handwriting on the telex stated that, "regarding Assa Corp., the matter was discussed with Mr. Badr and it was agreed to send the text accepted by the attorney to this agency to be reported via telex."  (Id.; see also GX 154C-T.)

A few days later, Karjooravary wrote to Rahi (Director of Bank Melli's ONSD).  (GX 163-T; Trial Tr. 1263:1-12 (Karjooravary).)  The telex stated:

> [F]ollowing telex # 1781 regarding Assa Corp, we would like to inform you it appears with formation of Assa Corp. NY there will be no problem transferring the shares of Assa Channel Islands and/or the mother company to Bank Melli.  This matter was also discussed with Mr. Firooznia [the New York Foundation's accountant] and he didn't see a problem regarding the transfer because, basically, all that is needed is to execute a general change of ownership and not mention the name of the new owner to the lawyers of Assa Corp of New York. Of course in this manner the transfer of the shares to the bank's name could be done much easier, without mentioning the bank name, if Assa Channel Islands was established with other company.
>
> Therefore, we suggest you ask Mr. Behdadfar to transfer the related shares to the bank's name, inform the Assa Corp lawyers about the facts and circumstances of the transfer without mentioning the bank's name, and send them the introduction to the new directors in accordance with the suggested text of message #1781 dated 08/28/1990.  We hope that with his resolve and desire to protect the interests of the bank and the treasury, he can take action to stabilize the issue of Assa Corp as soon as possible.  God willing, he can arrange for necessary changes to bring more gains and profits before the deadline for filing the tax declaration letter for the first year of company's establishment.

(GX 163-T (emphases added).)

45

Karjooravary had a number of interactions with Board members of the New York Foundation. He testified that he understood the New York Foundation did not want the name of Bank Melli to be associated with the Building because it might impact rental opportunities or values. (Trial Tr. 1264:9-1265:20 (Karjooravary).) Having such an understanding was important to the execution of Karjooravary's duties and responsibilities because he acted as a point of contact between Bank Melli and the New York Foundation.

Karjooravary's testimony also supports the unique nature of the Partnership itself. According to Karjooravary, he was unaware of another instance in which Bank Melli satisfied a loan by way of a transaction in which offshore companies were created to own shares in a partnership. (Id. 1674:3-11 (Karjooravary).)

In late September 1990, Karjooravary wrote a telex to Siavash Naghshineh (Executive Vice President of Bank Melli). (Id. 1277:1-18 (Karjooravary).) Karjooravary's statements demonstrate an understanding that the New York Foundation knew perfectly well that Bank Melli was its true partner:

> Following message #1784 dated 08/31/1990 regarding the transfer of the Assa Channel Island shares of the mother company to the bank and the introduction of new directors: I beg to inform you that Mr. Firooznia contacted the bank today and informed them that he has collected the necessary documents to stabilize Assa Corporation's situation. He is now waiting to receive the paperwork from Assa Corp for a final decision. He was worried that it may not be possible to file the declaration letter for Assa Corp for the first year, as well as any necessary changes in the amount of cash and the loan investment, due to not having enough time to file. In any case, he will present the collected information to this agency in the next week for submission to the Central Office. . . . The only pressing items to be completed are those concerning the mother company, namely the ownership transfer and the introduction of the new directors as well as a

representative who can receive the Assa Corp documents; expediting these matters will entail meeting many requirements.  <u>Mr. Badr doesn't see any problem regarding the transfer of the mother company's ownership or think it will pose an issue to the partnership status; his understanding has always been that the ownership of the mother company was with Bank Melli.</u>

(GX 164-T (emphasis added).)

Assa's American lawyers also must have known of the continued involvement of Bank Melli in the Partnership.  (<u>See</u> GX 425-T; GX 425 at 20.)  On December 2, 1990, Naghshineh (Executive Vice President of Bank Melli) advised Peter Livingston (Assa's American lawyer) that "[i]f you have any queries you may also contact Mr. Badr Taleh of the [New York] Foundation, whom we met recently and kindly accepted to deliver this letter, as well as Mr. Behdadafar's letter to you."  (GX 425 at 21-22.)

On December 14, 1990, Karjooravary wrote to Rahi (Director of Bank Melli's ONSD), stating, "[r]espectfully, per today's telephone conversation, and <u>after our meeting and our consulting sessions in the presence of Misters Badr Taleh, Firooznia, and Livingston</u>, please find the following matters for the information and guidance of the Bank's esteemed management."  (GX 165-T at 2 (emphasis added).)  It noted the "positive actions of Misters Badr Tale[h] and Firooznia."  (<u>Id.</u> at 3.)  And it went on to state that, "due to Mr. Firooznia's knowledge of the general partnership issues, the fact that he is Iranian and it is easier to discuss various financial problems with him, and in view of the dedication he has shown so far, it is suggested that he continue to be utilized as the financial consultant and the person in charge of preparing and adjusting tax matters."  (<u>Id.</u>)

47

Further evidence of the Government of Iran's control of the New York Foundation is evident in a series of documents received by Hesami-Kiche in 1990, which shows a number of financial transfers between bank accounts owned by the New York Foundation and Iran's Mission to the U.N. On July 12, 1990, Badr-Taleh (President of the New York Foundation) requested that Hesami-Kiche (Secretary of the New York Foundation, but also working in Germany for Vena) transfer $150,000 of the New York Foundation's money to Iran's U.N. Mission. (GX 652-T; GX 635-T; GX 647; GX 629; GX 636.) GX 647 makes the relationship of the New York Foundation to the Iranian Foundation particularly clear: $200,000 was transferred from the New York Foundation to a German Bank account, and then Hesami-Kiche transferred $150,000 of it to the Iranian mission at the U.N. (GX 647; Trial Tr. 2013:17-18, 2015:17-18 (Hesami-Kiche).) Hesami-Kiche wrote a letter about this transaction to Seyyed Karim Sobhani (head of international affairs at the Iranian Foundation). (See GX 637-T.) The letter referred to the "transfer of 200,000.00 dollars from the account of the representative office of the Mostazafan Foundation office in NY to the account of the UN office, showing transfer of 150,000.00 dollars to the account of Islamic Republic of Iran in the UN which was made as per the instruction of the Foundation . . . ." (Id.) It also warned that "it was not advisable to send money directly from the representative office in NY to the UN office, which is a political organization, as it would cause problems for the Foundation." (Id.)

Direct involvement of the Government of Iran in both the Iranian and New York Foundations' affairs continued after the establishment of the Partnership. For instance, in 1990, despite the fact that Shafie had left his position on the Board of the New York Foundation, Kharazi (the Iranian Ambassador to the U.N.) asked Shafie to travel to Iran to assist in transferring the "ideological management" of both the New York and Iranian Foundations to the Ayatollah Khomeini. (Trial Tr. 869:22-870:7 (Shafie).) Around that time, Mohsen Rafighdoost became the head of the Iranian Foundation. (Id. 2018:8-12 (Hesami-Kiche); GX 601-T.) Rafighdoost was appointed to his position directly by the Ayatollah. (Trial Tr. 2019:14-20, 2020:10-11 (Hesami-Kiche).) In September 1990, Rafighdoost was copied on a letter relating to a potential sale of the Building (that did not ultimately occur). (GX 644.)

In November 1990, Badr-Taleh (President of the New York Foundation) wrote to Kharazi (Iran's Ambassador to the U.N.) regarding a legal claim by Alam Co. against the New York Foundation. (GX 649-T.) In particular, the New York Foundation had loaned Alam, which was "associated [with] the system of Islamic Republic," hundreds of thousands of dollars as part of a real estate investment that did not materialize. (Id. at 2.) Badr-Taleh's letter to Kharazi sought assistance because officials from Alam were now suing the Foundation. (Id. at 4.)

In May 1991, Badr-Taleh (President of the New York Foundation) wrote to Sobhani (Director of International Affairs for the Iranian Foundation) about some of the New York Foundation's real estate investments. (GX 646-T; Trial Tr. 2023:17-20 (Hesami-Kiche).) Badr-Taleh wrote that if the sale of a particular property was

profitable, the Foundation "<u>could pay a portion</u> of the investments made <u>by particularly [] the Ministry of Foreign Affairs</u>." (GX 646-T at 2 (emphases added).) Badr-Taleh then demonstrated his continuing knowledge of the true relationship between the various entities and the need for concealment: "[A]lthough I conveyed all the details of the actions taken by the Foundation, [] the information <u>should not be relayed to others. We should only say that the Mostazafan Foundation of NY is an independent institution and has not any relations with Iran Foundation</u> . . . ." (<u>Id.</u> (emphasis added).) He continued that this was because, "[i]n the past an American individual who had a legal claim against the Foundation, in order to show that there is an affiliation between New York Foundation with Iranian Foundations and proving it to New York State Court and Attorney General, falsely raised the issue of purchasing the building of New York Foundation at a high price with the persons in charge of Iran, but fortunately they replied the New York Foundation is an independent entity and has nothing to do with Iran Foundations and thus they prevented any unpleasant events." (<u>Id.</u> at 2-3.) He concluded by stating that "the persons in charge of Iran should not interfere in any issue on behalf of New York Foundation, because it could cause difficulties." (<u>Id.</u> at 3.)

In 1991, Sobhani (Director of International Affairs for the Iranian Foundation) told Hesami-Kiche that Rafighdoost (head of the Iranian Foundation) wanted to appoint new Board members. (Trial Tr. 2029:24-2030:8 (Hesami-Kiche).) Sobhani stated that this <u>directive</u> ultimately came from the <u>Ayatollah Khameini himself</u>. (<u>Id.</u> 2030:9-10 (Hesami-Kiche).) On May 7, 1991, Hesami-Kiche (Secretary

50

of the New York Foundation and still working for Vena, the German company owned by the Iranian Foundation), Ahmadi (a Board member of the New York Foundation who eventually became President of the New York Foundation and remained in that position until 2013), and Badr-Taleh (President of the New York Foundation) wrote a letter to the Ayatollah Khamenei, referencing that his "directives regarding the replacement of the undersigned . . . were submitted through your representative, Mr. Haj Mohsen Rafighdoost." (GX 601-T at 1 (emphases added).) They wrote that, "[i]n obedience to the Supreme Leader's directives, we herewith announce our readiness to resign our posts of responsibility at the Most[a]zafan Foundation of New York and our whole hearted willingness to cooperate with forthcoming changes in compliance to laws pertaining to non-profit organizations in America under legal directives of the public prosecutor of New York." (Id. (emphasis added).) The letter stated that, "under the worst and most sensitive of political conditions between America and Iran," they "succeeded in fully protecting and expanding the Foundation's interests which in truth belongs to the people of Iran," and successfully carried out "cultural and Islamic activities in the country of the Great Satan which faced an excessive void in the area of Islamic teachings due to the nonrepresentational of the Islamic Republic of Iran." (Id. (emphasis added).) Badr-Taleh, Hesami-Kiche, and Ahmadi offered to stay on in their positions until their replacements were announced, and noted that they hoped the New York Foundation's activities "will further improve and develop under the

view of your Excellency and respected representative in [the Iranian Foundation] and [the New York Foundation]." (Id. at 2.)

Farsi-language minutes of a May 16, 1991 meeting in Switzerland of the New York Foundation's Board reflect the attendance of several individuals who held positions with the Iranian Foundation. (GX 602-T at 1.) In attendance were Rafighdoost (head of the Iranian Foundation), (Trial Tr. 2031:1-5 (Hesami-Kiche)); Pirayandeh (Board member of the New York Foundation also with the cultural section of the Iranian Foundation), (id. 2031:6-11 (Hesami-Kiche)); Badr-Taleh (President of the New York Foundation), (id. 2013:12-14 (Hesami-Kiche)); Ahmadi (Board member of the New York Foundation), (id. 2013:15-16 (Hesami-Kiche)); Hesami-Kiche (Secretary of the New York Foundation and still employed by Vena), (id. 2031:12-18 (Hesami-Kiche)); Malekzadeh (an advisor for Rafighdoost employed by the Iranian Foundation), (id. 2031:19-20 (Hesami-Kiche)); Sobhani (head of international affairs at the Iranian Foundation), (id. 2031:21-23 (Hesami-Kiche)); and Mahmoud Asghari (head of the New York Foundation's office located in Tehran),[38] (id. 2031:24-2032:1 (Hesami-Kiche)).

The Farsi-language minutes reflect that this group made changes to the composition of the New York Foundation's Board "as per the orders given by the Supreme Leader . . . ." (GX 602-T at 1 (emphasis added).) Piryandeh would remain in his current capacity, but the new members of the Board of the New York

---

[38] The New York Foundation's tax returns between 1987 and 1994, for example, reflect that the Foundation had an office in Tehran, Iran. (DXs 210-217.)

Foundation were Mehdi Hojat (an Iranian official with responsibility for an Iranian governmental entity, "Cultural Heritage"), (Trial Tr. 2032:17-21, 2034:8-10 (Hesami-Kiche)); Mir Sadegh Mirakhor;[39] Seyed Sadr Hanini, also known as Hosseini (a member of the clergy rumored to be a cousin of the leader of the Iranian Revolution), (id. 2034:18-23 (Hesami-Kiche)); and Ali Ebrahimi (the representative of a newspaper in New York owned by the Government of Iran), (id. 2034:24-2035:15). (See also GX 602-T at 1.) At this meeting, the individuals present also discussed matters relating to the charitable works of the New York Foundation. (Id.) No official English-language version of these minutes was created. (See id.; GX 205; Trial Tr. 2038:4-13 (Hesami-Kiche).)

On May 24, 1991, Badr-Taleh wrote to Sobhani (head of International Affairs of the Iranian Foundation). (GX 624-T.) In that letter, Badr-Taleh informed Sobhani that Kharazi (Iran's Ambassador to the U.N.) had called him and Shafie (former President of the New York Foundation) to his office. (Id. at 1.) He reported that, in the conversation, Kharazi stated: "I (Mister Kharrazi) with the order from Haj Agha in hand, am directly responsible for the Foundation and am the Managing Director of the Board of Trustees[.]" (Id. (emphasis added); Trial Tr. 867:3-9 (Shafie).) Here, "Haj Agha" refers to the Ayatollah Khameini. (See Trial Tr. 2045:5-14 (Hesami-Kiche); GX 605-T at 2.) Badr-Taleh also reported that Kharazi stated that, "from now on, the role of the Managing Director and the role of the Board of Directors will just be a formality and [Kharazi] will be conducting all of its

---

[39] The document references "Mir Sadegh" Mirakhor. Abbas Mirakhor became a member of the New York Foundation's Board that year. (See DX 5004 ¶ 20.)

affairs." (GX 624-T at 1 (emphasis added).) Badr-Taleh requested that Sobhani inform him from whom he should take direction: the Iranian Foundation, or Iran's Ambassador to the U.N. (Trial Tr. 2045:15-20 (Hesami-Kiche); GX 624-T at 1.) He stated that "Kharrazi's involvement poses a great danger to the Foundation," demonstrating his understanding of the need for concealment and the dangers associated with direct involvement by the Government of Iran in the affairs of the New York Foundation. (GX 624-T at 1.) The letter continued: "At this time, through the Office of the Mission of Iran (Mister Kharrazi), all those who are in some way connected to the Iranian community . . . have been informed of the primary changes within the Board of Trustees and administration of the Foundation." (Id.) Badr-Taleh added: "Also, concerning other impending security issues which have arisen in the past few days and need to be dealt with in person: If deemed appropriate, I will travel to Iran alone or together with Mister Shafie and Mister Firooznia [the accountant for the New York Foundation] and submit them to you and Haj Agha [the Ayatollah] in person." (Id. at 2 (emphasis added).)

The Board of the New York Foundation met at Kharazi's house in August 1991. At that meeting, Badr-Taleh was replaced as President of the New York Foundation by Mohammad Geramian. Kharazi (Iran's Ambassador to the U.N.) was responsible for Geramian's nomination. (Trial Tr. 880:18-881:11, 882:17-22 (Shafie); DX 535.) Shafie described Kharazi as having "[chosen] the board member[s] and determin[ed] what contract, where to go, what not to do, what not to

happen, the control of the foundation." (Trial Tr. 913:13-15 (Shafie).) Geramian remained President of the New York Foundation until 2007. (DX 5004 ¶ 20.)

On May 30, 1991, Badr-Taleh wrote to the <u>Ayatollah</u>: "Greetings, I hereby inform your honor of my <u>compliance with your directives</u> concerning my resignation from the Most[a]zafan Foundation of New York, as stated in <u>a letter presented to you by honored brother Rafighdoost</u> [head of the Mostazafan Foundation in Iran]. . . ." (GX 605-T at 2 (emphases added).) "To prevent the dismantlement, or, God forbid, the suffering of any <u>loss to the properties or the interest of the wealth of Bayt Al-Mal</u>, I and the other members of the present Board of Trustees, while continuing our duties, in consultation with the lawyers of the Foundation, and the office of the Attorney General of New York, will assure the legal and smooth transition of the members of the Board of Trustees." (<u>Id.</u> (emphasis added).) "<u>Bayt Al-Mal</u>" refers to "<u>property belonging to the Government of Iran.</u>" (Trial Tr. 2050:4-7 (Hesami-Kiche).) Badr-Taleh stated that Kharazi had introduced himself "as the President of the Board of Directors." (GX 605-T at 2.) He stated further that "Kharrazi's appointment to a position of responsibility connected to the Foundation's affairs presents enormous political, security, and economic dangers, [but] we feel assured that <u>the Supreme Leader has made this decision</u> with discernment, unique insight, and a thorough knowledge of all pertaining aspects." (<u>Id.</u> (emphasis added).)

Badr-Taleh's letter to the Ayatollah attached a letter from him addressed to Kharazi. (<u>Id.</u> at 4.) That letter, dated May 30, 1991, stated that, "[h]aving received

55

the directive of the Supreme Leader regarding the replacement of four out of the five members of the Board of Trustees [of the New York Foundation] in Zurich, Switzerland through the honored brother, Haj Mohsen Rafighdoost [head of the Iranian Foundation], in obedience to the decision of the Supreme Leader, I along with Doctors Ahmadi and Hesami immediately submitted our resignations to him and brother Rafighdoost." (Id. (emphases added).)  It added that, "[u]nfortunately, your attitude towards the Foundation and me . . . had suffered changes.  Your insistence on my immediate resignation and that of other members of the Board of Trustees will result in unfavorable ramifications for the Foundation." (Id.)  He continued, "[h]owever, we will all wholly abide by this decision as it was made through the judgment, wisdom and insight of the Supreme Leader . . . .  We are confident that by this directive the Supreme Leader does not intend to cause irreversible damage or to commit wrongful and illegal actions that would cause undue harm to the property of Bayt Al-Mal." (Id. (emphases added).)  He ended by stating that, "I therefore once more announce my sole obedience of the Supreme Leader's orders, but will continue to carry out the daily affairs; preparing for the-final transition of the Board of Trustees and the individual in charge of the Foundation, until the meeting of the Board of Trustees on August 20th and 21st 1991 in Tehran." (Id. at 5 (emphasis added).)

Badr-Taleh wrote to Sobhani (head of international affairs for the Iranian Foundation) on June 3, 1991.  (GX 628-T.)  In that letter, Badr-Taleh stated that Kharazi had been interviewing Iranian employees of the Foundation in order to

take over the Foundation, which "<u>would function under the supervision of the</u> <u>[Iranian] Mission</u>." (<u>Id.</u> at 1 (emphasis added).)  Kharazi had been telling others that "from now on they are the sole direct responsible people for the [New York Foundation] and will control and supervise all activities of the Center." (<u>Id.</u>)  Badr-Taleh also wrote that Shafie and Mahalati, former Presidents of the Foundation, had "through friendly and threatening messages, relayed to me that I should resign soon." (<u>Id.</u>)  He continued that he is "constantly under threat," and that others are claiming that he has "<u>divulged [or will divulge] everything</u> to the New York Attorney General." (<u>Id.</u> at 3 (alteration in original) (emphasis added).)  He wrote further that he "and the members of the Board of Trustees of the Foundation, frequently signed affidavits to the American Authorities, such as the Attorney General, Legal Courts, Tax Office and FBI saying that the Foundation is an independent entity and has no connection with the Iranian Government and any affiliate[s] of Iranian authorities." (<u>Id.</u>)  He then expressed concern that they could "be considered in violation according to the laws of America and there will be a heavy crime against us and therefore our situation should be of concern and something has to be done." (<u>Id.</u>)

Badr-Taleh's expression of concern did not change any plans for the replacement of members of the Board.  Farsi-language minutes of a meeting of the New York Foundation dated July 7, 1991, stated that "[b]ased <u>on the order of his</u> <u>Excellency, Supreme Leader of Iran</u>, a meeting was held to discuss changes of a few individuals in charge of the Mostazafan Foundation of New York, in the presence of

Mister Rafighdoost [of the Iranian Foundation], representative of the Supreme Leader at the Most[a]zafan and Janbazan Foundation." (GX 625-T (emphases added).) The meeting was held in Tehran, at the central office of the Iranian Foundation. (Trial Tr. 2066:9-10 (Hesami-Kiche).) The minutes reflected that Badr-Taleh and Hesami-Kiche resigned from the Board. (See GX 625-T.) The minutes further stated that, "while explaining the possible dangers associated with the appointment of the brothers, and the interference of Doctor Kharrazi in the affairs of the Mostazafan Foundation of New York, they willingly, in obedience to the directives of the Supreme Leader and his respected representative, Mr. Rafighdoost, submitted their resignations." (Id. (emphasis added).) Additional minutes of this meeting were created in English. (GX 606.)[40] Those minutes provide a different, cleansed explanation for the resignations. Those minutes indicated that Hesami-Kiche resigned due to his "difficulty in commuting to the United State[s] of America and as such can not serve his duties efficiently . . . ." (Id. at 1.) The presence of representatives of the Iranian Foundation is not mentioned in the cleansed, English version. (See id.) Two of the directors appointed to the Board of the New York Foundation by the Ayatollah at the May 1991 meeting (Ebrahimi and Mirakhor) were then "elected" to replace Badr-Taleh and Hesami-Kiche. (Id. at 2.) Ebrahimi remained on the Board of the New York Foundation until 2013; Mirakhor remained on the Board until 2005. (DX 5004 ¶ 20.) In addition, Geramian was selected to be President of the New York Foundation. (GX

---

[40] Although the English minutes are dated July 8, their content makes clear that they refer to the same July 7 meeting.

606 at 2.)  The Court finds it incomprehensible that Ebrahimi and Mirakhor were not aware of these events and of the Ayatollah's involvement in their appointments. Similarly, Geramian must have known of the extensive involvement by the Government of Iran in the affairs of the New York Foundation at this time. Geramian remained on the Board, and served as its President, until 2007.  (DX 5004 ¶ 20.)

The Farsi-language minutes of an August 27, 1992 meeting between individuals from Bank Melli Iran (including Naghshineh), Rahi, and Mohsen Ghadimipour (head of Bank Melli's foreign affairs or international division, (Trial Tr. 1063:2-5, 1078:19-20 (Rahi))) reflected a discussion regarding debts owed by the New York Foundation to Bank Melli.  (GX 206-T; Trial Tr. 1078:9-20 (Rahi).) According to Naghshineh, despite misgivings about entering into the Partnership with the Foundation in 1989 and the remaining debt, "he emphasized the bank's commitment to stand by the Foundation."  (GX 206-T at 1.)  The minutes also indicated that, "[i]n order to further clarify the framework of the parties' interests and claims, as well as their obligations in case of deviation from the contents of the contract dated July 1989, another meeting in New York was attended by Mr. Geramian [the President of the New York Foundation], Mr. [Seyed Mohammad] Shafaat [the Bank Melli representative in charge of Assa in New York], Mr. Karjooravary [with Bank Melli], and Mr. Firooznia."  (Id. at 2; see also GX 445-T; Trial Tr. 1129:8-19, 1135:1-4 (Rahi).)  Here, Geramian is interacting directly with Bank Melli (demonstrating his unambiguous awareness of its involvement).

In September 1992, Norman Gabay filed a civil action against the Iranian Foundation and New York Foundations to recover damages resulting from the Government of Iran's alleged expropriation of several businesses he owned in Iran. As part of that litigation, Geramian (President of the New York Foundation) submitted an affidavit dated November 5, 1992 in which he wrote that, <u>inter</u> <u>alia</u>, "[t]he New York Foundation conducts no business with the Government of Iran or the [Iranian Foundation]," (GX 1403 ¶ 3); "[n]one of the officers or directors of the New York Foundation is an officer, official, director, employee or agent of the [Iranian Foundation]," (<u>id.</u> ¶ 5); and "[t]he New York Foundation has never been the agent or instrumentality of the Government of Iran," (<u>id.</u> ¶ 6). During a deposition on November 30, 1995, Geramian again said there was no relationship between the New York Foundation and the Iranian Foundation.[41] (GX 1409 at 6.)

These statements were false. In August 1992, for example, Geramian met with several Bank Melli officials—including Naghshineh (on Bank Melli's Board of Directors), Rahi (Director of Bank Melli's ONSD), and Karjooravary (Director of Bank Melli New York)—to discuss the Partnership's finances. (GX 206-T.) In November 1992, Geramian also sent a signed copy of his affidavit from the <u>Gabay</u> litigation to the New York Foundation's office in Tehran and wrote in a cover letter that "[i]t is necessary to explain that this defense, according to the facts, indicates the denial of any relationship as well as financial and administrative relations

---

[41] Also during that litigation, Ahmadi (a New York Foundation Board member and later President) stated during his deposition that he never "received instructions in terms of [his] role as a director for the New York [F]oundation from any person or entity in Iran." (GX 1003 at 21.)

between the government of Iran and Mostazafan and Janbazan. . . . [P]lease take action to cooperate with us to resolve any possible worries in this regard." (GX 204-T.) The next month, Geramian separately faxed a letter to the International Legal Affairs Department of the Iranian Foundation to let them know that the relevant information related to Gabay's lawsuit had been sent to the New York Foundation's Tehran office, and that they should "contact that office immediately and cooperate with them to resolve the attributed accusations." (GX 1406-T.)

Gabay's case eventually was dismissed. (PX 61.) That court in that case found that, inter alia, Gabay had not shown that the Iranian Foundation exercised control over the New York Foundation. (Id. at 4-6.)

By this point in its history, the New York Foundation already had acquired several pieces of real estate on behalf of the Government of Iran. Concerns regarding exposure of involvement by the Government of Iran led to a desire for further concealment efforts. This is clear from a 1993 letter from Bank Melli Iran to Bank Melli New York regarding the change of ownership of the companies affiliated with Assa. That letter stated: "However, please have them look into whether Mr. Naghshineh—the Assa's New York director whose affiliation with the Bank could be easily be proven—could be replaced with another individual whose affiliation with the Bank could not be easily proven. Would this make it possible to maintain ownership of the building's shares?" (GX 167-T.) Karjooravary responded to Ghafour Memarzadeh (Director General of the International Division of Bank Melli) that "the examinations of this agency pretty much corroborates with the past

views; that means it is better to take the necessary steps in regard to the transfer and the change in the ownership so that the bank would not directly or indirectly become the owner." (GX 450-T.) Karjooravary stated further that "the legal problem of direct ownership of each of the affiliated companies in the United States is defined by local laws and regulations, and the law <u>prohibits banks from purchasing buildings for the purpose of real estate activities</u>. . . . The issue of changing the names of the directors without changing the aforementioned ownership of the mother company will not solve the legal problem of the ownership, <u>though it may be effective from the point of view of protection</u>." (<u>Id.</u> (emphases added).) He concluded, "[i]n consideration of the above matters, and to avoid any possible problems, my suggestion is to make some kind of arrangement so the above-mentioned ownership can be completely transferred to the other related organization." (<u>Id.</u>)

On March 25, 1994, Shafie (former President of the New York Foundation, who continued to act as its agent) wrote a letter to Kharazi (the Iranian Ambassador to the U.N. who had by this point taken over control of the New York Foundation). (GX 661-T.) It started: "In view of the sensitive situation and the tight schedule, you are kindly requested <u>to instruct</u> that a meeting will be held with the presence of me and a few other people you deem appropriate, <u>so that the real estate issues of the Foundation which are now under sensitive and important conditions will be discussed</u>, . . . and thereby we may render worthwhile services to Foundation in the short and long runs." (<u>Id.</u> (emphases added).) At trial, Shafie

testified that, when he set up that meeting, he was hoping Kharazi would bring, among others, Geramian (President of the New York Foundation) and Yaholiah Alidoost (the attorney for the New York Foundation), and that they would go over the affairs of the Foundation.  (Trial Tr. 915:18-916:3 (Shafie); GX 1042J at IRS000511; GX 1042H at IRS000350; see also DXs 222-232.)  When asked why he provided this level of detail about the Foundation's issues to Kharazi, Shafie testified: "Because they were doing wrongs together with Mr. Geramian, and I was seeing that it's not serving the purpose of the Foundation.  I asked Dr. Kharazi to . . . correct this thing."  (Trial Tr. 917:10-15 (Shafie).)  In other words, Kharazi was understood to be in control.

On April 4, 1994, Shafie wrote again to Kharazi seeking to be appointed to manage the Building.  (See GX 666-T; Trial Tr. 917:24-918:2, 918:20-919:2 (Shafie).)  The letter offered "two proposals for the management of maintenance and a contract to act as representative for the rental works of Bonyad (Foundation) building."  (GX 666-T.)  Shafie testified that he went to Kharazi and not Geramian because he "felt that Mr. Geramian is a puppet and Kharazi is running the job."  (Trial Tr. 922:5-6. (Shafie).)

In June 1994, Bank Melli again communicated with Karjooravary regarding the ownership of Assa.  The telex stated: "In fact, Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies."  (GX 151-T.)  The letter from Bank Melli Iran also expressed concerns regarding seizure due to issues

between the Government of Iran and the United States. (See id.) Bank Melli New York responded that increased efforts at concealment were appropriate: "[I]n the opinion of the bank's attorney it would be wise to use all possible means to remove the bank's name from the ownership of the mother corporation. In addition issues still remain pertaining to the seizure of <u>the partnership assets</u> due to the reputation of the partnership's partner; <u>their similarity in name to an organization in our</u> <u>country increases the chances of lawsuits and the seizure of the partnership's</u> <u>assets</u>." (GX 150-T (emphasis added).) At this time, the New York Foundation was still referred to as the Mostazafan Foundation of New York, and the Iranian Foundation was referred to as the Mostazafan or Janbazan Foundation of Iran.

On July 21, 1994, Bank Melli New York sent a letter to Khajeh Pour (Managing Director of Bank Melli's Special Inspection Team) that stated: "As you have been informed, the above company [Assa] has been established in relation with the partnership with the 650 Building. . . . Since last year, following [the filing of the <u>Gabay</u> complaint] against the partnership's partner and one in which the partnership's building had been mentioned, it seems that management has declared that all of the partnership's affairs be handled by a different entity other than this Agency. Nevertheless, Assa Corporation's legal issues are now being handled by this Agency in connection with the Central Office." (GX 168-T.)

In the 1990s, the New York Foundation also continued to grow its real estate portfolio. In particular, it purchased four lots in Queens, New York in 1991 and

1997.  (See GX 78.)  And it acquired real property in Catharpin, Virginia in 1990.  (Id.; PX 50.)

      C.   1995 Sanctions

      In March 1995, President Clinton issued Executive Orders ("EO") declaring the "actions and policies of the Government of Iran" a threat to U.S. national security and imposing financial sanctions on U.S. persons for various transactions and commerce with the Government of Iran.  Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995); see also Kirschenbaum, 830 F.3d at 119.  Pursuant to the authority of the EOs, OFAC determined that Bank Melli was owned or controlled by the Government of Iran, and thus "subjected it to, among other things, limitations on the receipt of services from U.S. financial institutions beginning June 6, 1995, except as authorized by an OFAC license."  Kirschenbaum, 830 F.3d at 119 (citing Implementation of Executive Order No. 12,959 With Respect to Iran, 60 Fed. Reg. 40,881-02 (Aug. 10, 1995)).

      OFAC then promulgated Iranian Transactions Regulations ("ITRs").  The ITRs took effect on August 20, 1997, and prohibited U.S. entities from conducting business with or providing services to "the Government of Iran," which the ITRs define as "[t]he state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof," "[a]ny person owned or controlled, directly or indirectly, by the foregoing," and "[a]ny person . . . acting or purporting to act, directly or indirectly, for or on behalf of the foregoing."  31 C.F.R. § 560.304

(2012); see id. §§ 560.203, 560.204, 560.207, 560.208, 560.301. The New York

Foundation and 650 Fifth Ave. Co. are U.S. entities "subject to these orders and

regulations and prohibited thereby from conducting business with or providing

services to Bank Melli or any other instrumentality owned or controlled by, or

acting on behalf of, the Government of Iran." Kirschenbaum, 830 F.3d at 119.

There is no dispute that Assa was owned or controlled by the Government of Iran

even after 1995. Id.

     "In addition to conferring authority on the President to regulate and prohibit

transactions to deal with threats to this nation's security, foreign policy, or

economy, the IEEPA authorizes the President to block property to address such

threats." Id. In 2012, President Obama issued Executive Order 13,599 "to take

additional steps with respect to the national emergency declared in Executive Order

12,957 of March 15, 1995, particularly in light of the deceptive practices of the

Central Bank of Iran and other Iranian banks to conceal transactions of sanctioned

parties." Exec. Order No. 13,599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012)

(hereinafter "Exec. Order 13,599"). That Order states that "[a]ll property and

interests in property of the Government of Iran, including the Central Bank of Iran,

that are in the United States . . . are blocked and may not be transferred, paid,

exported, withdrawn, or otherwise dealt in." Id.; see also 31 C.F.R. § 560.211

(implementing the order). The Order defines "Government of Iran" as the

"Government of Iran, any political subdivision, agency, or instrumentality

thereof . . . and any person owned or controlled by, or acting for or on behalf of, the Government of Iran." Exec. Order 13,599, at 6660.

D. Post-1995 Activity

Sometime after the sanctions were imposed in 1995, Memarzadeh (Director General of the International Division of Bank Melli) traveled to the United States. (Trial Tr. 1092:14-1093:8 (Rahi).)  While in the United States, he and Rahi (who by then was in charge of Bank Melli's New York branch, (id. 1053:18-25, 1101:6-9 (Rahi))) also met with Kharazi (the Iranian Ambassador to the U.N. who had taken over actual control of the New York Foundation) because Memarzadeh wanted to discuss the possibility of Bank Melli's exiting the Partnership.  (Id. 1093:9-1094:10 (Rahi).)  This would have left the Government of Iran's interest within the New York Foundation—but would have removed direct participation by Bank Melli, the more obvious source of danger to Iranian interests.  At that meeting, Kharazi told Memarzadeh that it was not a good time to sell Bank Melli's share in the Partnership because of market conditions.  (Id. 1094:21-25 (Rahi).)  Bank Melli's shares were not sold.  (Id. 1095:1-5 (Rahi).)

In 1995, Bank Melli transferred the shares in Assa to two new straw owners, Shakeri and Aghamiri.  (GX 78 ¶¶ 4-5; GX 3503; GX 3502; GX 3506.)  In response to an inquiry from the New York State Attorney General about Assa, the New York Foundation's attorney wrote that "the Foundation agreed with Assa (which it apparently had located after placing a series of world-wide advertisements seeking co-investors) to form the Partnership for the purpose of acquiring the building."

(DX 324 at 2.)  The attorney also stated that "[n]either the Foundation nor we have any other documentation or information concerning Assa, but we have written Assa's New York City counsel and asked if they could furnish us with additional information which would help us to respond to your request."  (Id.; see DX 322.) This statement to the Attorney General was untrue in several obvious respects. There had never been "world-wide advertisements" seeking co-investors and the New York Foundation knew that.  In addition, Shakeri and Aghamiri were only the latest known straw investors for Bank Melli.

On November 7, 1995, Geramian (President of the New York Foundation) wrote to Shafaat (Bank Melli's representative for Assa), asking for the names of Assa's stockholders on behalf of a lender.  (DX 325 at 1.)  Shafaat apparently called and told Hussein Mirza (controller of the New York Foundation) that the stockholders were Shakeri and Aghamiri, with an address at a P.O. Box in Dubai. (Id. at 2; Trial Tr. 2728:12-19 (Safakamal).)  The New York Foundation did not follow up on this information until almost a decade later; indeed, the Partnership continued to pay distributions to Assa through December 2007.  (See GX 15C; GX 15D.)

In 1998, Steven M. Flatow obtained a judgment against the Government of Iran.  (PX 63 at 3.)  Later that year, he brought an action against the New York Foundation to attach and execute the judgment.  (Id. at 3-4.)  As part of that case, Mirza (the New York Foundation's controller) submitted a perjurious affidavit that said that no current or past "officer, director or employee of the [New York]

Foundation has ever been an officer, director or employee of the [Iranian Foundation]."  (PX 318 ¶¶ 1, 2.)  Flatow's case was dismissed.  (PX 63.)  That court found that the Government of Iran did not exercise control over the New York Foundation.  (Id. at 5-8.)

Because of U.S. sanctions, Bank Melli's U.S. banking operations dried up.  (Id. 1102:25-1103:5 (Rahi).)  Beginning in 2000, Rahi was asked to use personal funds to pay the rent and utilities for Bank Melli's New York branch.  (Id. 1102:14-1103:5 (Rahi).)  Several years later, Rahi was reimbursed by Bank Melli for these expenses through Firooznia (the New York Foundation's accountant).  (Id. 1103:11-16, 1104:4-23 (Rahi).)  The checks—written from Firooznia's personal account—were dated January, February, and March 2005.  (GXs 717-721.)

In 2003, Patterson, Belknap, Webb & Tyler ("Patterson Belknap"), counsel for the New York Foundation, (e.g., PX 441; see also DXs 207-234), did some work for which it was reimbursed by the Government of Iran.[42]  (PXs 645-647; Bench Tr. 88:12-20, 92:19-24 (Rahi).)  Instead of paying Patterson Belknap directly, Bank Melli's New York branch asked Bank Melli's ONSD in Iran to pay Alidoost (the lawyer for the New York Foundation), who in turn paid Patterson Belknap.  (PXs 645-647; Bench Tr. 89:13-17, 90:19-91:4, 93:1-3 (Rahi).)  In those same emails, Bank Melli's New York branch also asked that Bank Melli's name not be mentioned in connection with rental payments for fear that the American bank would return the

---

[42] Patterson Belknap was one of two law firms representing defendants at trial.

funds because Iran was involved. (PXs 645-647; Bench Tr. 87:1-88:1, 89:13-17, 91:13-18 (Rahi).)

Ebrahimi (a member of the New York Foundation's Board from 1991 to June 2013, (DX 5004 ¶ 20)) kept journals. He hid those journals in a hatchway in a closet in his house.[43] (Trial Tr. 1312:4-10 (McWilliams).) At trial, the Government introduced several of Ebrahimi's journals in their entirety, as well as certain entries. While it is certainly true that the journals are an odd collection of information that Ebrahimi chose to retain, when numerous entries are read seriatim, they are easier to follow. In any event, the most important points to be drawn from the journals do not require any particular information about whether Ebrahimi was himself having a particular thought or was instead conveying the thought of another. The point is that the statement was made at all, and made at a particular point in time, by a member of the Board of the New York Foundation. Among the probative entries in this regard are the following: In an entry from June 17, 2001, Ebrahimi wrote, inter alia, "Bank Melli = conspiracy. 40% Assa Corp = Will pay back. Bank Melli's money 60% + 40% . . . Problem – Government separate – Foundation 'Sure death.'"[44] (GX 505-T at 1.) This entry demonstrates knowledge of the entities' true relationship, and a concern for illegality and loss.

---

[43] The Court views the fact that the journals were hidden as evidence of Ebrahimi's knowledge that they contained damaging information.

[44] Ebrahimi was one of several deponents affiliated with the New York Foundation who invoked the Fifth Amendment in this case. As discussed in more detail below, the Court is permitted to draw an adverse inference from the invocation. Brink's Inc. v. City of New York, 717 F.2d 700, 710 (2d Cir. 1983). Among the questions Ebrahimi was asked at his deposition included:

In another entry from the Ebrahimi journals dated July 25, 2003, (GX 503-T), Ebrahimi wrote, inter alia, "Assa share," "Sell it," "Assa dangerous," "Get rid of it," and "It is illegal," and he also mentioned Javad Zarif (the Iranian Ambassador to the U.N. at that time, (DX 5004 ¶ 14)).[45] This entry against demonstrates knowledge and a concern for illegality. A resolution from the New York Foundation's Board meeting on July 25, 2003 corroborates that the Board discussed Assa's offer to sell its shares to the New York Foundation pursuant to the Partnership Agreement. (DX 576.) Elsewhere, Ebrahimi mentioned Ahmadinejad (a President of Iran); Mohammad Khazaee (the Iranian Ambassador to the U.N. from July 2007 until 2014, (DX 5004 ¶ 15)); and Faridzadeh, (the Iranian Cultural Ambassador to the U.N., (Trial Tr. 1349:3-6 (McWilliams))). (GX 504-T at 1-3.)

A journal entry from Ebrahimi's journals dated Fall 2004 reinforces the ongoing connection between officials within the Government of Iran and the New York Foundation, as well as the Government's ultimate control of the Foundation. Ebrahimi wrote, "Zarif - Should always be in the meetings." (GX 500-T.) In another journal entry, Ebrahimi wrote, "[i]t is certain that the Board of Trustees should be

- "[I]n your entry on or about Sunday, June 17th, 2001, did you write about Bank Melli's relationship with Assa Corp.?" (GX 3003 ¶ 74.)
- "[I]n your entry on or about Sunday, June 17th, 2001, did you indicate your concern regarding Bank Melli's involvement with Assa Corporation?" (Id. ¶ 75.)
- "On or about June 17th, 2001, were you concerned about Bank Melli's involvement with Assa Corporation?" (Id. ¶ 76.)
- "[I]n your entry on or about Sunday, June 17th, 2001, did you indicate your concern regarding Assa Corp.'s 40% stake in 650 Fifth Avenue Company?" (Id. ¶ 77.)

(See also GX 3004 ¶¶ 43-44.) The Court draws an adverse inference from Ebrahimi's refusal to answer these questions.

[45] At the deposition, Ebrahimi also invoked the Fifth Amendment as to the following question: "In your July 25th, 2003 entry, . . . did you express your concerns about Assa Corporation?" (GX 3003 ¶ 89.)

expanded with new members as soon as possible. I agree with anyone that is recommended by Doctor Zarif for membership in the Board of Trustees." (GX 502-T.)

Mirakhor (Treasurer of the New York Foundation from 1991 to 2005, (DX 5004 ¶ 20)) testified by video deposition. On direct examination—conducted largely through leading questions by defendants' counsel—Mirakhor testified to his view of the New York Foundation's independence from Bank Melli and the Government of Iran, and the lack of influence the Government of Iran had over the Foundation's operations and charitable donations. (E.g., Mirakhor Tr. 64:23-65:15, 75:14-76:25.) The Court is not persuaded that this testimony reflects the reality of control by the Government of Iran. Rather, most generously, it reflects the fact that, by this point in time, concealment of Iranian control had become more sophisticated—even certain Board members may not have known the full state of affairs. Nevertheless, Mirakhor's own involvement with the Board reflected control by the Government of Iran. He joined the Board at the request of Kharazi (Iran's Ambassador to the U.N.) and the Governor of the Central Bank of Iran. (Id. 28:17-33:6.) During the time he served on the New York Foundation's Board, Mirakhor was very busy (from "6:00 in the morning till 8:00 at night") at his high-level day job with the IMF, and was unable to attend more than two or three Board meetings a year. (Id. 56:22, 58:1-9.) In all events, Mirakhor conceded that he understood Bank Melli to have some ownership interest in Assa, the New York Foundation's partner to whom it was making partnership distributions and for whom it was managing the Building.

(E.g., id., 84:2-7, 85:5-86:9, 87:11-14, 262:1-265:19.)  He testified that a bank in the United Kingdom was actually owned by Bank Melli, (id. 87:11-14, 176:22-23, 262:12-14), and that "this bank had some ownership interest in Assa.  Assa had an ownership interest in the Foundation.  That's the link," (id. 264:4-7).

Based upon the Court's review of the entire evidentiary record, it appears that Mirakhor was used by the Government of Iran to confer legitimacy, and that he was not informed of the extent of Iranian control over the New York Foundation. Nevertheless, even he knew that the Government of Iran was the New York Foundation's partner through Bank Melli.  And as Treasurer of the New York Foundation for years, he oversaw millions of dollars in distributions to Assa— knowing that they ultimately would go to Bank Melli.  (See GX 15C; GX 15D.) These distributions occurred during the period of U.S. sanctions when such transfers were unlawful.

Events relating to a failed transaction between the New York Foundation and Hanif further evidence extensive control of the New York Foundation's operations by the Government of Iran.  In approximately 2003, Hanif attempted to purchase Assa's shares in the Partnership.  (Id. 101:21-25; Trial Tr. 2731:10-13 (Safakamal).)  Hanif was owned or controlled by Mahalati (a former President of the New York Foundation).  (Trial Tr. 2732:24-2733:1 (Safakamal).)  The New York Foundation had a right of first refusal over sale of Assa's interest in the Partnership, and informed Assa that it would exercise that right.  (Id. 2729:21-23 (Safakamal).)  In a November 2003 Farsi-language report to the Board of the New

York Foundation, Geramian (President of the New York Foundation) stated that "[t]he chiefs of [Assa] have always shown interest in selling their share due to unacceptable income derived from [the] investment" in the Building. (GX 235-T at 2.) He then laid out several reasons the New York Foundation should exercise its right of first refusal, including "[r]educing the risk of ASSA dealing with an unknown and strange buyer whose real intentions or the intentions of their successors are unclear to us;" "[p]reventing strangers and unknown persons becoming partners who can easily alter the foundation's control over the building, and ultimately shake up its ownership;" and "[c]onducting a low-risk business between the foundation and ASSA." (Id. at 2.) Later, Geramian demanded that Mahalati "introduce his partners and clarify the details of his mutual agreements with respect to this transaction." (GX 232-T at 1; see also GX 233-T.) The New York Foundation's serious pushback against Hanif's potential purchase of Assa's shares—because of the above-outlined risks—stands in stark contrast to its lack of response to the transfer of Assa's shares to Shakeri and Aghamiri in 1995. The differing responses is persuasive evidence that the New York Foundation was aware that the 1995 change in ownership was really no change in ownership at all, and that they knew Bank Melli continued to be the real owner of Assa. In essence, the 1995 transfer in ownership did not present the risks of the unknown that the Hanif bid did.

To finance the acquisition of Assa's shares, the New York Foundation approached Wachovia Bank ("Wachovia"). (Trial Tr. 2729:24-2730:2, 2754:7-12

(Safakamal).)  Wachovia initially approved the loan but withdrew the approval after receiving an anonymous email stating that the Building owned by the Partnership had ties to Iran.  (Id. 2730:1-6, 2731:20-23 (Safakamal).)  The email stated that Assa was "under investigation by international financial institutions for alleged connection with an Iranian government bank."  (GX 138 at 4.)  The Board of the New York Foundation was aware of this email, Patterson Belknap (set forth on the New York Foundation's tax forms for years as general counsel, (see e.g., DXs 207-234)) knew of this email, and, nonetheless, the New York Foundation continued to pay Assa its partnership distributions.[46]  (Trial Tr. 2751:16-23 (Safakamal).)

In June 2003, Ahmadi Azizi (Managing Director of Bank Melli London) emailed Mohammad Hassan Dehghani Tafti (of Assa).  (GX 62.)  Azizi stated that he "had the letter of Intent and the Contract for Sale reviewed."  (Id.)  Azizi commented that "the arrangements should be amended to require payment by a suitable cheque drawn on a US Dollar account maintained outside the US to ensure that there is no possibility, however remote, of facing difficulties with payment of the cheque due to the operation of the US sanctions."  (Id.)  He also noted that he still had "not received the attachment with regards to 'Waiver of First Refusal' mentioned in [a prior] email."  (Id.)

It appears that the Wachovia email did spur activity to try and create a false paper trail regarding the New York Foundation's knowledge of Assa's "owners": On November 6, 2003, the New York Foundation's lawyers wrote Assa's lawyers,

---

[46] The Partnership apparently stopped paying Assa in December 2007.  (GX 15C.)

attaching the email Wachovia received. This email was the beginning of a prolonged effort to craft an alternative narrative regarding the New York Foundation's knowledge of the Government of Iran's involvement. The letter requested the identity of Assa's intermediate and ultimate owners and principals, as well as their countries of origin. (GX 138; DX 761.) Of course, even if their outside lawyer did not know, the New York Foundation quite clearly knew that the Government of Iran owned Assa—the New York Foundation's own President (Geramian) was placed on its Board at a meeting at which directives from the Ayatollah regarding Board composition were expressly followed. This meeting was after Kharazi had taken over real control of the New York Foundation.

On November 11, 2003, Livingston (Assa's U.S. attorney) responded: "With respect to the identity of the principals of Assa Corp. and Assa Co. Ltd., I am surprised that you are asking for this information since the parties have been engaged in a partnership enterprise for almost 15 years, and I am sure your clients know the names of the individuals. Nevertheless, all of the individuals involved were set forth on the various corporate resolutions which were given to you many months ago." (DX 762 at 1.) The reference to "15 years" is revealing; it disproves any argument that, while the New York Foundation may have known of Iranian involvement in Assa until 1995, it lost the thread when Assa's shares changed hands. In essence, the reference to 15 years says: "You know exactly who you are dealing with, it has been the same for 15 years." In this letter, Assa's lawyer continued: "With respect to your request at this point for additional information

regarding their country of national origin, I'm not sure that this is appropriate and I will consult with my client regarding this matter." (Id.)  This last reference plainly reflects an understanding that setting forth "Iran" as the country of origin carried potential hazards in 2003.

The New York Foundation's attorney wrote back that, "until you told us on November 10 that the same individuals are the principals of Assa Corp. and Assa Co. Ltd., neither the Foundation nor this firm knew the identity of Assa Company Limited's directors." (DX 764.)  This was of course untrue:  In 1995, Mirza (controller of the New York Foundation) had learned of the identities of Shakeri and Aghamiri, (DX 325 at 2; Trial Tr. 2728:12-19 (Safakamal)); and of course the Board had long known of Bank Melli's actual continued involvement.  This kind of letter reads like one that was sent to create legal cover.

Despite the New York Foundation's and the Government of Iran's efforts at continued concealment, avarice overwhelmed caution and, as a result, exposed the truth of Iranian control.  In February 2004, Hanif—of which Mahalati was the principal—filed suit against the New York Foundation and Assa in New York State Court.  (DX 5006 ¶ 1.)  The lawsuit alleged that Assa had breached its contract with Hanif regarding the sale of Assa's interest in the 650 Fifth Ave. Co., and that the New York Foundation had tortiously interfered with that contract.  (Id.)  Hanif sought $4 million in damages from Assa and the New York Foundation, plus interest.  (Id.)  The New York Foundation moved to dismiss the lawsuit, arguing that it had not tortiously interfered with the contract because the Partnership

Agreement gave it a right of first refusal to purchase Assa's shares in the 650 Fifth Ave. Co. (Id. ¶ 2.) During the litigation, Mahalati threatened to reveal the fact that Bank Melli owned Assa. (Bench Tr. 40:14-18 (Ennis).) Zarif (Iran's Ambassador to the U.N.) directed the New York Foundation to settle the lawsuit. (Trial Tr. 514:16-19 (Ennis); id. 1329:12-17 (McWilliams).) In November 2004, Hanif dismissed the lawsuit in exchange for a payment of $4 million.[47] (DX 5006 ¶ 5; Trial Tr. 2732:5-16 (Safakamal).)

Mahalati, the principal of Hanif, also was one of three directors of MIRI.[48] MIRI was the entity—contemplated in documents dating back to 1989, (see GX 632-T)—that purchased a building for renting apartments to employees of the Iranian Mission to the U.N. (Modarres Tr. 72:10-13.) It is unclear if the "indirect assistance" of the New York Foundation was used for this purpose. For a period of time in the mid-2000s, Modarres, who testified by videotaped deposition in this case, was a member of MIRI's Board. (Id. 70:2-3, 72:15.) MIRI's other two Board members were Mahalati and Hadi Sadeghi. (Id. 72:18-22.)

After Hanif filed suit, Zarif (Iran's Ambassador to the U.N) instructed Modarres to communicate with Alidoost (the New York Foundation's lawyer) regarding receipt of a settlement payment. (Id. 87:1-89:12.) Alidoost requested that

---

[47] During their depositions, Ahmadi, Ebrahimi, Geramian, and Hassani invoked the Fifth Amendment when asked whether, in or about 2004, Zarif (Iran's Ambassador to the U.N.) "direct[ed] the Alavi Foundation to settle the Hanif Partnership lawsuit." (GX 3013 ¶ 136; GX 3015 ¶ 92; GX 3003 ¶ 135; GX 3009 ¶ 50; PX 1 ¶ 200.) The Court draws an adverse inference that the Government of Iran gave instructions to settle.

[48] Masoud Modarres testified that he thought it likely that "MIRI" stood for "Mission of the Islamic Republic of Iran." (Modarres Tr. 198:20-199:4.)

Modarres open a bank account on behalf of MIRI, and Modarres did so.  (Id. 86:19-25, 91:14-16.)  Alidoost had told Modarres to expect a check to arrive and to deposit it in the MIRI bank account.  (Id. 94:9-13, 95:13-21.)  A check for $1.1 million was sent and deposited.  (Id. 92:7-12, 94:20-21.)  The check for MIRI was signed by Mahalati on behalf of Hanif.  (Id. 94:4, 99:23-100:14.)

Thereafter, money from the settlement proceeds was funneled to various Iranian embassies.  Modarres testified that Zarif asked him for blank, signed checks a few weeks after the money was deposited into the MIRI account.  (Id. 108:12-111:11.)  The checks, in the range of $250,000 or $300,000, were cashed a few months later.  (Id. 112:10-114:8, 124:21-22.)  Zarif assured Modarres that the checks were supposed to be deposited and that they were given to "legitimate" people.  (Id. 124:25-125:7.)  Alidoost or Firooznia then ordered Modarres to close the MIRI bank account.  (Id. 117:8-11.)  Zarif later told Modarres that all the checks had been addressed to accountants at Iranian embassies in Europe.  (Id. 257:2-4.)  This was corroborated by other evidence at trial.  In effect, the settlement itself was used as a vehicle to obtain American currency for Iranian embassies.

On July 2, 2005, Tafti (Assa's President) emailed Ghadimipour (Director of Bank Melli's foreign affairs or international division).  (GX 39-T.)  The email stated:

> As you are aware, the issue of the place of residence of share holders and the director of the company [Assa] in the USA has a special importance.  At present, share holders are forbidden from having residences [in Iran], and as per the view of the legal experts, [the American government] may freeze the capital of the share holders. At the present time, owing to prevention of four Iranian companies, the issues are more sensitive.  Fortunately, Assa Corp. has not had a problem, except for the weakness of residence location of the share

> holder which should be removed. Therefore, please make some
> arrangement that the residence location of the share holders of Assa,
> Mr. Davoud Shakeri and Mrs. Aghamiri be changed to another
> country, and considering my knowledge of the United Arab Emirates,
> one of the Emirates is proposed. Please order appropriately.

(Id.) Four days later, Tafti again emailed Ghadimipour. (GX 38-T.) This email stated that, as a result of discussions with lawyers in the U.S. and London, "[c]hanging the share holder of Assa Ltd. is possible, but the share holder should reside in a free country [tax free country]. Otherwise, the country of residence will collect a tax from the income of the share holder." (Id.)

In several other communications, the New York Foundation persisted in trying to create a false paper trail suggesting ignorance of Assa's connection to the Government of Iran. On January 17, 2006, Geramian (President of the New York Foundation) wrote Tafti to request a meeting with the members of Assa's Board. (DX 331.) The letter stated that "[o]ur general counsel has advised that in order to protect our legal interests such a meeting is necessary." (Id.) On February 14, 2006, Tafti responded to Geramian, proposing a meeting in May. (DX 332.) On May 22, 2006, Geramian again wrote to Tafti, stating that "the directors of [the New York] Foundation very much want to meet with the directors of ASSA Corp.," but not mentioning Tafti's prior offer for a meeting that month. (DX 333.) On May 31, 2006, Tafti pointed to his February response to Geramian's January letter proposing a meeting date, and also referenced a meeting that had been scheduled but apparently cancelled by Geramian. (DX 334.) Tafti also wrote that "Assa Corpo[r]ation has always emphasized on a close cooperation between the two partners based on the Partnership Agreement and would therefore, once again

welcome[] a meeting at the earliest convenience." (Id.) Geramian responded on July 12, 2006, again stating that the New York Foundation wanted a meeting with the directors of Assa Corp., and expressing that the Board members were willing to travel for such a meeting. (DX 335.) On August 21, 2006, Tafti responded that "[t]he Board of Assa Corp will be pleased to meet your esteemed Board Members on Wednesday September 6, 2006, at 12:30 pm in our office." (DX 336.)

The Court views all of this—and similar correspondence discussed below—as part of the overall concealment plan. It frankly makes no sense: The New York Foundation always knew that Bank Melli owned Assa, and that the Government of Iran and the Iranian Foundation controlled it. Defendants' main defense in this case and the forfeiture action (apart from legal arguments) has been that these correspondences reflect the truth beliefs of the New York Foundation's Board. This assertion is incredible on so many levels it is hard to know where to begin: Board members interacted with Bank Melli for Assa before and after the alleged 1995 "change" to Shakeri and Aghamiri; Mirakhor knew Bank Melli was still an owner into the 2000s; if Shakeri and Aghamiri were real, one would have expected the New York Foundation to have attempted to exercise its right of first refusal as it did with Hanif; and the recorded conversations discussed below provide further evidence. Any argument to the contrary is just not credible.

In fact, on November 4, 2007, the New York Foundation's Board met with Tafti at the Islamic Institute of New York in Queens. (See DX 646; DX 602.) Despite the fact that the meeting apparently lasted between two and three hours

and "investment in Real Estate" was discussed, the written record consists of only a few lines.  (DX 646.)  The document indicated that Assa Ltd., the owner of Assa Corp., "is a British Co.," its partners are "Mr. Shakeri & Mrs. Aghamiri," and Assa Corp.'s president is Tafti.  (Id.)

In March 2007, counsel for the New York Foundation again wrote to Assa's counsel and stated that, "[h]aving not heard back from you after our telephone conversation at the end of January, we are writing to memorialize the [New York Foundation's] . . . request for a face-to-face meeting between the Foundation's directors and the directors of Assa Corp. ("Assa") in London. . . .  [F]or almost two years the Foundation's directors have requested (orally and in writing) a meeting with Assa's directors.  However, Assa's U.S. representative, Deh[]ghani Tafti, has refused to arrange one."  (DX 339 at 1.)  It also stated that "[m]eeting with Assa's directors and learning the identity of its officers and shareholders will enable the Foundation to satisfy its corporate duties and maintain adequate oversight to ensure that its primary business partner is not engaged in any activities that would jeopardize the Company's ability to do business. . . .  The Treasury Department's guidelines . . . advocate that United States charities carefully vet the recipients of any charitable funds or other assets."  (Id. at 1-2.)  In August 2007, Farshid Jahedi (newly President of the New York Foundation) wrote to Tafti "to introduce [himself] . . . and to request, as [his] predecessor has, a meeting with the individual stockholders and/or managers of [Assa's] parent company here in New York."  (DX 341; see DX 5004 ¶ 20.)

The New York Foundation held a Board meeting on October 5, 2007. (GX 207-T.) Farsi-language notes of that meeting were found in Jahedi's office.[49] (Trial Tr. 2641:19-23; GX 82.) The notes indicate that Mohammad Khazaee (Iran's representative to the U.N. in 2007) was present at the meeting. (GX 207-T at 1, 6-7.) At that meeting, increasing the profit from the Building was discussed, concerns about Assa were raised, and directives that the Foundation should only allocate funds to Shiites were given. (Id. at 1-2.) On the third page, the notes stated: "The composition of the Board of Trustees = Whatever I decide should be approved and it should not be otherwise. The esteemed Members of the Board of Trustees are experienced, religious, and dedicated." (Id. at 3.) The notes also stated: "I don't see a need for change—despite the fact that the gentlemen are taking a risk and it is not an easy thing to do. . . . I thought that the number of the board members can be changed from 5 to 7 if necessary. . . . Stay at work and do not resign." (Id. at 4.) On the sixth page, Khazaee is reported as having stated that, "[i]f there is an issue that needs to be conveyed to Tehran, let me know, I will convey it." (Id. at 6.) Also on that page the notes stated that "[a] legal format for ASSA has to be thought of." (Id.)

The FBI opened a criminal investigation of Assa and the Partnership in 2006. Hesami-Kiche became a confidential source in early 2007 and began making

---

[49] On appeal in the forfeiture action, the Second Circuit noted that "the authorship of these notes is unknown." In re 650 Fifth Ave. & Related Properties, 830 F.3d 66, 82 (2d Cir. 2016). During summations, defendants acknowledged that these notes were Jahedi's. (Bench Tr. 362:25-363:1 ("These are the notes from Mr. Jahedi who took notes of a 2007 meeting with the ambassador.").)

recordings of conversations with individuals associated with the New York Foundation around September 2008. (Trial Tr. 257:25-258:4 (Esposito); id. 418:19-419:23, 614:15-615:19 (Ennis); GX 86.) A recorded conversation from October 2008 among Hesami-Kiche, Hassani (a Board member of the New York Foundation), and Geramian (the Foundation's President until 2007) leaves no doubt that members of the New York Foundation were engaged in a charade to deny knowledge of its connection to the Government of Iran, but were in truth well aware that the New York Foundation and Assa were controlled by the Government of Iran. (See Trial Tr. 1854:18-21, 1857:6-18 (Hesami-Kische).) In this recorded conversation, Geramian references Mazaheri (an Iranian governmental official and, for a period of time, head of the Iranian Foundation) as having been involved "from the beginning." (GX 5008-T at 12:54:14.) Hesami-Kiche testified that he understood this to be a reference to the fact that Mazaheri had been the architect of the Partnership. (Trial Tr. 1863:11-1864:2 (Hesami-Kiche).) During this conversation, Hassani discussed a potential new deal between the New York Foundation and Assa, in which Assa would sell its interest to the New York Foundation. He stated that Mazaheri would determine the payment method. (GX 5008-T at 12:54:38; Trial Tr. 1865:8-14 (Hesami-Kiche).) Hesami-Kiche asked what role Mazaheri played, and Hassani replied that his role "is in the banking system and financial, [] how the contract is drafted and how much to pay later." (GX 5008-T at 12:56:13.) During the conversation, Geramian evinced an understanding that "any connection with Mazaheri and his people with links to Iran, will cause problem for everyone," and

"[i]f Mazaheri is to issue orders for Assa, any deal with them will be dangerous."

(Id. at 12:57:50.)  Geramian also stated: "I sent $2,000 to my mother who was sick

in Iran via a friend of mine once.  They gave him such a hard time.  They asked him

what the money was for, what its purpose was, where it came from.  Now, you want

it with 40%?  He is not even here.  He went to Iran."  (Id. at 12:58:57.)

In a second recorded conversation that month, Hesami-Kiche and Geramian

discussed what could be done with Assa's ownership.  (GX 5015-T.)  Geramian

stated that, "[i]n my opinion if this was an error so be it.  There is nothing to be

done now.  It is like someone who has become sick; he has a heart problem and now

you are coming after such a long time to fix it."  (Id. at 2.)  The Court draws the

reasonable inference from this statement that Geramian was referring to the long-

known involvement of Bank Melli in the Partnership.  Later in the same

conversation Geramian stated, "[i]f they ever ask me anything, I will tell them all."

(Id. at 3.)  He added, "if you hear they are making the deal through Khazaee and

Mazaheri, my duty as a citizen would be to leak the information.  I don't want to

know.  This would force me to reveal them."  (Id.)  He went on to say that, "for one

to one and a half year[s] we asked Deghani [Tafti] bring those people; let us know

who they are.  He would not tell us.  My assumption was they had an independent

organization.  That is even if the Bank Melli owned it, it had split it and had

established a Committee."  (Id. at 3.)  The Court interprets this statement as an

expectation of an additional layer of concealment, not sale to actual third parties.

And, "if they come to interrogate me they would blame me for not having revealed

that the General Director was making a deal with Iran. They would then make me a partner of the crime." (Id. at 4.) In the context of the overall conversation, the Court understands it to demonstrate that Geramian was under no illusions about involvement by the Government of Iran and that he hoped the problem was further obscured through the creation of yet another entity with straw owners.

In December 2008, Hesami-Kiche recorded a conversation with Firooznia (the New York Foundation's accountant until 2004). (DX 5001.) During that conversation, in the context of a discussion about how to resolve Assa's ownership of the Foundation, Firooznia stated, "He knows, Khazaie [at the U.N.] knows." (GX 5014-T at 3.) Firooznia added that, "[a]t the beginning, when he came here, I told him everything: the problem is not here, the problem has to be taken care of there." (Id. (emphasis added).) The Court infers that "there" refers to Iran. Hesami-Kiche also testified that decisionmaking for Assa was done in Iran with the head of Bank Melli. (Trial Tr. 1903:14-21 (Hesami-Kiche).) Firooznia then stated, "I have spoken to ten people about this . . . . I said this to those that were higher than him. I said sir, if something happens, all of his things, all of his shares, will be gone and they will give him hell. Did you see what they did to the French Bank[?]" (GX 5014-T at 5.) Firooznia said that the only person who could solve the issue was Mazaheri. (Trial Tr. 1906:21-25 (Hesami-Kiche).) Later in the conversation, Firooznia stated that "Azizi is in it. Azizi is aware of it." (GX 5014-T at 7.) Azizi was the head of Bank Melli in London. (Trial Tr. 1911:12-14 (Hesami-Kiche).)

Throughout the course of the conversation, Firooznia displayed a keen awareness of the relationship between the New York Foundation and the Government of Iran. He described being called to a meeting in Tehran in 2006—despite the fact that he was no longer officially the New York Foundation's accountant, (DX 5001)—at which he said to others that "you will have big problems, they are going to take your positions." (GX 5014-T at 9-10.) Firooznia mentioned that "[t]hey even carried out a court order against them in France, which is their friend. They will take it." (Id. at 9.) Firooznia described having presented a five- or six-page written report to the attendees of the meeting in Tehran. (Id. at 9, 11.) Later in the conversation, Firooznia stated that "[t]hey all know it completely. [] Saif [Bank Melli's director] and others [.] I went to London before 2006 to Azizi. I told him it is not a joke." (Id. at 10.) Firooznia then described the report: "All of it, it explains all of it. What was the origin, what are the past causes of this case? What happened? Where has it gone? How did it get this way? And then what problems came, what happened? How did we get this far? And what are the solutions? From top to bottom, eight [solutions]." (Id. at 12.) Firooznia then discussed selling the "forty percent part," clearly a reference to the Assa shares. (Id. at 12.) Firooznia characterized the proposal: "Well, they should either sell the mother or they should sell the baby." (Id. at 12-13.)

On December 17, 2008, the FBI served Jahedi (President of the New York Foundation) with a grand jury subpoena relating to its investigation of Assa and the 650 Fifth Ave. Co. (Trial Tr. 267:12-13 (Esposito).) That investigation was

expanded to include the New York Foundation.  After Jahedi was served with the subpoena, the FBI conducted surveillance of him.  On December 18, 2008, FBI agents observed Jahedi depositing shredded documents into a trash receptacle at a train station in Yonkers.[50]  (Trial Tr. 132:7-14, 142:3-6 (Wineriter).)  Those documents, among other things, referenced a potential sale of Assa's Partnership shares, (GX 28J), and diagrammed Assa's corporate structure as of February 2008, (GX 28I).  The reasonable inference from these notes (which refer to "father" and "son") is that, in February 2008, Jahedi knew of Bank Melli's continued ownership of Assa.

On December 18, 2008, the Government filed its initial action seeking forfeiture of Assa's interests in the Partnership and the Building.  On November 12, 2009, the complaint was amended to seek forfeiture of the New York Foundation's 60% interest in the Partnership and all of its other properties.  Between December 2008 and May 2013, the Judgment Creditors filed lawsuits seeking turnover of the same assets.  (See App'x A; DX 5004 ¶ 1.)

VI.  INFERENCES BASED ON ASSERTIONS OF THE FIFTH AMENDMENT

In addition to the above evidence, the Court also draws several adverse inferences related to certain individuals' invocations of their Fifth Amendment rights.  The Court notes, however, that its findings of fact above are irrespective of

---

[50] Jahedi was another of the New York Foundation-affiliated individuals who invoked the Fifth Amendment during his deposition in this matter.  He refused to answer the following question: "On or about December 18, 2008, did you destroy documents that were responsive to the Grand Jury subpoena that you were served with on December 17, 2007?"  (See GX 24 ¶ 124; Trial Tr. 2654:18-20 (Jahedi).)

the invocations by these individuals. No findings would change—and the Court's ultimate conclusions in these cases would not change—if it ignored the Fifth Amendment invocations altogether.

During fact discovery, the following five individuals refused to answer questions at their depositions based on their Fifth Amendment right against self-incrimination:

1. Houshang Ahmadi: a member of the New York Foundation's Board between 1979 and 2013, and President of the Foundation beginning in 2009, (DX 5004 ¶ 20);

2. Alireza Ebrahimi: a member of the New York Foundation's Board from 1991 to 2013, (DX 5004 ¶ 20);

3. Mohammed Geramian: President of the New York Foundation's Board from 1991 to 2007, (DX 5004 ¶ 20);

4. Hassan Hassani: a member of the New York Foundation's Board between 2005 and 2013, (DX 5004 ¶ 20); and

5. Farshid Jahedi: President of the New York Foundation's Board from 2007 to 2009, (DX 5004 ¶ 20).[51]

---

[51] Ali Dabiran, who was a member of the New York Foundation's Board from 2005 to 2013, (DX 5004 ¶ 20), also invoked the Fifth Amendment during his deposition in this case. (Bench Tr. 178:7-17.) While that fact was introduced during the bench trial, neither the transcript of the deposition, nor the questions he refused to answer, were admitted.

While the majority of the Court's conclusions of law are set forth below, the Court here sets forth the law regarding the adverse inferences that may be drawn, and the inferences the Court does draw.

There is no doubt that a non-party witness's invocation of his or her Fifth Amendment right not to testify may constitute admissible, competent evidence in a civil case.[52]  See, e.g., Brink's, 717 F.2d at 710 ("Overall, we are inclined to agree with Judge Weinfeld that the employees' claims of privilege were admissible and competent evidence under the circumstances of this case . . . .").  The test for whether the invocation is admissible is "the circumstances of the particular case," including (1) the nature of the relevant relationships between the witness and the parties, (2) the degree of control of the party over the non-party witness, (3) the compatibility of the interests of the party and non-party witness, and (4) the role of the non-party witness in the litigation.  LiButti v. United States, 107 F.3d 110, 121, 123-24 (2d Cir. 1997).  As with any evidence, however, it is up to the judge to determine whether Federal Rule of Evidence 403 nonetheless militates against admission, and if the evidence is admitted, the trier of fact must determination what weight it should be given and the reasonable inference(s) that should be drawn therefrom.  Id. at 710; see also LiButti, 107 F.3d at 124.

The use of a witness's invocation of his or her Fifth Amendment right as competent, admissible evidence traces back to the Supreme Court's 1976 decision in

---

[52] The Federal Rules of Evidence provides that the common law, as interpreted by the federal courts in light of reason and experience, governs a claim of privilege unless the U.S. Constitution, a federal statute, or rules prescribed by the Supreme Court provide otherwise.  Fed. R. Evid. 501.

Baxter v. Palmigiano.  425 U.S. 308 (1976).  In that case, the Court held that a prison disciplinary hearing is a civil proceeding and that adverse inferences could therefore be drawn against an inmate who refused to testify.  Id. at 320.  "The Court pointed to 'the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'"  Brink's, 717 F.2d at 709 (alteration in original) (quoting Baxter, 425 U.S. at 318).

Adverse inferences may be drawn even when the Government (who could presumably offer immunity from criminal process) is a party to the action in which the privilege was asserted.[53]  See United States v. Ianniello, 824 F.2d 203, 208 (2d Cir. 1987) (holding that an adverse inferences may be drawn from the assertion of the Fifth Amendment privilege in civil RICO actions brought by the Government).  An adverse inference also may be drawn when the witness is a not a party to the proceeding.  See, e.g., Brink's, 717 F.2d at 710 (allowing an adverse inference to be drawn from invocation of privilege by a former employee).  Indeed, "'[a] non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree.'"  LiButti, 107 F.3d at 121 (quoting RAD Servs., Inc. v. Aetna Casualty & Sur. Co., 808 F.2d 271, 275 (3d Cir. 1986)).

As discussed, the Second Circuit has outlined several factors that a court should consider when deciding whether to draw an adverse inference against a party when the invocation was made by a non-party (here, a former Board member):

---

[53] Here, both the Government—as a litigant in the civil forfeiture action—and the judgment creditors noticed the relevant depositions and asked questions.

1. The Nature of the Relevant Relationships: While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a non-party witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship.

2. The Degree of Control of the Party Over the Non-Party Witness: The degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed. R. Evid. 801(d)(2), and may accordingly be viewed, as in Brink's, as a vicarious admission.

3. The Compatibility of the Interests of the Party and Non-Party Witness in the Outcome of the Litigation: The trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation.

4. The Role of the Non-Party Witness in the Litigation: Whether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court.

LiButti, 107 F.3d at 123-24.

As to the weight to be accorded to adverse inferences, the Second Circuit has reminded district courts of Justice Brandeis's statement that "[s]ilence is often evidence of the most persuasive character," LiButti, 107 F.3d at 124 (quoting United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-54 (1923)), and has required a balancing under Rule 403 should be done prior to admission, see Brink's, 717 F.2d at 710. In short, a witness's invocation of the Fifth Amendment is competent evidence, and it may be admissible so long as care is taken under all of the circumstances.

Here, the circumstances of the invocations support certain adverse inferences against defendants.  There is no doubt that each of the deponents faced actual criminal exposure at the time he invoked the Fifth Amendment.  (See ECF Nos. 1706, 1777.)  In addition, at the time of his deposition, each individual also was represented by counsel.

In an effort to exclude this evidence, defendants have argued that, at a certain point in the investigation, the Government sought to bolster its civil case by applying pressure in order to "collect" deponents' invocations of the Fifth Amendment so that such invocations could later be used against defendants.  The Court agrees that, at some point, the Government became aware that many potential witnesses would invoke the Fifth Amendment, and that the Government nonetheless noticed and took depositions of these individuals.  But this does not amount to inappropriate litigation tactics, and there is no indication here of intentional gamesmanship on the Government's part.  Indeed, a rule preventing the Government from seeking relevant, admissible evidence from critical witnesses because they invoked the privilege, or preventing the introduction of that fact at trial, would be unfair and unworkable.  Such a rule would result in witnesses invoking the Fifth Amendment without cost.  The law does not support this manner of proceeding in civil cases.  See Brink's, 717 F.2d at 710.  Second, the videotaped depositions were played at trial.  The Court was able to see the deponents and to satisfy itself that there was nothing about their demeanors that suggested undue pressure.

Furthermore, each of the <u>LiButti</u> factors weighs in favor of drawing adverse inferences based on the witnesses' refusals to testify, even if those witnesses were no longer members of the Board of the New York Foundation.

The first factor, the nature of the relationships between the parties, supports drawing an adverse inference: All the invoking deponents were former Board members of the New York Foundation. The nature of their positions supports continuing loyalty to the New York Foundation. The second <u>LiButti</u> factor, the control the party has and had over the non-party, supports an adverse inference: The evidence at trial amply supported the fact that the New York Foundation was controlled by the Government of Iran, and that the invoking deponents owed their positions to, and felt continuing obligations toward, the Government of Iran. The third <u>LiButti</u> factor, the compatibility of the interests of the party and the non-party witnesses in the outcome of the litigation, weighs strongly in favor of drawing an adverse inference because "assertion of the privilege advance[d] the interests of both the non-party witness and the affected party in the outcome of the litigation." <u>LiButti</u>, 107 F.3d at 123. Here, the witnesses all have an interest in continued concealment of the Government of Iran's control of the New York and Iranian Foundations. Fourth and finally, in terms of the role of the non-party witness in the litigation, the deponents who invoked the Fifth Amendment held high-level positions within the New York Foundation, one of the defendants on trial. As such, they possess highly relevant information regarding the nature of a connection between the New York Foundation and Iran.

In sum, having weighed the LiButti factors as to the former Board members, the Court finds that considering their invocations of the Fifth Amendment is appropriate. In terms of the inferences to be drawn from such invocations, the circumstances under which the deponents invoked the Fifth Amendment suggest that, had they given truthful testimony, it would have been against defendants' interests.

Next, the Court considers the questions as to which it will draw any adverse inferences from a deponent's invocation of the Fifth Amendment. See Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1265 (9th Cir. 2000) (An adverse inference from invocation of the Fifth Amendment can only be drawn as to each question individually "[b]ecause of the question-by-question nature of the privilege[.]"); In re Bernard L. Madoff Investment Secs. LLC, 560 B.R. 208, 226 (Bankr. S.D.N.Y. 2016) ("The [Fifth Amendment] privilege must be invoked on a question-by-question basis, and an adverse inference can only be drawn as to questions that are actually asked." (internal quotation marks omitted)); cf. Hoffman v. United States, 341 U.S. 479, 48687 (1951) ("To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (emphases added)). At the depositions, the Government marked as exhibits documents containing dozens of questions. The Government then asked each deponent whether he had read the questions, understood them, and had an opportunity to confer with his counsel on

them.  Each stated that he had.  The Government then asked whether the deponent intended to invoke his Fifth Amendment privilege as to each and every question, and each deponent confirmed that he did.  The Judgment Creditors supplemented that list of questions.

The Court is cognizant of a need to have a reasonable basis to believe the deponent had a role that provided a sufficient basis for a foundation to ask a deponent about particular subject matter.  Accordingly, the topics on which the Court focuses were relevant facts known to the Court from other evidence regarding the deponent's role and the subject areas covered at Board meetings.[54]

Although both invocations of the Fifth Amendment and the Court's adverse inferences therefrom are done on a question-by-question basis, for efficiency and comprehensibility the Court organizes its analysis of these questions by topic.  The following deponents invoked their Fifth Amendment rights when asked questions on the following issues:

1. <u>The Government of Iran's Dominion, Control, or Influence over the New York Foundation</u>

---

[54] At the end of trial, defendants belatedly raised form and foundation objections to the deposition questions to which Hassani and Jahedi invoked their rights not to testify.  There had been no objections to the deposition questions previously admitted by the Judgment Creditors with respect to the other invoking individuals.  Further, there is no indication that form objections were raised at the time of the depositions, at which counsel for the New York Foundation was present.  (GX 24A; GX 3008.)  The rules provide that failure to raise form objections at the time of the deposition waives them.  Fed. R. Civ. P. 32(d)(3)(B).  Nevertheless, the Court considers the objections.  The stated bases for the objections were hearsay and a lack of foundation.  (Bench Tr. 180:25-181:8.)  In terms of hearsay, the Court said at the time these objections were raised and has said before, (see, e.g., ECF No. 1782), that the statements could be admitted under Federal Rule of Evidence 801(d)(2)(E), the co-conspirator exception to the hearsay rules.  With regard to the foundation objections, there is a sufficient factual basis in the record to suggest that the deponents who invoked the Fifth Amendment would have had relevant testimony to provide.

Ahmadi (a Board member from 1979 to 2013 and President from 2009), Ebrahimi (a member of the Board and its Treasurer from 1991 to 2013), and Hassani (a member of the Board between 2005 and 2013) invoked the Fifth Amendment when asked questions regarding whether, during the time they were on the Board, officials of the Government of Iran, or of any agency, instrumentality, or department of the Government of Iran, exercised dominion or control over the New York Foundation.  (GX 3004 ¶¶ 45-48; GX 3010 ¶ 38; GX 3016 ¶¶ 5, 51.)

Each of these three, along with Geramian (President between 1991 and 2007) and Jahedi (President from 2007 to 2009), also invoked the Fifth Amendment when asked questions about whether their appointments or the appointments of other Board members were influenced by Iranian government officials, or agencies, instrumentalities, or departments of the Government of Iran.  (GX 24 ¶¶ 55-62; GX 3003 ¶¶ 96-99, 105-08; GX 3009 ¶¶ 28, 29; GX 3013 ¶¶ 72-75; GX 3015 ¶¶ 72, 74; PX 1 ¶¶ 83-86, 92-95; Trial Tr. 1022:15-20 (Geramian); id. 1455:16-19 (Karjooravary); id. 1700:17-22 (Ahmadi); id. 2283:17-20 (Hassani); id. 2654:12-14 (Jahedi).)

Finally, all five invoked the Fifth Amendment when asked questions regarding whether the resignations of Board members were influenced by Iranian government officials, or agencies, instrumentalities, or departments of the Government of Iran.  (GX 24 ¶ 63; GX 3003 ¶¶ 101-04, 109, 111; GX 3009 ¶¶ 30, 32; GX 3013 ¶¶ 70, 79; GX 3015 ¶¶ 73, 75; PX 1 ¶¶ 88-91, 96, 169, 171-72, 174.)

The Court draws the adverse inference that these deponents would have provided evidence supportive of a finding that Iranian government officials, or agencies, instrumentalities, or departments of the Government of Iran, exercised control over the New York Foundation.

2. Knowledge Regarding the Relationship Between Assa and Bank Melli

Ahmadi, Ebrahimi, Geramian, Hassani, and Jahedi invoked the Fifth Amendment when asked questions regarding whether, during the time they were Board members, they knew Assa was owned or controlled, directly or indirectly, by Bank Melli Iran. (GX 24 ¶ 20; GX 3003 ¶¶ 39, 40; GX 3009 ¶ 12; GX 3013 ¶¶ 24-27; GX 3015 ¶ 29; PX 1 ¶¶ 30, 31, 61, 62; Trial Tr. 1455:3-10 (Ebrahimi); id. 1700:9-12 (Ahmadi); id. 2654:5-7 (Jahedi).)

All five invoked the Fifth Amendment when asked questions regarding whether, during the time they were Board members, they knew that funds paid to Assa by 650 Fifth Ave. Co. were further transferred for ultimate payment to Bank Melli Iran in Iran. (GX 24 ¶ 40; GX 3003 ¶ 56; GX 3009 ¶ 20; GX 3013 ¶ 43; GX 3015 ¶¶ 35, 37; PX 1 ¶¶ 38, 40; Trial Tr. 1022:21-24 (Geramian); id. 1455:11-15 (Ebrahimi); id. 1700:13-16 (Ahmadi); id. 2654:8-11 (Jahedi).)

All five invoked the Fifth Amendment when asked questions regarding whether, during the time they were Board members, payments for the ultimate benefit of Bank Melli Iran were made to Assa in order to conceal or disguise Bank Melli Iran's ultimate ownership and control of those funds. (GX 24 ¶ 46; GX 3003

¶¶ 58, 59; GX 3009 ¶ 23; GX 3015 ¶¶ 38, 39; PX 1 ¶¶ 41, 42; Trial Tr. 1022:25-
1023:4 (Geramian); id. 2283:3-7 (Hassani).)

The Court draws the adverse inference that these deponents would have
provided testimony supportive of a finding that Board members of the New York
Foundation knew Assa was controlled by Bank Melli.

3. Instruction or Direction from Iran's Representatives to the U.N.

Ahmadi, Ebrahimi, Geramian, Hassani, and Jahedi invoked the Fifth
Amendment when asked whether, during the time they were Board members, the
Ambassador to the Iranian Mission to the U.N. gave instructions to the Board. (GX
24 ¶ 71; GX 3003 ¶ 115; GX 3009 ¶ 36; GX 3013 ¶¶ 83-85, 88; GX 3015 ¶ 80; PX 1
¶ 177; Trial Tr. 1700:23-1701:1 (Ahmadi).)

All five invoked the Fifth Amendment when asked questions about whether,
during the time they were Board members, they met with the Iranian Ambassador
to the U.N. at the Ambassador's residence to discuss matters relating to the New
York Foundation. (GX 24 ¶ 78; GX 3003 ¶ 124; GX 3009 ¶ 41; GX 3015 ¶ 85; PX 1
¶¶ 186-87.)

All five invoked the Fifth Amendment when asked whether, during the time
they were members of the Board, the Iranian Ambassador to the U.N. attended
Board meetings. (GX 24 ¶ 70; GX 3003 ¶ 114; GX 3009 ¶ 35; GX 3013 ¶ 87; GX
3015 ¶ 79; PX 1 ¶ 176; Trial Tr. 1455:20-22 (Ebrahimi); id. 2283:21-23 (Hassani); id.
2654:15-17 (Jahedi).)

Finally, Geramian and Jahedi invoked the Fifth Amendment when asked whether, while they were President of the New York Foundation, they signed fraudulent minutes of Board meetings in order to conceal the participation, influence, or instructions of the Iranian Ambassador to the U.N. at those meetings. (GX 25 ¶¶ 58, 60; GX 3013 ¶¶ 117, 119.)

The Court draws the adverse inference that these deponents would have provided testimony supportive of a finding that the Iranian officials to the U.N. gave instructions to the Board of the New York Foundation.

VII.    SUMMARY OF CERTAIN FINDINGS OF FACT

Based on the totality of the evidence and as discussed above, among this Court's findings of fact are the following:

1.  The New York Foundation is, and since its inception has been, an entity used by the Government of Iran as a means to effectuate various significant national purposes, including to act as a real estate holding company and as a source of U.S. funds. While the New York Foundation—now Alavi—has always engaged in charitable works (many of which promoted Iranian culture, heritage, the Persian language, and the Muslim religion), its most important function has been to manage and protect a group of very valuable properties within the United States. Among these properties is the Building located at 650 Fifth Avenue, New York, New York.

2. While the New York Foundation is incorporated in the United States as a not-for-profit entity, that incorporation obscures its real purpose and use as an entity that functions as a vehicle for the fulfillment of national purposes of the Government of Iran. The fact of "incorporation" within the United States has itself been used as a tool to conceal and obscure the New York Foundation's true purpose, which is to serve as the means by which the Government of Iran has been able to manage and protect valuable real estate assets within the United States and, when possible, to receive funds from those entities.

3. In fact, the most important decisions regarding the operations, management, and assets of the New York Foundation have been made by the Government of Iran through its officials (including the Ayatollah or his representatives) or other instruments (such as the Iranian Foundation or Bank Melli).

4. The New York Foundation is the managing partner of the Partnership. This Court has previously determined that its 40% partner—Assa—was an instrumentality of Bank Melli, which in turn is an instrumentality of the Government of Iran.

5. The members of the Board of the New York Foundation have always understood that Assa was an instrument serving important purposes of the Government of Iran. The New York Foundation knew that it 1989

and has never been ignorant of that fact.  It is absolutely clear that the New York Foundation was not defrauded by Assa.

6. The New York Foundation has consistently served as a means for transferring U.S. currency to the Government of Iran, and for the benefit of the Government of Iran's embassies in Europe.

7. Beginning in the 1980s and continuing to the present, the Government of Iran has employed a variety of tactics to try and conceal the true identity and function of the New York Foundation as an instrument of the Government of Iran.  In the more recent period since 2003, those efforts have included an attempt to deny knowledge of the ownership and control of Assa by Bank Melli, thereby trying to further a perception that the New York Foundation was unaware of its true role as an instrument of the Government of Iran.

8. These efforts have taken many forms—including a letter-writing campaign that attempted to suggest that the New York Foundation had forgotten who owned and controlled Assa; the New York Foundation is simply an independent charitable organization with Persian heritage but not affiliated with the Government of Iran; and the Board of Directors of the New York Foundation was independent from the Government of Iran's control.

9. The most recent years of what is portrayed as seeming independence of the New York Foundation is nothing more than a "long game," whereby

the Government of Iran fully understands that it must withdraw into the background until a more fortuitous time arises when the New York Foundation's assets may again be employed for use by the Government of Iran.

10. A number of current and past members of the Board—including each of the Presidents of the New York Foundation—have understood the Foundation's true status as an instrument of the Government of Iran, the requirement that they take direction from the Government of Iran, and that the New York Foundation serves the national interests of the Government of Iran.

VIII.    CONCLUSIONS OF LAW

Plaintiffs have asserted two separate bases for turnover of the Subject Properties: § 201(a) of the Terrorism Risk Insurance Act ("TRIA"), 28 U.S.C. § 1610 note, and § 1610(b)(3) of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610(b)(3). Plaintiffs bear the burden of proving that the attachment of the Subject Properties is appropriate. See Kirschenbaum, 830 F.3d at 12; Harrison v. Republic of Sudan, No. 13-cv-3127, 2017 WL 946422, at *3, 5 (S.D.N.Y. Feb. 10, 2017). Importantly, plaintiffs may prevail if they meet their burden under either statutory provision.

A.    TRIA § 201(a)

Plaintiffs' TRIA § 201(a) claim is asserted against both defendants. Section 201(a) of TRIA provides:

Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) [as such section was in effect on January 27, 2008] of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337-40 (2012) (codified at 28 U.S.C. § 1610 note) (emphasis added).

Thus, to attach the Subject Properties under TRIA, plaintiffs must show (1) that defendants' properties are "blocked assets," and (2) that defendants are a "terrorist party"—here, the Government of Iran[55]—or an "agency or instrumentality of that terrorist party" (again, the Government of Iran). Id.

1. Blocked Assets

To attach defendants' properties under TRIA, plaintiffs must show that defendants' properties are "blocked assets." See TRIA § 201(a). Based on the Court's factual findings above, and as described further in the Court's analysis below, it is quite clear that the Subject Properties constitute blocked assets under TRIA § 201(a).

The term "blocked asset" is defined as "any asset seized or frozen by the United States under section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)) [now 50 U.S.C. § 4305(b)] or under sections 202 and 203 of the [IEEPA] (50

---

[55] There is no doubt that the Government of Iran is a designated terrorist party under TRIA. See Kirschenbaum, 830 F.3d at 131-32 (citing Determination Pursuant to Section 6(i) of the Export Admin. Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984)).

U.S.C. 1701; 1702)." TRIA § 201(d)(2)(A). "Both blocking regimes 'authorize the President to freeze the assets of foreign enemy states and their agencies and instrumentalities' in order to 'put control of foreign assets in the hands of the President so that he may dispose of them in the manner that best furthers the United States' foreign-relations and national-security interests.'" Kirschenbaum, 830 F.3d at 137 (quoting Bank Markazi v. Peterson, 136 S. Ct. 1310, 1318 (2016)).

The Second Circuit has already found as a matter of law that all assets that belong to an entity that satisfies Executive Order 13,599's definition of the Government of Iran are automatically blocked. Id. at 137, 139. Executive Order 13,599 defines the Government of Iran as "any political subdivision, agency, or instrumentality thereof, . . . and any person owned or controlled by, or acting for or on behalf of, the Government of Iran." Exec. Order No. 13,599 § 7(d); see also 31 C.F.R. § 560.304 note (2016).

As set forth extensively above and as will be discussed further below, this Court has found that the New York Foundation was extensively controlled by the Government of Iran, acted as its instrument, and was the subsidiary of one of its agencies. Furthermore, the New York Foundation has been used as a tool to obscure the true ownership, control, and purpose of itself[56] and the 650 Fifth Avenue Company. Accordingly, the New York Foundation's property, and therefore

---

[56] When the Shah of Iran originally incorporated the Pahlavi Foundation of New York, it appears that the entity was expected to function as a charitable organization under the Shah's direction. The ultimate control by the Government of Iran never changed—though the purpose of the Foundation expanded from being merely a charitable organization to, in effect, acting as a real estate holding company that would preserve the value of such assets on behalf of Iran.

the assets of the 650 Fifth Avenue Company, are blocked assets.[57] See 31 C.F.R. § 560.425; Kirschenbaum, 830 F.3d at 141 n.26.

The Court notes that the same facts that determine whether an entity satisfies the definition of a terrorist party or an "agency or instrumentality" of a terrorist party under TRIA § 201(a) also answer the question as to whether the entity satisfies Executive Order 13,599's definition of the Government of Iran. Below, the Court finds that defendants are agencies or instrumentalities of the Government of Iran (or, at the very least, instrumentalities) under TRIA § 201(a). Accordingly, this further supports that their assets are "blocked" and subject to attachment and execution.

## 2. Agency or Instrumentality Status

Section 201(a) of TRIA confers subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an "agency or instrumentality" of a "terrorist party," even if the agency or instrumentality is not itself named in the judgment. See Kirschenbaum, 830 F.3d at 132; Weinstein, 609 F.3d at 50. In other words, even though plaintiffs obtained their underlying judgments against the Government of Iran and not against the New York Foundation or the 650 Fifth Avenue Company specifically, plaintiffs may attach defendants' properties under TRIA if, inter alia, defendants qualify as agencies or instrumentalities of Iran under TRIA.

---

[57] In a May 15, 2017, Memorandum Decision & Order, this Court rejected defendants' argument that their assets had become "unblocked" by certain licenses issued by OFAC. (ECF No. 1675.) Defendants acknowledged this in their closing arguments and did not provide any persuasive reason for the Court to revisit its prior determination.

The Second Circuit has instructed that the terms "agency" and "instrumentality" are to be giving their ordinary meaning in light of the statutory text of TRIA as a whole.[58] Kirschenbaum, 830 F.3d at 135. Principles of statutory construction further require that each term be given a separate meaning. Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used. Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise here it does not." (internal citation omitted)). The Court therefore construes the words "agency" and "instrumentality" separately and differently.[59]

An "agency" is defined as "[a] person or organization acting on behalf of another, or providing a particular service." Agency, Oxford English Dictionary Online, http://www.oed.com/view/Entry/3851? (last visited June 29, 2017). In other words, an agency is "a person or thing through which power is exerted or an end is achieved." Agency, Merriam-Webster Online, https://www.merriam-

---

[58] In Kirschenbaum, the Second Circuit rejected the argument that TRIA's definitions of "agency or instrumentality of [a] terrorist party" mirrored the FSIA's definitions of "agency or instrumentality of a foreign state." Kirschenbaum, 830 F.3d at 134-35 (refusing to assume Congress "intend[ed] for FSIA § 1603(b) to apply selectively to the TRIA") (emphasis added).

[59] At closing arguments, defendants advanced the position that "agencies or instrumentalities" is a term of art and, as used in TRIA, does not refer to separate and different things. Defendants cited other statutes such as the Federal Tort Claims Act, and referred this Court to their petition for a writ of certiorari from the Second Circuit's Kirschenbaum decision. This Court rejects defendants' argument, based primarily on the statutory interpretation described above. Defendants' argument also conflicts with the standard set forth by the Second Circuit. In all events, this Court finds that defendants' meet TRIA's definition of both "agencies" and "instrumentalities" and would also meet the applicable standard if "agencies or instrumentalities" was construed as a term of art. According to defendants, "agencies or instrumentalities" as a term of art centers around control; here, as the Court has explained, Iran exercised sufficient control over defendants.

webster.com/dictionary/agency (last visited June 29, 2017); <u>see also</u> Merriam–
Webster Collegiate Dictionary 22 (10th ed. 1993) (defining agency as "a person or
thing through which power is exerted or achieved").

In contrast, an "instrumentality" is defined as "a means <u>or</u> [a]gency through
which a function of another entity is accomplished." Black's Law Dictionary (10th
ed. 2014) (emphasis added). Put differently, an "instrumentality" is "something
that serves as an intermediary <u>or</u> agent through which one or more functions of a
controlling force are carried out." Webster's Third New Int'l Dictionary 1172 (1993);
<u>see also</u> Merriam-Webster Collegiate Dictionary 22 (10th ed. 1993) (defining
instrumentality as a "means" <u>or</u> an "agency" (emphasis added)).

As the definitions above make clear, an instrumentality need not be agency.
See <u>Loughrin v. United States</u>, 134 S. Ct. 2384, 2390, 189 L. Ed. 2d 411 (2014) ("To
read the next clause, following the word 'or,' as somehow repeating that
requirement, even while using different words, is to disregard what 'or' customarily
means. As we have recognized, that term's 'ordinary use is almost always
disjunctive, that is, the words it connects are to be given separate meanings.'"
(quoting <u>United States v. Woods</u>, 134 S. Ct. 557, 567, (2013)). It may be the case,
even frequently, that an instrumentality is in fact also an agency. In other
situations, however, the two can have subtle but important differences. While an
agency is typically acknowledged and publicly known to be more directly acting on
behalf of another, an instrumentality may serve as an intermediary without
widespread recognition.

The Court notes that whether acting as an agency or an instrument, an entity acting for another can fulfill some national purpose, as defendants did here.

Accordingly, as the Second Circuit has made clear: "To demonstrate that Defendants are 'agencies or instrumentalities' of a terrorist party under the TRIA, therefore, Plaintiffs must show that each Defendant (1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party." Id. (emphasis added). Importantly, and as discussed further below, status as an "agency or instrumentality" is measured as of the time plaintiffs' complaints in this action were filed.[60] Id. at 136.

The Court notes that to be an "agency or instrumentality" under the first or second prongs, a "materiality" requirement must be met. This requirement provides some protection to those who might unwittingly be acting as instrumentalities and thereby exposing the property used in that regard to attachment. A materiality threshold ensures that only when important functions are fulfilled will either agency or instrumentality status be found.

TRIA does not define the phrase "material function" or "material services." In the absence of a statutory definition, words in a statute should be given their plain and ordinary meaning. See Kirschenbaum, 830 F.3d at 135. A "material"

_____

[60] Defendants assert that instrumentality status should be determined as of the date the wrongful death or personal injury complaints were asserted against Iran, and to which each of the judgments relates. This is incorrect. The issue under TRIA arises as of the time a proceeding is commenced to attach property in aid of execution on that judgment. The question of whether the property is an instrumentality of Iran at that time is the relevant issue. But in all events, the agency or instrumentality status in this case was present at all relevant times.

function or service is an important one.  See Material, Oxford English Dictionary Online, http://www.oed.com/view/Entry/114923 (last visited June 29, 2017) ("Of serious or substantial import; significant, important, of consequence."); Assured Guar. Mun. Corp. v. Flagstar Bank, FSB, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) ("According to [its] dictionary definition[], 'material' means '[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential,' Black's Law Dictionary (7th ed. 1999) . . . .").  It is plain that for any sovereign, an array of different functions and services may be important.  No legal principle requires that such functions or services be limited to particular ones.

As the Court will describe in detail below, whether examined as an agency or as an instrumentality, defendants meet each of the applicable standards at all relevant times.  The Court's factual findings amply demonstrate that defendants in fact were both "agencies" and "instrumentalities:" they "(1) [were] a means through which a material function of [Iran] is accomplished, (2) provided material services to, on behalf of, or in support of [Iran], [and] (3) [were] owned, controlled, or directed by [Iran]."  Id.

i.  Means through which a material function is accomplished

As the Court has detailed extensively in its findings of fact, defendants have served, and continue to serve, as instrumentalities of the Government of Iran—that is, they serve as the means through which a material function is accomplished.  Specifically, the New York Foundation and the Partnership have been the vehicles that have directly enabled the Government of Iran to maintain and protect its

110

ownership interests in s portfolio of real estate assets, namely the Building at 650 Fifth Ave. as well as the Subject Properties.[61]  Through the Partnership, Iran has received millions of dollars in U.S. currency long-after the sanctions regime went into effect.  (GX 15A; GX 15C.)  In addition, these entities continue to act as a means of value preservation as they seek to shield the assets from forfeiture and attachment.  But, in addition, as the facts above demonstrate, Iranian officials also viewed the charitable works focuses on Iranian heritage and culture as fulfilling an important function for Iran.

Finding instrumentality status under this "means" test is straightforward. Bank Melli has previously acknowledged that it is an instrumentality of Iran.  See Weinstein, 609 F.3d at 48 ("Finally, Bank Melli concedes that it is an instrumentality of Iran.").  This concession carries considerable importance.  Bank Melli owned the New York Foundation's partner, Assa.  As the Court has explained in great length, the Government of Iran needed to conceal the fact that Assa was owned by Bank Melli and that Bank Melli was making major decisions for the Partnership and the New York Foundation.  To this end, Bank Melli used Assa as a front; from the very outset, Assa's purpose was to participate in the Partnership, which was created to allow for Bank Melli's concealed ownership.  However, this

---

[61] Relying on Stansell v. Revolutionary Armed Forces of Colombia, 771 F.3d 713, 735 (11th Cir. 2014), defendants argue that the material function or material service provided must specifically support the criminal activity that caused a terrorist organization to be designated as such.  The Court disagrees.  The Second Circuit has not adopted such a requirement.  Such a narrow reading is not found in TRIA's plain text, nor do the purpose and legislative history behind § 201 support restricting the provision in such a manner.  Requiring that a material function or material service be connected to specific terrorist activity would improperly constrain TRIA's "agency or instrumentality" requirement.

could only be accomplished through the Partnership as was only accomplished with the active assistance of the New York Foundation; the New York Foundation provided the means through which Iran could conceal its involvement and interest. Indeed, its corporate form and charitable works have provided cover for the material functions these entities were carrying out for Iran.

To function, the Partnership needed a managing partner—someone to oversee the day-to-day operations of the Partnership, and someone whose identity further obscured any connection to the Government of Iran. An incorporated charitable entity such as the New York Foundation was a useful concealment device. In the absence of a managing partner, the Partnership could accomplish nothing. As the factual findings above demonstrate, from the time the Partnership was created, the New York Foundation was designated by Iran to fulfill this material function. Without the New York Foundation, the Partnership would not have been able to function and the Partnership would not have been able to preserve the valuable asset located at 650 Fifth Ave. The New York Foundation is, of course, the exclusive vehicle through which Iran's charitable mission is accomplished.

Both the Partnership and the New York Foundation thus provided Iran the ability to conceal long-term ownership of real estate assets, to access to U.S. currency provided through those assets, and—once the sanctions came into effect— to evade the trade embargo and to insulate the Subject Properties from attachment in connection with the Government of Iran's lawful debts (and to fulfill an Iranian

mission to promote its heritage and culture).  All of this was accomplished through concealment of Iran's involvement and control.  Given the value of the assets and the amount of Iran's debts, this was a highly material function.  Furthermore, as with the <u>Hanif</u>, <u>Gabay</u>, and <u>Flatow</u> litigations, defending against these lawsuits is also acting in protection of those assets.

The New York Foundation served for decades as the crucial, active instrument to accomplish the Government of Iran's ultimate objectives with regard to the valuable assets and business of the New York Foundation.

ii.  <u>Provided material services</u>

As the Court found and detailed extensively in its findings of fact above, both defendants were agencies of the Government of Iran—that is, they provided material services to, on behalf of, and in support of the Government of Iran.[62]  In addition to protecting the real estate assets, through active provision of real-estate management services by the New York Foundation, defendants from time to time provided currency in various circuitous ways to the Government of Iran and/or its officials.  For instance, the Partnership transferred to Assa, which transferred to Bank Melli and thus to the Government of Iran, millions of dollars in partnership distributions.[63]  The accountant who watched over the New York Foundation's

---

[62] The Court notes that there is some overlap in how defendants provided material services to Iran and how defendants serve as a means through which a material function of Iran is accomplished.

[63] Defendants argue that the last of these payments occurred in 2007, and thus, the Partnership cannot be deemed to have been providing such payments as a "material service" during the relevant time period under <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468 (2003).  As defendants appeared to acknowledge at closing arguments, however, the relevant time period is not limited to the literal date on which the complaints were filed, but necessarily is also based to some degree on a historical analysis leading up to the date on which the complaints were filed.

finances at this time also provided information and services to Assa and Bank Melli.

Furthermore, the New York Foundation continues to serve the Government of Iran by protecting its assets, including the building at 650 Fifth Avenue, for future use by the Government of Iran. Bluntly put, it serves the national interests of the Government of Iran for defendants to try to preserve an ownership interest in the assets for the long term, as the Court has already detailed.

### iii. Ownership, control, and direction

In addition to serving the functions and purposes described above, the facts unequivocally demonstrate that defendants were always controlled and directed by Iran. The New York Foundation was merely a branch of the Iranian Foundation; its charitable mission was directed by the Iranian Foundation, and the Iranian Foundation was controlled by the Government of Iran. As the facts also demonstrate, the most important decisions for the New York Foundation were made by Iranian officials.

Importantly, these decisions included how to manage the Partnership, the composition of the Board of the New York Foundation, and how to maintain the value of the Building. Concealing Iran's involvement was paramount. There are numerous examples of this set forth above and the Court will not attempt to reiterate them all here. Suffice it to say, they include: the use of layered shell companies and straw owners; board meetings held with individuals from the Iranian Foundation and other Iranian officials, reflected in Farsi-language minutes but cleaned form English-language minutes; correspondence using secrecy;

114

perjurious denials of connections between the New York Foundation and Iran; settlement of litigation both to prevent revealing the truth and that was used, in part, to funnel U.S. currency to Iranian embassies, and so on.

iv. <u>Relevant time-frame</u>

The Court has already noted that defendants' status as agencies or instrumentalities must be measured as of the time plaintiffs' complaints in this action were filed. <u>Kirschenbaum</u>, 830 F.3d at 136. That is, if defendants were not agencies or instrumentalities of Iran at that time, then plaintiffs' TRIA claims must fail. The Court has considered whether defendants were agencies or instrumentalities at the time each plaintiffs' complaint was filed,[64] as detailed in Appendix A.[65] The first of plaintiffs' actions was filed on January 8, 2009, and the last was filed in 2013. The factual findings here, as the Court has detailed, support that defendants were agencies or instrumentalities of Iran at all points during defendants' existence, including on January 8, 2009, and through 2013.

Defendants assert that, as a matter of law, neither the New York Foundation nor the Partnership could constitute an agency or instrumentality of Iran after December 17, 2008—the date on which the Government commenced its initial forfeiture action against Assa's property, including its interests in the Partnership. According to defendants, on December 18, 2008, in connection with the filing of that

---

[64] During closing arguments, defendants acknowledged that this inquiry

[65] The <u>Hegna</u> plaintiffs filed their claims pursuant to an order to show cause. Their claims have been treated as the equivalent to all of the other plaintiffs' claims throughout this litigation. As discussed above, this Court therefore draws no distinction based on the manner in which their claim was initially presented.

action, the Government obtained a "Protective Order" from the Court directing the Partnership to transfer all income and/or other disbursements dues and owing to Assa to a designated bank account. (See ECF No. 2.) Defendants argue that, in addition, on April 28, 2010, the Court appointed a monitor to ensure appropriate expenditures. (ECF No. 136.) According to defendants, both the court-issued Protective Order and the fact of the monitor necessarily mean that the New York Foundation cannot—after the Protective Order (the earlier of the two events)—have been an instrument of Iran. As both a matter of fact and law, this is incorrect.

As a matter of law, there is no legal principle involved in either the Protective Order or the appointment of the monitor that divested the New York Foundation of its partnership interest in the Subject Properties. The same is true with respect to the Partnership's interest in the Building and related bank accounts.[66] The retention of those interests continues to serve important interests of the Government of Iran by protecting hard assets during a time of trade embargo.

As a factual matter, there is ample evidence that, despite the monitorship and the Protective Order, the New York Foundation and the Partnership have retained their status as instrumentalities of the Government of Iran. First, they continue to own the Subject Properties—though what they can do with those assets is currently constrained. This ownership, in and of itself, continues to serve one of these entities' most important functions: protecting the assets for future use by

---

[66] The Court notes that paragraph 13 of the Protective Order states: "Nothing in this Protective Order shall be construed as affecting in any way the rights of any part[y] under Section 201 of the Terrorism Risk Insurance Act of 2002." This illustrates that defendants understood the Protective Order would not serve to eliminate potential attachment under TRIA.

Iran—its "long-game." The fact that use of those assets is constrained in the short term during the pendency of the litigation does not alter that purpose. If the defendants succeed in this suit (as well as in the forfeiture suit brought by the Government), the Government of Iran will have ultimately succeeded in retaining those assets. In addition, and as part of working on behalf of the Government of Iran to preserve the assets, the New York Foundation has also continued to act as the managing partner of the Partnership. It has continued to contract with a real estate management company, it has continued to enter into agreements with commercial tenants, and it has continued to collect rents.[67] The New York Foundation has continued in all ways to try and preserve the Subject Properties for the benefit of itself and the Partnership—and the Court has found that this furthers the interests of the Government of Iran. For its part, the Partnership has provided the vehicle through which the New York Foundation has been able to manage the most valuable of all assets, the Building.

Thus, the New York Foundation and the Partnership were, at the very least, instrumentalities of the Government of Iran at the time the first of the relevant complaints here was filed in 2009 and remained so throughout the time each of the Judgment Creditor complaints was filed.[68]

---

[67] The Court notes that during the period from September 2014 to August 2016—which was the period immediately following this Court's summary judgment ruling—until resolution of the appeal, the monitor had increased responsibilities. Nevertheless, the Foundation and the Partnership continued to perform certain independent functions.

[68] This Court notes that the Hegnas brought their initial order to show cause on March 27, 2009— well before the Protective Order was issued or the monitor appointed.

v.  Knowledge of agency or instrumentality status

The parties dispute whether TRIA requires that an agency or instrumentality know of its status.  This question was left open by the Second Circuit's decision in Kirschenbaum.  830 F.3d at 136 ("Neither the District Court nor before [the Second Circuit] have the parties addressed whether, to satisfy the TRIA's definition of agency or instrumentality, plaintiffs must show that Defendants knew, or reasonably should have known, that they were functioning for, providing material services on behalf of, or being owned, controlled or directed by the terrorist party (here, Iran).")

Ultimately, the Court need not resolve this question because, as a factual matter and as discussed at length above, it is patently clear that at all times, the various Presidents of the New York Foundation as well as many of the members of the Board have known that both the New York Foundation and the Partnership were "agencies or instrumentalities" of Iran.  As the Second Circuit stated, the New York Foundation's knowledge is at issue because "if [the New York Foundation] had such knowledge, it would be imputed to 650 Fifth Avenue Co., of which [the New York Foundation] owns 60%."  Kirschenbaum, 830 F.3d at 136 n.20; see also Alliance 3PL Corp. v. New Prime, Inc., 614 F.3d 703, 706-07 (7th Cir. 2010) ("A corporation knows what its managers know, and it does not acquire amnesia when the management team changes."); N.Y. Partnership Law § 23 ("Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to

118

his mind, <u>and</u> the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner" (emphasis added).).[69]

Thus, to the extent that knowledge is a required element of TRIA, then such knowledge would have to have existed at the time that a plaintiff's complaint was filed. And, as this Court's findings of fact make clear, such knowledge did exist at that time and at all times. Furthermore, there was clearly no fraud on the New York Foundation or the Partnership. In short, the New York Foundation and the Partnership have had uninterrupted knowledge of their status as "agencies or instrumentalities" of Iran continuously to the present.

Even if that were not the case, the Court would find conscious avoidance that amounts to knowledge on the part of the New York Foundation. Conscious avoidance is the equivalent of knowledge of a particular fact "'(1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist.'" <u>United States v. Schultz</u>, 333 F.3d 393, 413 (2d Cir. 2003) (quoting <u>United States v. Feroz</u>, 848 F.2d 359, 360 (2d Cir. 1988)). The Court's findings of fact make clear that, at the least, "'surrounding circumstances were such that

---

[69] This Court notes that for such imputation to occur, the fact at issue must be within the scope of "partnership affairs." As discussed above, the Partnership was formed for the essential purpose of concealing Iran's interest. Thus, as a matter of fact, this Court finds that Iranian involvement goes directly to partnership affairs, making imputation appropriate. The Court also finds that Assa's knowledge may be imputed to the Partnership. Assa's knowledge that it was owned by Bank Melli likewise related to the Partnership affairs and was a fact that "reasonably could and should have communicated" to Alavi while Alavi was acting on behalf of the Partnership. Furthermore, the facts reveal that there was no fraud on the Partnership that vitiates imputation.

reasonable persons [the President and Board of the New York Foundation] could have concluded that the circumstances alone should have apprised defendants of the'" truth.  <u>United States v. Civelli</u>, 883 F.2d 191, 195 (2d Cir. 1989) (quoting <u>United States v. Guzman</u>, 754 F.2d 482, 489 (2d Cir. 1985)).[70]

As a matter of law, however, this Court does not believe knowledge of instrumentality status is a required element for a TRIA § 201(a) claim; the Court does believe that, generally, agency principles prevent an agent from lacking knowledge as to its principle.  But people or entities may become the unwitting instruments of another.  <u>Cf</u>. <u>Bennis v. Michigan</u>, 516 U.S. 442, 446-47 (1996).  The fact that they may be, or are, unaware of their status as instruments does not eliminate their role as such.  In this regard, an instrumentality may be passive: An instrument is something that may be played upon or used by another.

The legislative intent in enacting the TRIA does not support a knowledge requirement, even for a passive instrumentality.  In this regard, the breadth and purpose of TRIA § 201(a) indicate an intent to cast a broad net to effectuate deterrence.  This legislative intent is best fulfilled without reading in a knowledge requirement.  Repercussions for even passive use by a terrorist party encourages an entity at risk of such use to engage in active review.

In addition, another statute with somewhat related statutory purposes—IEEPA—has specifically eliminated lack of knowledge as a defense to forfeiture.

---

[70] Clandestine behavior itself may be used to provide circumstantial evidence of knowledge.  As the Court has found, there was clear clandestine behavior on the part of defendants.

See 18 U.S.C. § 983(i).  Finally, the materiality threshold discussed above further ensures that even an instrumentality who lacks knowledge will only have its assets subject to attachment if it has provided a material function.

Thus, even if this Court were to find that the New York Foundation did not know of its status as an agency or an instrumentality of Iran, if all of the other elements of TRIA are met, including that defendants were instrumentalities of Iran (as they are here), then attachment is nonetheless appropriate.[71]

### 3.  The innocent-owner defense

In its 2016 decision, the Second Circuit also left unresolved whether an "innocent owner-type defense" would be available to a terrorist's agency or instrumentality.  Kirschenbaum, 830 F.3d at 136.  This issue is closely related to the knowledge question above.  Ultimately, this issue also need not be resolved as the Court's findings of facts establish that the New York Foundation was not an innocent owner.[72]  The facts found above establish a lack of innocence—and indeed, knowledge, complicity, and active participation—by defendants.

But, the Court additionally finds that the concept of an "innocent owner" is in

---

[71] Defendants have also made vague assertions that constitutional due process or takings under the Fifth Amendment are implicated by TRIA's lack of a knowledge requirement.  Defendants have neither presented a clear explanation of the basis for such a right nor analyzed its implications for this litigation.  However, even if defendants had properly briefed the issue, the argument would be unavailing because the Supreme Court has made clear that even in civil forfeiture—never mind the kinds of turnover actions here—constitutional due process "does not protect [an owner's] interest against forfeiture" even when the owner "did not know that her [property] would be used in an illegal activity."  Bennis v. Michigan, 516 U.S. 442, 449 (1996).  Defendants' nebulous allusions to due process as a source of a knowledge requirement therefore fail.

[72] The Partnership is the legal owner of the Building, while Alavi is owner of an interest in the Partnership and owns additional property in its own right.  The Partnership only acts and has knowledge through its partners; here, Alavi is the managing partner able to cause the Partnership to act.  It is therefore Alavi's knowledge that must be answered in connection with the innocent owner defense.

any event inapplicable to TRIA § 201(a) as a matter of law. As now discussed extensively, TRIA § 201(a), requires that an entity be an agency or an instrumentality of a terrorist party. It is plain that agency principles prevent an agent from lacking knowledge as to its principal; the concept of "innocent owner" thus has no meaning when one is examining the question from the point of view of an agent of a terrorist party. One simply cannot be innocent in such a principal/agent relationship.

The issue must be analyzed differently with regard to an instrumentality. As the Court has discussed above, an instrument need not know that it is an instrument. Thus, an entity may have instrumentality status and be unaware of that fact. No knowledge is required. It is plain, therefore, that to apply an innocent owner defense on top of a statutory provision allowing attachment of instrumentalities' property would defeat the breadth—and ultimately the deterrent purposes—of this provision. Accordingly, the Court does not find that the innocent owner defense is or should be applicable to claims asserted pursuant to § 201(a) of TRIA. However, as stated, even if this defense was available it would fail as defendants were not innocent owners.

Finally, the analogy to 18 U.S.C. § 983(i) is again helpful. There, the applicability of an innocent-owner defense is specifically eliminated from IEEPA violations. Given the similar legislative intent underlying these statutes, Congress's decision in §983(i) is instructive and persuasive here.

4. The statute-of-limitations defense

Defendants argue that the Rubin, Miller, Hegna, Peterson, Acosta, Heiser, Kirschenbaum, and Havlish judgment creditor actions are time barred by the ten-year statute of limitations in 28 U.S.C. § 1605A, under which some of the plaintiffs' underlying claims arose. (ECF No. 1855, 1886.) The Court disagrees as both a matter of logic and law. First, logic dictates otherwise: If the turnover actions were required to comply with the statute of limitations that applies to the underlying actions giving rise to the judgment, it would follow that a plaintiff who filed an action seeking a liability judgment on the last day of the statute of limitations period for the underlying action would never be able to file a turnover action pursuant to TRIA. That is, under defendants' reading, the situation could arise where a judgment only issues after the expiration of the underlying statute of limitations, rendering attachment impossible. This is would be an absurd result and would defeat Congress's clear intent in enacting TRIA to expand remedial avenues for holders of judgment against terrorists and sponsors of terrorism.[73] See Weinstein, 609 F.3d at 51 ("The effect of TRIA, therefore, was simply to render a judgment more readily enforceable against a related third party." (emphasis added)).

Under Federal Rule of Civil Procedure 69, the procedure on execution of judgment "must accord with the procedure of the state where the court is located," unless a federal statute applies. Fed. R. Civ. P. 69. As discussed, the FSIA statute

---

[73] The Court notes that the title of TRIA § 201 specifically references "satisfaction of judgments," and § 201 specifically requires that a person "has obtained a judgment" before proceeding under that section. TRIA § 201(a), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337-40 (2012) (codified at 28 U.S.C. § 1610 note).

of limitations does not apply here, and TRIA does not independently provide a statute of limitations. This Court therefore applies New York law. Under New York Consolidated Laws, Civil Practice § 211(b), a twenty-year statute of limitations applies in these circumstances.

Therefore, once a judgment has been registered in this district (as these all have), the Judgment Creditors have twenty years to find subject assets in order to collect on them. See 28 U.S.C. § 1963; Fed. R. Civ. P. 69(a); New York C.P.L.R. § 211(b). The oldest of the underlying judgments in the Judgment Creditor actions is from 2002. (See App'x A; DX 5003 § I; PX 1000; PX 1034; PX 1014; PX 1004; PX 1006; PX 1025; PX 1026; PX 1030; PX 1011; PX 1019; PX 1020; HX 1; HX 2.) The last of the turnover actions was filed in 2013. (See App'x A; PX 52; DX 5004.) Accordingly, all of the turnover actions are well within the applicable statute of limitations and are not time barred. In addition, defendants have long been on notice of plaintiffs' claims, rendering a laches defense unavailable.

In sum, this Court finds that the Judgment Creditors have satisfied all of these elements of TRIA § 201 and are therefore entitled to turnover of the subject properties.

B.     FSIA SECTION 1610(b)(3)

As reflected in Appendix A, a number of the Judgment Creditor plaintiffs have asserted claims under § 1610(b)(3) of the FSIA[74] as a separate basis for

---

[74] The Hegnas maintain that they have live claims under FSIA § 1610(g). In light of the Second Circuit's 2016 decision in Kirschenbaum, this Court disagrees. There, the Second Circuit examined the record before it in the context of the appeal of this Court's ruling on summary judgment. The

attachment and execution regarding the Subject Properties owned by the Partnership (only).[75]  The FSIA recognizes the general principle of sovereign immunity from suit in the United States, and provides the sole basis for obtaining subject matter jurisdiction over sovereign states or their agencies or instrumentalities.  See 28 U.S.C. § 1604 et seq.; see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989).  The relevant provision regarding jurisdictional immunity is § 1605A.

However, having a basis for subject matter jurisdiction over a sovereign or its agencies or instrumentalities does not itself allow for attachment of that sovereign's property—or the property of its agencies or instrumentalities—in aid of attachment and execution of a judgment.  "In addition to conferring a presumption of jurisdictional immunity on foreign sovereigns, the FSIA presumes attachment and execution immunity over a foreign sovereign's property."  Kirschenbaum, 830 F.3d at 123.  Thus, where a valid judgment has been entered against a foreign state, unless a statutory exception applies that allows for execution and attachment, any property of that foreign state that may be located within the United States is immune from execution and attachment.  Id.

---

Court found that, as a matter of law, the § 1610(g) claim could not survive.  Kirschenbaum, 830 F.3d at 128.  While it is certainly the case that another option would have been to find a triable issue on that question and to vacate this Court's decision pending development of a fuller trial record, that was not the manner in which the parties pursued the appeal or the manner in which the Second Circuit ruled.  Accordingly, even if the fuller record would now allow for a different decision on § 1610(g), that is foreclosed.

[75] The FSIA claim is not asserted against the Subject Properties owned by the New York Foundation.

Accordingly, for plaintiffs to succeed on their FSIA § 1610(b)(3) claim here, they must both establish a jurisdictional basis for suit under § 1605A, as well as meet all of the requirements for execution and attachment set forth in section 1610(b)(3).

1. Jurisdictional immunity

Section 1605A(a)(1) provides the required exception to jurisdictional immunity. This provision states:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). As each of the underlying judgments obtained by plaintiffs demonstrates,[76] plaintiffs' judgments are all based on personal injury or death caused by acts of terrorism in which Iran participated. See Appendix A. Thus, the jurisdictional basis for suit under § 1605A is satisfied here.

2. Attachment and execution immunity

---

[76] "Some plaintiff members obtained judgments pursuant to § 1605A's predecessor, § 1605(a)(7), which was in effect until it was repealed and replaced by § 1605A in January 2008. See National Defense Authorization Act for Fiscal Year 2008, Pub. L. 110-181, Div. A, sec. 1083, 122 Stat. 3, 338–44 (repealing 28 U.S.C. § 1605(a)(7) and creating 28 U.S.C. § 1605A). The version supporting Plaintiffs' underlying judgments is immaterial for resolution of this appeal." Kirschenbaum, 830 F.3d at 123 n.8.

The Court turns next to whether property of the sovereign (Iran) or its agencies or instrumentalities may be attached and executed under § 1610(b)(3). That provision provides:

> [A]ny property in the United States of <u>an agency or instrumentality of a foreign state</u> engaged in <u>commercial activity</u> in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if . . . the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008, <u>regardless of whether the property is or was involved in the act upon which the claim is based.</u>

28 U.S.C. § 1610(b)(3) (emphasis added).

Thus, in order to determine whether plaintiffs succeed on their remaining FSIA claim, they must demonstrate two things: (1) that the Partnership is an agency or instrumentality of Iran, and (2) that it was engaged in commercial activity.

### i. <u>Agency or instrumentality status</u>

The FSIA defines "agency or instrumentality" as follows:

> (b) An 'agency or instrumentality of a foreign state' means any entity—
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an <u>organ</u> of a foreign state or political subdivision thereof, or a majority of whose shares <u>or other ownership interest</u> is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) (emphasis added). "All three statutory elements must be satisfied to render an entity an agency or instrumentality under the FSIA." Kirschenbaum, 830 F.3d at 126. "Because jurisdiction depends on 'the state of things at the time . . . the action [is] brought, an entity's agency or instrumentality status under the FSIA 'is determined at the time of the filing of the complaint.'" Id. (quoting Dole Food Co. v. Patrickson, 538 U.S. 468, 478, 480 (2003) (alteration and ellipsis in original)). All three of the § 1603(b) elements are met here.

The Court turns to the first element of § 1603(b): As a registered partnership under New York law, the 650 Fifth Avenue Company meets the definition of a separate legal entity for purposes of § 1603(b)(1). See Kirschenbaum, 830 F.3d at 126 (explaining that the Partnership did not dispute this element).

Defendants nevertheless argue that, while not specified in § 1603(b), implicit within that provision is a requirement that once the fact of a separate juridical entity has been established, there must be an additional set of findings that allows such separateness to be ignored. As support for the addition of such a required finding, defendants point to the language of §§ 1603(b)(3) and 1610(g).

FSIA § 1610(g) explicitly permits a terrorism victim to execute a terror-based judgment against property belonging to a foreign state or its agencies or instrumentalities "regardless of" five elements: (1) the level of economic control over the property by the foreign government; (2) whether the profits of the property go to the government; (3) the degree to which government officials manage the property or control its daily affairs; (4) whether the government is the sole beneficiary in

128

interest of the property; or (5) whether establishing the property as a separate entity would entitle the foreign state to the benefits of the U.S. courts while avoiding its obligations.  28 U.S.C. § 1610(g)(1)(A)-(E).  In contrast, FSIA § 16039(b)(3) does not contain similar language.

According to defendants, the legislative history of the newly-created FSIA § 1610(g) that added this authority to ignore separateness, and Congress's failure to include similar language in FSIA § 1610(b)(3), necessarily means that there is an implicit requirement to find both legal separateness under § 1603(b) and that such separateness may properly be ignored as not reflective of the actual relationship between the parties.

In contrast, plaintiffs argue that defendants read § 1610(g) too narrowly, and that it in fact allows for any person holding a judgment pursuant to § 1605A to ignore corporate separateness.  According to plaintiffs, this is so even if the person seeks attachment under a different provision altogether, including section § 1610(b)(3).  In support of their argument, plaintiffs point to the fact that § 1610(g) refers to "attachment in aid of execution . . . as provided in this section" and that "section" refers to § 1610, not solely the subsection 1610(g).  Plaintiffs also cite Rubin v. Islamic Republic of Iran, where the Seventh Circuit persuasively addressed this question as follows:

> Section 1610(g) lifts the Bancec [First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983)] rule for holders of terrorism-related judgments, allowing attachment in aid of execution 'as provided in this section' without regard to the presumption of separateness—that is, without the requirement of establishing alter-ego status or showing an injustice.  The phrase 'as

129

provided in this section refers to the immunity exceptions found elsewhere in § 1610, one of which must apply to overcome execution immunity. So although subsection (g) substantially eases the enforcement process for terrorism victims by removing the <u>Bancec</u> barrier, it is not a freestanding terrorism exception to execution immunity.

830 F.3d 470, 474 (7th Cir. 2016), <u>cert. granted</u>, (June 27, 2017) (No. 16-354); <u>see also</u> <u>Bennett v. Islamic Republic of Iran</u>, 825 F.3d 949, 967 (9th Cir. 2016), <u>petition for cert. filed</u>, (Sept. 15, 2016) (No. 16-334) ("Section 1610(g) leads to two straightforward conclusions under FSIA. First, if a party obtains a § 1605A judgment against a state sponsor of terror, the <u>Bancec</u> presumption is eliminated, which permits a court to attach and execute against the property of the agency or instrumentality to satisfy the judgments against the foreign state. Second, the language 'as provided in this section' requires a judgment creditor to find an existing mechanism of attachment under § 1610. Section 1610(g) does not create a new avenue for attachment under FSIA; rather, § 1610(g) broadens the force of § 1610's existing avenues for attachment . . . . (internal citations omitted)). This Court agrees with plaintiffs' reading of § 1610(g).

Here, plaintiffs all hold terrorism-related judgments obtained as a result of the jurisdictional provision in § 1605A. The congressional intent expressed in § 1610(g) is not limited to actions where attachment is sought solely on that basis (which would be actions brought solely pursuant to § 1610(g) and not some other provision such as § 1610(b)(3)), but extends to claims based on a terrorism-related judgment along with attachment based on the "commercial activity" provided for in § 1610(b)(3). That is the posture currently before this Court. Defendants' argument would read out of all

of § 1610 other than subsection (g) the obvious congressional intent to make it easier to attach properties held by agencies or instrumentalities of terrorist states. Congress had good and sufficient reasons to enact such a provision, and its intent must be respected.

However, it is ultimately unnecessary for this Court to resolve whether this reading of the statute is correct as the Court's findings of fact make it quite clear that the elements in § 1610(g) that otherwise enable separateness to be ignored (that is, elements (A)-(E)), are sufficiently met here.[77]

The first element regarding whether an entity's juridical separateness is effectively real is the level of economic control the foreign government exercises over the property. As the Court's findings of fact make clear, the Government of Iran, including at times the Ayatollah himself, have directly and consistently controlled the most significant aspects of the 650 Fifth Avenue Company's activities. First, the New York Foundation has always acted as managing partner and concerned itself with partnership issues; the Government of Iran and the Iranian Foundation controlled composition of the Board. In addition, these Board members oversaw financial distributions to Iran. The record contains extensive evidence of Iranian

---

[77] Even if these factors were not met, the Court finds that defendants' separate legal status would "work a fraud or injustice" and should therefore be ignored under Bancec. The detailed factual record, as described by the Court, demonstrates that Bank Melli and Iran sought to use the Partnership to fraudulently conceal assets and create a shelter from liability. This Court acknowledges that the Second Circuit found this "fraud or injustice" argument was waived in the context of plaintiffs' claims under FSIA Sections 1610(a)(7) and 1610(g), which were then before that court on appeal. See Kirschenbaum, 830 F.3d at 131 n.15. As this Court noted in its May 4, 2017, Memorandum Decision & Order, the Second Circuit's decision did not, and could not, have addressed plaintiffs' separate claim under FSIA § 1610(b)(3)—a claim that plaintiffs' explicitly reserved. Accordingly, plaintiffs' have not waived their "fraud or injustice" argument here (which they have asserted with regard to their FSIA § 1610(b)(3) claim).

officials actively directing the formation of the Partnership in order to resolve the New York Foundation's financial issues; they determined whether lawsuits concerning the Partnership would be settled and the monetary terms thereof (and they received a portion of such settlement monies at Iranian embassies); they took a portion of the cash distributions from the Partnership; they oversaw the appointment of an accountant—Firooznia—who, in turn, oversaw the financial aspects of the Partnership as well as the New York Foundation, including distribution of millions of dollars to Iran; and the Iranian Ambassador to the U.N. fundamentally controlled operations of the Partnership, through control of the New York Foundation, for years. In short, the major decisions by the Partnership relating to protection of assets and use of assets have been controlled by the Government of Iran. It is of little moment that coordinated and consistent efforts to conceal such control have resulted in periods when the control is less apparent (and the concealment has been more successful) than at other times. There is sufficient evidence of prolonged and complete control, and complicity in concealment, to render such periods of less apparent control of little counter value.

The second element relating to separateness is whether the profits of the property—here, the Partnership assets—go to the foreign government. The same facts now discussed on multiple occasions above support this element as well. First, it is plain, when it could be done—directly or circuitously—that Partnership distributions went to the Government of Iran through Assa (see, e.g., GX 15C, GX 15D); and the value of the Partnership interest and the Building ultimately inures

to the benefit of Iran.  But, in addition, as managing partner, the New York Foundation has been responsible for payments to its partner and to maintain the value of the Building.  As found above, the New York Foundation has never been under any illusions regarding who Assa was or in whose hands the money would end up.

The third element relevant to whether separateness is real is the degree to which foreign government officials manage the property or control its daily affairs. Here again, the facts leave no doubt that this element is met. The facts make it clear that (1) the Iranian Ambassador to the U.N. has been in effective control of the New York Foundation for a number of years.  He understood his role and that of the Board as controlling the Partnership (as managing partner) and thus the Building (in this regard, notes of the October 5, 2007, Board meeting where increasing the profits of the Building was discussed are instructive); (2) the Iranian Foundation and the Government of Iran have also exercised oversight over the New York Foundation, including appointment of members of its Board; (3) how the New York Foundation, as managing partner of the Partnership, managed financial affairs has been controlled at the highest level by the Ayatollah and other officials in the Iranian Government.  This, again, resulted in funds being transferred via Partnership distributions to Iran and the enhancement of a portfolio of real estate in the United States.  Such control is evident from the outset of the Partnership's existence—when Iranian officials decided to enter into a partnership with Bank Melli; and (4) the evidence demonstrates that the most significant decisions

regarding the finances of the Partnership were decided by Iranian officials, along with Bank Melli.

The fourth element regarding separateness is whether the foreign government is the sole beneficiary in interest of the property.  Here, it is clear that the Building and the bank accounts at issue are ultimately controlled by the Iranian Government.  It is also clear that the Iranian Government allows a certain amount of the cash generated therefrom to increase and enhance the other real estate assets in the name of the New York Foundation but held for the ultimate, and actual, benefit of Iran.

Most significantly, Iran has used the fact of the separate incorporation of the New York Foundation, as well as its charitable mission, as cover for Iranian control of the Partnership being associated with Iran.  Further, Iran has, in the past, demonstrated a willingness to use the Partnership to access and control the assets of the New York Foundation for itself.

The last and final element of determining true separateness is whether establishing the property as a separate entity would entitle the foreign state to the benefits of the U.S. courts while avoiding its obligationsg.  Again, the facts demonstrate that allowing for separateness would privilege the form of the Partnership (and the New York Foundation's interest in the Partnership) over their true substance.  The Partnership would be able to rely on such separateness to avoid the attachment sought here, and also avoid having to pay the judgments against the Government of Iran.

Having found a lack of separateness as a matter of fact, the Court turns to the third element of FSIA § 1610(b)(3)—the Court will then subsequently analyze the second element of FSIA § 1610(b)(3).

The third element of § 1603(b)(3) requires a determination of whether the Partnership meets the definition of "citizen" as provided for in 28 U.S.C. § 1332(c). In a thorough analysis of this issue, the Second Circuit has found that, as a matter of law, it cannot. With regard that element, the Second Circuit focused primarily on this Court's 2014 determination that corporate form could be ignored under Bancec when to do otherwise would result in a fraud or injustice. See Kirschenbaum, 830 F.3d at 126. It analyzed this view and disagreed with it. Id. at 127. In discussing this aspect of the district court's decision, the Second Circuit included an important footnote—footnote 10. There, the Court noted that § 1603(b)(3) specifically incorporates the citizenship provision of § 1332(c), and noted that Congress had never expanded "'this grant of citizenship to include artificial entities other than corporations.'" Id. at 127 n.10 (quoting Americold Realty Tr. v. Conagra Foods, Inc., 136 S. Ct. 1012, 1015 (2016)); see also Lincoln Prop. Co. v. Roche, 546 U.S. 81, 84 n.1 (2005) (noting that for "diversity purposes, a partnership entity, unlike a corporation, does not rank as a citizen"); Chapman v. Barney, 129 U.S. 677, 682 (1889) (declining to read § 1332(c) to encompass a "mere partnership"). The Second Circuit further analyzed the issue and determined that "[i]n these circumstances, we construe § 1603(b)(3) to incorporate only the § 1332(c) definition of corporations, and not to extend to partnerships." Kirschenbaum, 830 F.3d at 127 n.10.

135

The Court now turns to the second element of FSIA § 1603(b). This element requires that an entity be "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). The Court here focuses first on the meaning of what constitutes an organ and what constitutes a political subdivision and then focuses on what constitutes an "other ownership interest."

In <u>Filler v. Hanvit Bank</u> the Second Circuit set forth five factors to determine whether an entity constitutes an "organ" of a foreign state. 378 F.3d 213, 217 (2d Cir. 2004). This determination requires balancing the factors, and "an entity can be an organ even if not all of the factors are satisfied." <u>European Cmty. v. RJR Nabisco, Inc.</u>, 764 F.3d 129, 144 (2d Cir. 2014), <u>rev'd and remanded on other grounds</u>, 136 S. Ct. 2090 (2016).[78] The <u>Filler</u> factors are:

1. Whether the foreign state created the entity for a national purpose;

2. Whether the foreign state actively supervises the entity;

3. Whether the foreign state requires the hiring of public employees and pays their salaries;

4. Whether the entity holds exclusive rights to some right in the [foreign] country; and

5. How the entity is treated under foreign state law.

---

[78] <u>European Cmty.</u>, 764 F.3d at 144-47, and <u>Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.</u>, 476 F.3d 140, 143 (2d Cir. 2007), address these factors in some detail and are consistent with this Court's discussion of them as set forth herein.

Filler, 378 F.3d at 217.  Again, there is no requirement that all five factors be fulfilled to support the conclusion that an entity is an "organ" of a foreign state. Considering these five factors, as discussed below, this Court finds that the Partnership is an organ of Iran.

The Court reviews each of these factors in turn.  First, a "national purpose" means a purpose which fulfills a national interest, that is, an interest of the national government.  Here, as the Court has detailed extensively above, the Partnership served the critical purpose of enabling the Government of Iran to maintain, build, and protect its ownership interest in valuable assets, namely the building at 650 Fifth Ave.  The Partnership (as well as the New York Foundation[79]) provided Iran with an ability to evade the trade embargo, and through concealment of Iran's ownership interest, insulate properties such as the Building from attachment in connection with Iran's lawful debts.  Through the Partnership, Iran has had access to millions of dollars in U.S. currency from Partnership distributions.  Given the value of the assets and the amount of Iran's debts, this has plainly served an important national interest.

Iran directly participated in management decisions and decisions that established the Partnership, including the requirement in the Partnership Agreement (GX 125) for distributions to Assa.  These distributions were intended to, and did, provide Iran with a source of hard currency during a time when the

_____

[79] As the Court has already discussed, the New York Foundation was the child of the Iranian Foundation.  The national purpose of the New York Foundation itself is evident in the Iranian Foundation's "Legal Bill of Charter," which was similar to an "Articles of Incorporation."  See PX 559.

Iranian embargo otherwise severely constrained access to such.  It has also directed how the New York Foundation would retain and grow the value of the Partnership's (and by way of its interest in the Partnership, the New York Foundation's) primary asset, the Building.

Defendants argue for a narrow definition of "national purpose."  According to them, such a purpose must be a "quintessential government purpose," (ECF No. 1748 at 11), such as "establishing a common market and a monetary union, and [] coordinating economic activities throughout the community"; central planning and management of a national industry; or examining, supervising and investigating financial institutions.  (Id. (citing European Cmty, 764 F.3d at 145; Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion, 832 F.3d 92, 117 (2d Cir. 2016); Peninsula Asset Mgmt., 476 F.3d at 143).)

Defendants' argument draws its examples of "national" interests from instances in which the national government at issue is able to operate in the United States.  That is not the case here.  In the case of Iran, the question of what constitutes a "national interest" must be viewed through the lens of a country whose government has been under trade embargos for decades, that has deep and religiously influenced conflicts with its regional neighbors, and that faces tremendous diplomatic barriers in the international arena.

Viewed with these factors as backdrop, this Court is easily able to find that maintaining access to U.S. currency, which Iran may then use for any purpose,

through concealed distributions from the Partnership served an important national purpose, as did maintaining the value of that asset until such time as the sanctions were lifted and it could be readily monetized and put to more direct use.

The second factor is whether the Government of Iran actively supervises the entity. See Filler, 378 F. 3d at 217. The "active supervision" factor is met when the foreign state appoints the key officials and regulates at least some of the activities that they undertake. European Cmty., 764 F.3d at 145. This factor "does not require [that] the foreign state [] micro-manage every aspect of the organ's activities." Id. (finding that appointments of individuals to serve as representatives on two of the five basic institutions of the European Community was sufficient).

The Court's findings above demonstrate that the Government of Iran controlled Assa through Bank Melli. The facts also demonstrate that it actively controlled the New York Foundation and, in that way, the Partnership itself. The evidence demonstrates that its control came in two forms: (1) direct decision making by Iranian officials; and (2) the appointment of sufficient Board members and officers of the New York Foundation (who was the managing partner of the Partnership) to maintain control from within. Thus, Iran controlled decisions regarding the major financial aspects of the New York Foundation and the Partnership; these decisions were made with the understanding that Iran sought to control and maintain the value of the Partnership.

The third factor is whether the foreign state requires the hiring of public employees and pays their salaries. See Filler, 378 F. 3d at 217; European Cmty.,

764 F.3d at 145-46 (finding this element satisfied where the employees' pay was indirectly financed by nation states).  An individual need not be a public employee of the member state to fulfill this factors.  Id. at 146.  The Court acknowledges that the Partnership had no direct employees.  As set forth above in the Court's factual findings, however, the preponderance of the evidence demonstrates that the key personnel who directed the Foundation (and thus the Partnership) and who were within the New York Foundation and were actually making decisions for it (including managing the Partnership on a day-to-day basis) were put in place by Iranian officials—including Iran's U.N. Ambassador—directly on instructions from the Ayatollah, or through Iran's agents or instrumentalities—the Iranian Foundation and Bank Melli.  Furthermore, it is undisputed that the New York Foundation's partner in the Partnership—Assa—was owned and controlled by Bank Mellis and thus the Government of Iran.

The Fourth factor is whether the entity holds exclusive rights to some right in Iran.  Filler, 378 F. 3d at 217.  This factor has been given broad meaning.  See European Cmty., 764 F.3d at 146 (explaining that this factor includes the right to issue bank notes); In re Terrorist Attacks on September 11, 2001, 538 F.3d 71, 86 (2d Cir. 2008), abrogated on other grounds by Samatar v. Yousuf, 560 U.S. 305 (2010) (this element is satisfied when the entity held the 'sole authority" to collect and distribute charity to Bosnia for the foreign state); Peninsula Asset Mgmt., 476 F.3d at 143 (the right to receive periodic reports from a financial institution that it oversees); Corporacion Mexicana De Mantenimiento Integral,  832 F.3d at 117 (it

includes the right to exploit natural resources);  Murphy v. Korea Asset Mgmt.

Corp., 421 F. Supp. 2d 627, 644 (S.D.N.Y. 2005), aff'd, 190 F. App'x 43 (2d Cir. 2006)

(this right includes the right to dispose of non-performing loans).  It is unclear

whether this factor is met.  However, that is because the very participation of Iran

has been concealed; it is therefore difficult to know what rights the Partnership

might have in Iran.  It is relevant that this Court has found that control of the

Partnership may be traced through the Iranian Foundation, and it is known from

the Legal Bill of Charter of that entity that it holds various rights to, inter alia,

Pahlavi property.[80]

The fifth and final factor is how the Partnership is treated under Iranian law.

An entity is an "organ" if it is treated as part of the foreign state under its laws.  See

Corporacion Mexicana, 832 F.3d at 117 (finding that an entity had been treated as a

government entity in Mexico when Mexican courts found that it could not be forced

to arbitrate because it was part of the Mexican government); European Cmty., 764

F.3d at 146 (finding that the "government entity" factor was met for a multinational

entity which had been authorized by several nations to exercise government powers

in their stead).  The evidence at trial supports that the Partnership was and is

treated as an asset of the Iranian Foundation and Bank Melli, and it is reasonable

to infer that whatever Iranian laws apply to those entities apply to their progeny

(i.e., the Partnership).

---

[80] That document also shows the Iranian Foundation oversees a global mission to pursue Iranian interests.

In addition to finding that the Partnership is an organ of Iran, the Court also finds that § 1603(b)(2) is satisfied by facts demonstrating that Iran in reality owns the majority of the Partnership's shares or, at the very least, has an "other ownership interest" in the Partnership. It is certainly true that the New York Foundation is the nominal legal owner of 60% of the shares in the Partnership and that, under New York Law, the shares of a non-for-profit are not "privately owned." But these corporate formalities have been used as a vehicle to conceal the fact that, in reality, the New York Foundation holds that interest for the benefit of Iran; it takes directives from Iranian government officials, and its day-to-day operators have been appointed by Iranian officials to ensure conformity with the interests of the Government of Iran.

Finally, this Court also finds that, regardless of the Partnership's status as an agency or instrumentality of Iran, it is Iran's "alter ego" and, therefore, FSIA jurisdiction is properly as it would be over Iran. While the Second Circuit addressed this argument in its 2016 decision, <u>Kirschenbaum</u>, 830 F.3d at 128, it did so in the context of the evidentiary record before it on summary judgment. It explicitly found, however, that such an argument was not foreclosed as a matter of law. <u>Id.</u> at 128-29. The record now before this Court—and concerns plaintiff's claim under FSIA § 1610(b)(3), which was not before the Second Circuit—is far different from the one that was before the Second Circuit. <u>See</u> <u>id.</u> at 129 (noting that there was no "record evidence" to support an argument as a matter of law that the New York Foundation was "so extensively controlled by [Iran] that a relationship of

principal and agent is created.").  The significantly more fulsome trial record now affirmatively demonstrates that the Partnership is Iran's alter ego.

To establish that the Partnership is the "alter ego" of Iran, this Court applies the principles set forth in First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983), known as Bancec.  See EM Ltd. v. Banco Cent. De La Republica Argentina, 800 F.3d 78, 89 (2d Cir. 2015).

"The 'touchstone inquiry for "extensive control"' is 'whether the sovereign state exercise[d] significant and repeated control over the instrumentality's day-to-day operations.'"  Kirschenbaum, 830 F.3d at 129 (quoting EM Ltd, 800 F.3d at 91).  The factors relevant to this inquiry include "'whether the sovereign nation: (1) uses the instrumentality's property as its own, (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state.'"  Id. at 130 (quoting EM Ltd., 800 F.3d at 91).

In its decision reversing this Court's prior determination of alter ego status, the Second Circuit focused only on the New York Foundation.  Here, the record evidence set forth above and incorporated here, now supports the kind of extensive control necessary to support a determination that the Partnership is Iran's alter ego, as extensively detailed in the Court's factual findings.

ii. Commercial activity

Having found that the Partnership constitutes an agency or instrumentality of Iran, the Court turns next to whether the commercial activity requirement of FSIA § 1610(b)(3) has been met.  Again, that section provides that "any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States" may be subject to attachment in aid of execution on a judgment.  28 U.S.C. § 1610(b) (emphasis added).  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The statute directs that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  Id.  The Court has "a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA]." NML Capital, Ltd. v. Republic of Argentina, 680 F.3d 254, 257 (2d Cir. 2012) (quoting H.R. Rep. No. 94–1487, at 16 (1976)).

As plaintiffs' remaining FSIA claim is only being pursued as to the Partnership, the elements of this provision are easily satisfied.  The Supreme Court has stated that "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce."  Republic of Argentina v. Weltover, Inc.,

504 U.S. 607, 614 (1992) (emphasis in original) (quotation marks omitted). The

principal inquiry is whether the "foreign government acts, not as regulator of a

market, but in the manner of a private player within it." Id. at 614. Therefore, "the

commercial activity exception applies when a sovereign 'exercises only those powers

that can also be exercised by private citizens, as distinct from those powers peculiar

to sovereigns.'" Ford Motor Co. v. Russian Federation, 2010 WL 2010867, at *3

(S.D.N.Y. May 18, 2010) (quoting Kato v. Ishihara, 360 F.3d 106, 111 (2d Cir.

2004)).

        In addition, to render the Partnership's assets subject to attachment, "the

property [must have been] used for the commercial activity upon which the claim is

based." 28 U.S.C. § 1610(a) (emphasis added). The Second Circuit and Supreme

Court have not directly addressed the meaning of "used for." However, the Fifth

Circuit has adopted an ordinary dictionary definition of "use for," meaning "to put

the property in the service of the commercial activity, to carry out the activity by

means of the property." Conn. Bank v. Republic of Congo, 309 F.3d 240, 254 (5th

Cir. 2002).

        There is no doubt that the Partnership engaged in the commercial

management of real property, in particular, the commercial building located at 650

Fifth Avenue. Indeed, that was its purpose for existence. While leasing may not

always constitute "commercial activity," courts have found leasing to be commercial

activity in many cases. See, e.g., De Letelier v. Republic of Chile, 748 F.2d 790, 796

(2d Cir. 1984) ("The Senate Report [accompanying the FSIA] contains examples of

commercial activities: 'Activities such as a foreign government's . . . leasing of property . . . .'" (quoting S. Rep. 94-1310, 94th Cong., 2d Sess., at 16 (1976)); <u>Ford Motor Co.</u>, 2010 WL 2010867, at *3 ("Plainly, leasing a motor vehicle is by nature a commercial activity that a private party can engage in.")  Additionally, the House Report accompanying the FSIA states that "a foreign government's . . . leasing of property . . . would be . . . included within the [statute's] definition." H.R. Rep. No. 94-1487, at 16 (1976).  The leasing of the Building by the Partnership is the type of actions by which a private party would engage in commerce; furthermore, this use of the Building, and particularly the profits derived from it, is central to plaintiffs' claims.  In short, the Partnership's extensive and well-documented leasing activities readily meet the FSIA's "commercial activity" requirement.

IX.    CONCLUSION

For the foregoing reasons, the Court finds that the Judgment Creditors have proven entitlement to attach and execute upon the Subject Properties under both § 201(a) of the Terrorism Risk Insurance Act and § 1610(b)(3) of the Foreign Sovereign Immunities Act. [81] The parties shall confer on an appropriate form of judgment and provide to the Court within one week.  Upon entry of judgment, the Clerk of Court shall terminate all open motions in the above-listed actions.

SO ORDERED.

Dated:      New York, New York
            June 29, 2017

_____
     KATHERINE B. FORREST
     United States District Judge

---

[81] While most Judgment Creditors have asserted claims as to all properties, one or more of them have only asserted as to the Partnership's property.  Details as to distribution shall be worked out through the administrative process that shall follow.

# APPENDIX A

| TURNOVER CASE | UNDERLYING CASE | JUDGMENT(S) | INITIAL PLEADING | OPERATIVE PLEADING | CLAIMS REMAINING |
|---|---|---|---|---|---|
| Rubin et al. v. Alavi Foundation, et al., No. 09-CV-165 (S.D.N.Y.) | No. 01-1655 (D.D.C.) | September 10, 2003; 28 U.S.C. § 1605A PX1000; PX1003; PX33 | Complaint filed on January 8, 2009 (ECF 1) | Amended Complaint (ECF 292) | TRIA; 28 U.S.C. § 1610(b) |
| Miller et al. v. Alavi Foundation, et al., No. 09-CV-166 (S.D.N.Y.) | No. 01-1655 (D.D.C.) | September 10, 2003; 28 U.S.C. § 1605A PX1000; PX1003; PX33 | Complaint filed on January 8, 2009 (ECF 1) | Amended Complaint (ECF 293) | TRIA; 28 U.S.C. § 1610(b) |
| Greenbaum et al. v. Assa Corp., et al., No. 09-CV-553 (S.D.N.Y.) | No. 02-2148 (D.D.C.) | August 10, 2006; 28 U.S.C. § 1605(a)(7); PX1011; PX1012 | Notice of Removal from N.Y. Supreme Court filed on January 20, 2009 (ECF 1); Removed Notice of Petition filed in N.Y. Supreme Court on December 24, 2008 | Third Amended Complaint (ECF 73) | TRIA |
| Greenbaum et al. v. Assa Corp. et al., No. 09-CV-564 (S.D.N.Y.) | No. 02-2148 (D.D.C.) | August 10, 2006; 28 U.S.C. § 1605(a)(7); PX1011; PX1012 | Notice of Removal from N.Y. Supreme Court filed on January 21, 2009 (ECF 1); Removed Notice of Petition filed in N.Y. Supreme Court on December 24, 2008 | Third Amended Complaint (ECF 57) | TRIA |
| Hegna et al. v. Islamic Republic of Iran, No. 18-MS-0302 (S.D.N.Y.) | No. 00-0716 (D.D.C.) | January 22, 2002; 28 U.S.C. § 1605(a)(7); HX1 April 29, 2010 28 U.S.C. § 1605A HX2 | Order to Show Cause filed on March 27, 2009 | Order to Show Cause filed on March 27, 2009; Amended Order to Show Cause (ECF 21 filed in 08-cv-10934) | TRIA; 28 U.S.C. § 1610(b) |
| Peterson v. 650 Fifth Avenue Co., et al., No. 10-CV-1627 (S.D.N.Y.) | No. 01-2094 (D.D.C.) | September 7, 2007; 28 U.S.C. § 1605(a)(7); PX1034 | Complaint filed on March 1, 2010 (ECF 1) | Second Amended Complaint (ECF 31) | TRIA |

| TURNOVER CASE | UNDERLYING CASE | JUDGMENT(S) | INITIAL PLEADING | OPERATIVE PLEADING | CLAIMS REMAINING |
|---|---|---|---|---|---|
| Acosta et al. v. Assa Corp. et al., No. 10-CV-2464 (S.D.N.Y.) | No. 06-745 (D.D.C.) | August 26, 2008; 28 U.S.C. § 1605A; PX1014; PX1015 | Complaint filed on March 18, 2010 (ECF 1) | Amended Complaint (ECF 35) | TRIA; 28 U.S.C. § 1610(b) |
| Heiser et al. v. 650 Fifth Avenue Co., et al., No. 13-MC-71 (S.D.N.Y.) | No. 00-2329 (D.D.C.) No. 01-2104 (D.D.C.) | December 22, 2006; 28 U.S.C. § 1605(a)(7); PX1006; PX1007<br><br>September 30, 2009; 28 U.S.C. § 1605A; PX1004; PX1005 | Petition for Turnover filed on February 27, 2013 (ECF 1) | Petition for Turnover (ECF 1) | TRIA; 28 U.S.C. § 1610(b) |
| Kirschenbaum, et al. v. Assa Corp., et al., No. 13-CV-1825 (S.D.N.Y.) | No. 03-1708 (D.D.C.)No. 08-1814 (D.D.C.) | August 26, 2008;28 U.S.C. § 1605(a)(7);PX1023; PX1025May 19, 2011;28 U.S.C. § 1605A;PX1024; PX1026 | Complaint filed on March 19, 2013 | Complaint (ECF 1) | TRIA; 28 U.S.C. § 1610(b) |
| Beer, et al. v. Assa Corp., et al., No. 13-CV-1848 (S.D.N.Y.) | No. 06-473 (D.D.C.);<br><br>No. 08-1807 (D.D.C.) | August 26, 2008; 28 U.S.C. § 1605(a)(7); PX1017; PX1019<br><br>May 19, 2011; 28 U.S.C. § 1605A; PX1018; PX1020 | Complaint filed on March 20, 2013 (ECF 1) | Complaint (ECF 1) | TRIA; 28 U.S.C. § 1610(b) |
| Havlish et al. v. Assa Corp. et al., No. 08-CV-10934 (S.D.N.Y.) | No. 03-9848 (S.D.N.Y.) | October 16, 2012; 28 U.S.C. § 1605A; PX1029; PX1030 | Intervenor Complaint filed on May 23, 2013 (ECF 501) | Amended Complaint (ECF 1001) | TRIA; 28 U.S.C. § 1610(b) |

# APPENDIX B

| First Name | Last Name | Entity | Title | Approx Beg. Year/Known Operating Dates | Admissible Support | Admitted | End Year[1] | Admissible Support | Admitted |
|---|---|---|---|---|---|---|---|---|---|
| Ali | Afshar | Alavi | Board Member | 2005 | DX 583<br>DX 5004 | Y<br>Y | 2006 | DX 608<br>DX 611<br>DX 5004 | Y<br>Y<br>Y |
| Fatemeh | Aghamiri | Assa Ltd. | Owner (50%) | 1995 | GX 78 | Y | N/A | GX 78 | Y |
| Hooshang | Ahmadi Javadi | Alavi | Board Member (President from 2009) | 1979 | GX 196<br>DX 5004 | Y<br>Y | 2013 | PX 1079<br>DX 5004 | Y<br>Y |
| Ali | Aliabadi | Alavi | Program Coordinator | 1980s–1992; 2004 | Safdkamal Direct Tr. 2671: 8-10 | Y | | | |
| Yaholiah | Alidoost | | Alavi's Attorney | 1979 | Shafia Direct Tr. 893: 18 - 897: 6 (as to title) | Y | 2008 (at least) | GX 2011 | Y |
| | | M.I.R.I. Holdings | Attorney | ~2000s | Modarres Dep. Tr. 83: 6-13 (Trial Tr. 6-20 insert p. 13) | Y | | | |
| Mahmoud | Asghari (also spelled Askari) | Mostazafan Foundation of NY | Head of MFNY's Tehran Office | 1991 | GX 602-T<br>Kiche Direct Tr. 2027: 4-9 | Y<br>Y | March 1995 (at the latest) | DX 553 | Y |
| Asadollah Amir | Aslani | Bank Melli | Managing Director | 1991 | GX 166-T | Y | 1995 | | |
| Seyed Mohammad | Athari | Iranian Embassy in Europe (unknown country) | Accountant | ~2006 | Modarres Dep. Tr. 260: 14-261: 4 (Trial Tr. 6-20 insert p. 37-38)<br>GX 16C | Y<br>Y | | | |
| Ahmadi | Azizi | Bank Melli | Managing Director of Melli Bank PLC London | | GX 146<br>Rahi Direct Tr. 78: 13-79: 3 (Bench trial) | Y<br>Y | | | |
| Mohammad | Badr Talab | Mostazafan Foundation of NY | Treasurer | 1983 | DX 512 | Y | 1988 | DX 526 | Y |
| | | | President | 1988 | DX 526 | Y | 1991 | GX 602-T<br>GX 119 | Y |
| Mohammad | Bagherian | Bonyad Mostazafan | Director | 1989 | GX 632-T | Y | | | |
| Mahdi | Bazargan | Islamic Republic of Iran | Prime Minister | 1979 | Shafia Direct Tr. 766: 13-22 | Y | 1979 | | |
| Mohammad Hossein | Balabafhar | Bank Melli | Director and International Vice President | 1989 | GX 210-T | Y | | | |
| | | Assa Ltd. | Director | 1989 | GX 425 | Y | 1990 | GX 1216 | Y |
| | | Harter Holdings (Owner of Assa Ltd. from 1989-99) | 49% Shareholder | 1989 | GX 425 | Y | 1993 | GX 78 | Y |
| Martyn | Chatoo | Alavi | Secretary | 1983 | Chatoo Direct Tr. 2763: 5-8<br>Chatoo Direct Tr. 2764: 2-7 | Y<br>Y | Current | Chatoo Direct Tr. 2763: 5-8 | Y |
| Frank | Cline | Alavi | Board Member | 1979 | GX 131 | Y | 1979 | GX 196 | Y |
| Ali | Dabiran | Alavi | Board Member | 2005 | DX 595<br>DX 5004 | Y<br>Y | 2013 | PX 1079<br>DX 5004 | Y<br>Y |
| Mohsen | Davachi | Mostazafan Foundation of NY | Board Member, Treasurer | 1979 | GX 196 | Y | 1983 | DX 512 | Y |
| Alireza | Ebrahimi | Alavi | Board Member, Treasurer | 1991 | GX 606<br>DX 5004 | Y<br>Y | 2013 | PX 1079<br>DX 5004 | Y<br>Y |
| Kazem Najafi | Elmi | Bank Melli Iran | Managing Director | 1989 | Karjoo Direct Tr. 1233: 2-8<br>GX 210-T | Y<br>Y | | | |
| George | Ennis | Federal Bureau of Investigation | Special Agent | 1991 | Ennis Direct Tr. 320: 7-8 | Y | Current | Ennis Direct Tr. 320: 5-6 | Y |
| Michael | Esposito | NYPD, Joint Terrorist Task Force | Detective | 1992 | Esposito Direct Tr. 171: 21-22 | Y | 2012 | Esposito Direct Tr. 171: 11-12 | Y |
| Mahdi | Faridzadeh | Iran Mission to the United Nations | Cultural Ambassador | 2007 | McWilliams Direct Tr. 1349: 3-5<br>GX 504-T | Y<br>Y | | | |
| Hamid | Firooznia | Mokul & Firooznia | Alavi Accountant | 1984 | GX 610 | Y | 2004 | DX 595 | Y |
| | | 650 Fifth Avenue Company Accountant | Accountant | 1990 | GX 165-T | Y | 2004 | DX 595 | Y |
| | | Assa Accountant | | 1990 | Karjoo Direct Tr. 1255: 4-9; 1291: 5-7 | Y | | | |
| Antoine Lavelle | Frazier | Federal Bureau of Investigation | Forensic Document Examiner, Question Documents Unit | 1998 | Frazier Direct Tr. 158: 20 - 159: 2 | Y | Current | Frazier Direct Tr. 158: 20 - 159: 2 | Y |
| Mohammad | Geramian | Alavi | President | 1991 | GX 606<br>DX 5004 | Y<br>Y | 2007 | DX 611<br>DX 613<br>DX 5004 | Y<br>Y<br>Y |
| Mohsen | Ghadimipour | Bank Melli | Head of Foreign Investment with Overseas Offices | 1992 | Rahi Direct Tr. 1063: 3-7<br>GX 445-T | Y<br>Y | | | |
| Ahmad | Goudarzi | Iranian Embassy in Europe (unknown country) | Accountant | ~2006 | Modarres Dep. Tr. 271: 2-10 (Trial Tr. 6-20 insert p. 40)<br>GX 16C | Y<br>Y | | | |

| First Name | Last Name | Entity | Title | Approx Beg. Year/Known Operating Dates | Admissible Support | Admitted | End Year[1] | Admissible Support | Admitted |
|---|---|---|---|---|---|---|---|---|---|
| Hassan | Hassani | Alavi | Board Member | 2005 | DX 595 / DX 5004 | Y / Y | 2013 | PX 1079 / DX 5004 | Y / Y |
| Seyed Mojtaba | Hosaini Kiche | Mostazafan Foundation of NY | Secretary/Director | 1983 | GX 197 / DX 511 | Y / Y | 1991 | GX 602 / GX 119 | Y / Y |
| [Unknown] | Hodavi | Iranian Revolutionary Court | Revolutionary Judge | ~1979 | Shafia Direct Tr. 773: 25 - 776: 7. | Y | | | |
| Mahdi | Hodjat | Alavi | Board Member | 1991 | GX 606 / DX 5004 | Y / Y | 2005 | DX 583 / DX 587 / GX 1410E-T / DX 5004 | Y / Y / Y / Y |
| Ali | Hossainabadi | Iranian Embassy in Europe (unknown country) | Accountant | ~2006 | Modarres Dep. Tr. 256: 20-257: 4 (Trial Tr. 6-20 insert p. 36) GX 16C | Y / Y | | | |
| Seyed Mohammad Hadi Nejad | Hosseinian | Iranian Mission to the United Nations | Ambassador | 1998 | Shafia Direct Tr. 792: 23-793: 1 / DX 5004 | Y / Y | 2002 | DX 5004 | Y |
| Farshid | Jahadi | Alavi | President | 2007 | DX 611 / DX 613 / DX 5004 | Y / Y / Y | Jan. 8, 2009 | DX 5004 | Y |
| Mohammad | Karjoosaravy | Bank Melli NY | Deputy Director/Director at Bank Melli NY | 1986 | Karjoo Direct Tr. 1154: 5-1155: 1 | Y | 1994 | Karjoo Direct Tr. 1150: 9-11 | Y |
| Mohsen | Kavakand | Bank Melli | Manager - BM London | | Karjoo Direct Tr. 1219: 1-6 (as to title) | Y | | | |
| | | Harter Holdings (Owner of Assa Ltd. From 1989-99) | 49% Shareholder | 1989 | GX 78 | | 1993 | GX 78 | Y |
| Faheem | Kazini | Islamic Education Center | Board of Directors | 2008 | Kazini Direct Tr. 2829: 7-10 | Y | Current | Kazini Direct Tr. 2827: 18-21 | Y |
| | Khajehpour | Bank Melli | Managing Director of the Special Inspection Team | ~1994 | GX 163-T / Karjoo Direct Tr. 1596: 15-22 | Y / Y | | | |
| Ali | Khamenei | Islamic Republic of Iran | Supreme Leader | 1989 | Kiche Direct Tr. 2020: 10-14 | Y | | | |
| Kamal | Kharrazi | Government of Iran | News Media | (before becoming Ambassador) | Shafia Direct Tr. 881: 22-882: 8 / Shafia Direct Tr. 765: 25-766: 12 | Y / Y | | | |
| | | Iranian Mission to the United Nations | Ambassador | 1989 | DX 5004 | Y | 1997 | DX 5004 | Y |
| Sadegh | Kharrazi | Iranian Mission to the United Nations | Cultural Representative | 1991 | Kiche Direct Tr. 2054: 21-25 | Y | | | |
| Mohammad | Khazaee | Iranian Mission to the United Nations | Ambassador | 2007 | GX 504-T / DX 5004 | Y / Y | 2014 | DX 5004 | Y |
| Eisa Shahsavar | Khojasteh | Bonyad Mostazafan | Assistant Director of Commerce and International Affairs | 1989 | GX 604-T | Y | | | |
| Ayatollah Ruhollah | Khomeini | Islamic Republic of Iran | Supreme Leader | 1979 | GX 76 / Shafia Direct Tr. 765: 14-15 | Y / Y | 1989 | | |
| Saeed Rajaee | Khorasani | Iranian Mission to the United Nations | Ambassador | Early 1980s | Shafia Cross Tr. 978: 11-979: 9 | Y | | | |
| Javad | Kosari | Iranian Embassy in Europe (unknown country) | Accountant | ~2006 | Modarres Dep. Tr. 262: 20-263: 4 (Trial Tr. 6-20 insert p. 39) GX 16C | Y / Y | | | |
| Peter | Livingston | Assa Corporation | Assa outside counsel | 1989 | GX 425 | Y | 2008 | GX 78 | Y |
| Mohammad Hossein | Mahallati | Alavi | Board Member, President | 1983 | DX 512 | Y | 1988 | DX 526 | Y |
| | | M.I.R.I. Holdings | Board Member | ~2000s | Modarres Dep. Tr. 72: 16-22 (Trial Tr. 6-20 insert p. 9) | Y | | | |
| | | Hanif Partnership | President | 2003 | GX 232-T | Y | | | |
| Tahmasb | Mazaheri | Bonyad Mostazafan | Deputy Prime Minister of Iran and Superintendent | 1987 | GX 623-T | Y | | | |
| | | Government of Iran | Budget Planning Commissioner; Minister of Finance | | Kiche Direct Tr. 1749: 8-1750: 2 | Y | | | |
| | | Central Bank of Iran | Head | ~2008 | Kiche Direct Tr. 1913: 14-15 | Y | | | |
| Dan | McWilliams | Internal Revenue Service, Criminal Investigation Division | Special Agent Attache | 1995 | McWilliams Direct Tr. 1304: 21-23 | Y | Current | McWilliams Direct Tr. 1304: 14-15 | Y |
| Ghafour | Mazarzadeh | Bank Melli | Director General, International Division | ~1993 | GX 141 | Y | 1996-97 | Rahi Cross Tr. 1139: 15-19 | Y |

| First Name | Last Name | Entity | Title | Approx Beg. Year/Known Operating Dates | Admissible Support | Admitted | End Year[1] | Admissible Support | Admitted |
|---|---|---|---|---|---|---|---|---|---|
| Abbas | Mirakhor | Alavi | Board Member, Treasurer | 1991 | GX 606 / Mirakhor Dep. Tr. 9: 5-7 (Trial Tr. 6-19 insert p. 2) / Mirakhor Dep. Tr. 56: 21-25 (Trial Tr. 6-19 insert p. 23) / DX 5004 | Y Y Y Y | 2005 | DX 583 / DX 587 / GX 1410E-T / Mirakhor Dep. Tr. 9: 5-7 (Trial Tr. 6-19 insert p. 2) / DX 5004 | Y Y Y Y Y |
| Hossain | Mirza | Alavi | Controller | 1990 | Safakamal Direct Tr. 2728: 12-13 / Chatoo Direct Tr. 2768: 25-2769:1 | Y Y | 2004 | Chatoo Direct Tr. 2768: 25-2769:1 | Y |
| Masoud | Modarres | M.I.R.I. Holdings | Board Member | ~1998 | Modarres Dep. Tr. 70: 25-71:10 (Trial Tr. 6-20 insert p. 8) | Y | (less than 5 years) | Modarres Dep. Tr. 70: 25 71:10 (Trial Tr. 6-20 insert p. 8) | Y |
|  |  | Mellon Properties | Manager | 2004 | Modarres Dep. Tr. 129: 20-27 (Trial Tr. 6-20 insert p. 27) | Y |  |  |  |
| Hadi | Mohajeri | Government of Iran | Assistant to Prime Minister Mousavi | 1987 | GX 623-T | Y | 1989 | GX 651-T | Y |
| Majid | Mourtahheb | The Pahlavi Foundation of New York | Board Member | 1974 | DX 150 | Y | 1979 | GX 129 | Y |
|  |  | The Pahlavi Foundation of Iran | Employee | 1979 | Shafie Direct Tr. 780: 16-19 | Y |  |  |  |
| Mir-Hossein | Mousavi | Government of Iran | Prime Minister | 1987 | GX 623-T | Y | 1989 | GX 643C-T | Y |
|  |  | Jomhouri Eslami | Editor | ~1983 | Shafie Direct Tr. 841: 4-11 / Shafie Direct Tr. 817: 23-819: 4 (as to year) | Y Y |  |  |  |
| Howard | Muchnick | Alavi | Attorney | ~1986 | GX 127 (as to title) | Y |  |  |  |
| Kathleen | Murphy | Jones, Lang, Lasalle | Employee and Manager of 650 Fifth Avenue building | 2008 | Murphy Direct Tr. 2390: 19-2391: 8 / Murphy Direct. Tr. 2391: 17-19 | Y Y | 2013 | Murphy Direct. Tr. 2391: 17-19 | Y |
| Siavash | Naghshineh | Assa Corporation | Director and President | 1990 | GX 425 | Y |  |  |  |
|  |  | Bank Melli | Director and Executive Vice President | 1990 | Karjoo Direct Tr. 1283: 18-21 / GX 164-T | Y Y |  |  |  |
| [Unknown] | Nourbakhsh | Central Bank of Iran | Governor | 1991 | Mirakhor Dep. Tr. 33: 3-6 (Trial Tr. 6-19 insert p. 10-11) / Mirakhor Dep. Tr. 29: 17-31: 6 (Trial Tr. 6-19 insert p. 9) | Y Y |  |  |  |
| Mahmood Karimi | Nouri | Bonyad Mostazafan | Supervisor | 1980 | GX 102-T | Y |  |  |  |
| Duross | O'Bryan | Resolution Partners Group | Partner | 2014 | O'Bryan Direct Tr. 2847: 7-11 | Y | Current | O'Bryan Direct Tr. 2847: 7-11 | Y |
| Mohammad Reza | Pahlavi | Government of Iran | Shah of Iran | 1941 |  |  | 1979 | GX 76 | Y |
|  |  | The Pahlavi Foundation | Founder | 1973 | GX 75 | Y |  |  |  |
| Lisa Marie | Palluconi | U.S. Department of the Treasury | Office of the Chief Counsel for Foreign Asset Control | 2012 | Palluconi Direct Tr. 285: 3-5 | Y | Current | Palluconi Direct Tr. 285: 1-2 | Y |
| Mohammad | Pirayandeh | Mostazafan Foundation of Iran | Employee, Cultural Section | 1983 | Kicha Direct Tr. 1732: 20 - 1733:2 | Y |  |  |  |
|  |  | Mostazafan Foundation of NY | Board Member, Vice President, Educational and Cultural Affairs | 1983 | DX 511 / DX 5004 | Y Y | 2005 | DX 583 / DX 587 / GX 1410E-T / DX 5004 | Y Y Y Y |
| Abdollah | Poosti | Mostazafan Foundation of NY | Board Member | 1983 | DX 511 | Y | 1983 | DX 513 | Y |
|  |  | Mostazafan Foundation of Iran | Deputy in Legal Affairs |  | Kicha Direct Tr. 1734: 10-12 | Y |  |  |  |
| Mohsen | Rafighdoost | Bonyad Mostazafan | Head | 1991 | GX 625-T | Y |  |  |  |
| Gholamreza | Rahi | Bank Melli | Overseas Network Supervisor Department Director | 1980 | Rahi Direct Tr. 1028: 15-19 | Y | 1993 | Rahi Direct Tr. 1053: 18-25 | Y |
| William | Rogers | The Pahlavi Foundation | Board Member | 1974 | DX 301 | Y | 1979 | GX 131 | Y |
| Reza | Sadr | Anjoman Islami | Member |  | Shafie Direct Tr. 784: 18-23 | Y |  |  |  |
|  |  | Government of Iran | Minister of Commerce | ~1979 | Shafie Direct Tr. 784: 18-23 | Y |  |  |  |
| Hanieh | Safakamal | Alavi | Bookkeeper/Program Coordinator | 1999 | Safakamal Direct Tr. 2658: 14-20 / Safakamal Direct Tr. 133: 6-8 (Bench trial) | Y Y | 2005 | Safakamal Direct Tr. 133: 6-8 (Bench trial) | Y |

| First Name | Last Name | Entity | Title | Approx Beg. Year/Known Operating Dates | Admissible Support | Admitted | End Year[1] | Admissible Support | Admitted |
|---|---|---|---|---|---|---|---|---|---|
| | | Alavi | Financial Manager | 2005 | Murphy Direct Tr. 2398: 12-15 / GX 2016 / Safakamal Direct Tr. 130: 19-20 (Bench trial) | Y / Y / Y | 2014 | Safakamal Direct Tr. 130: 19-20 (Bench trial) | Y |
| Manouchar | Salour | Alavi | Head of the Organization | 1979 | Shafie Direct Tr. 773: 2-14 | Y | | | |
| Nassar | Sayyah | The Pahlavi Foundation | Board Member | 1974 | DX 502 | Y | 1979 | GX 124 | Y |
| Vladollah | Saif | Bank Melli | Chairman and Managing Director | ~2004 | GX 145 (as to title) | Y | | | |
| Seyed Mohammad | Shafa'at | Assa Corporation | Secretary/Manager | 1990 | GX 425 | Y | | | |
| | | Al-Makasseb Company | Managing Director | ~1991 | GX 154-B-T / GX 168-T | Y / Y | | | |
| Manouchar | Shafie | Mostazafan Foundation of NY | President | 1979 | Shafie Direct, Tr. 760: 20 | Y | 1983 | Shafie Direct, Tr. 760: 22 | Y |
| Davood | Shakari | Assa Ltd. | Owner (50%) | 1995 | GX 76 | Y | N/A | GX 76 | Y |
| Jafar | Sharif-Emami | The Pahlavi Foundation | Board of Directors | 1974 | DX 502 | Y | 1979 | GX 131 | Y |
| Ali | Shayeshmaik | Iranian Embassy in Europe (unknown country) | Accountant or Employee | ~2006 | Modarres Dep. Tr. 268: 12-269: 6 (Trial Tr. 6-20 insert p. 39-40) | Y | | | |
| Seyyed Karim | Sobhani | Mostazafan Foundation | Head of International Affairs | 1991 | GX 625-T / Kicha Direct Tr. 2016: 9-16 | Y / Y | | | |
| Mohamed | Souri | The Pahlavi Foundation | Board of Directors | 1979 | GX 131 | Y | 1980 | DX 508 | Y |
| | | Government of Iran | Deputy Minister of Commerce | 1979 | Shafie Direct Tr. 791: 7-22. | Y | | | |
| Mahadi | Tabatabai | Mostazafan Foundation of Isfahan | Head | ~1980 | Kicha Direct Tr. 1712: 9 - 1713: 13 | Y | | | |
| | | Mostazafan Foundation of Iran | Head | 1981-1982 | Kicha Direct Tr. 1716: 16-24 | Y | | | |
| Mohsen | Tahatabaaipour | Bonyad Mostazafan | President | 1983 | Shafie Direct Tr. 844: 22 -845: 2 (as to title) | Y | 1984 | GX 610 | Y |
| | | Mostazafan Foundation of NY | Board Member | 1983 | DX 511 | Y | | | |
| Sirousse | Tabrintchi | Mostazafan Foundation of NY | Executive Vice President | 1983 | DX 511 / Shafie Direct Tr. 843: 3 -7 | Y / Y | 1983 | | |
| Mohammad Hassan Dehghani | Tafti | Assa Corporation | President | 1996 | GX 76 | Y | 2008 | GX 76 | Y |
| Marc | Van Driessche | U.S. Internal Revenue Service | Special Agent in the Criminal Investigation Division | 2008 | Van Driessche Direct Tr. 2449: 5- 8 / Van Driessche Cross Tr. 2306: 16-17 | Y | Current | | |
| Allison | Van Dyk | Temple of Understanding | Chairman of the Board and Executive Director | 1960 | Van Dyk Direct Tr. 2490: 25-2491: 3 / Van Dyk Direct Tr. 2491: 7-13 | Y / Y | Current | Van Dyk Direct Tr. 2490: 25-2491: 3 | Y |
| George | Winsewther | Federal Bureau of Investigation | Supervisory Investigative Specialist | 2008 | Winsewther Direct Tr. 131: 9 - 132: 14 | Y | ~2010 | Winsewther Direct Tr. 130: 8 - 131:16 | Y |
| John | Winter | Patterson, Belknap, Webb & Tyler LLP | Attorney | | DX 761 | Y | | | |
| Ibrahim | Yazdi | Anjoman Islami | Leader | Mid 1970s | Shafie Direct Tr. 764: 10-22 | Y | | | |
| | | Government of Iran | Deputy Prime Minister | ~1979 | Shafie Direct Tr. 765: 20-24 | Y | | | |
| Mohammad Javad | Zarif | Iranian Mission to the United Nations | Ambassador | 2002 | Shafie Direct Tr. 905: 22-23 (as to title) / DX 5004 | Y / Y | 2007 | DX 5004 | Y |
| Tabar | Ziai | The Pahlavi Foundation | Board Member | 1974 | DX 150 | Y | 1979 | GX 131 | Y |
| Habib | Zobaidi Om-Jaridah | Mostazafan Foundation of NY | Board Member | 1984 | GX 610 | Y | 1991 | GX 205 | Y |
| | | Mostazafan Foundation of NY | Vice President/Treasurer | 1988 | DX 526 | Y | 1991 | GX 205 | Y |
| | | Bonyad Mostazafan | Deputy of Finance Affairs | 1984 | Kicha Direct Tr. 1742: 3-5 | Y | | | |

[1] Lack of date in this column does not imply that the individual remains in the indicated position.